IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY, | ) | Case No. 04-11300 (_____) |
| | ) | |
| Debtor. | ) | |

## AFFIDAVIT OF DAVID J. GORDON
## IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | ) ss.: |
| COUNTY OF SAN FRANCISCO | ) |

DAVID J. GORDON, being duly sworn, deposes and states:

1.    I am the President and Chief Executive Officer of The Flintkote Company (the "Debtor" or the "Company"). Previously, I served as the Debtor's Vice President and Assistant Secretary (from July 17, 2000 to August 5, 2002) and later as Senior Vice President and Secretary (from August 5, 2003 to December 31, 2003). In addition, I have served as a member of the Board of Directors of the Company since 2001. Based on my various roles with the Company, I am familiar with the Debtor's operations, business affairs and books and records.

2.    I submit this Affidavit in support of the "first day" motions and applications described further below (each, a "First Day Motion" or "Motion" and collectively, the "First Day Motions" or "Motions"). Except as otherwise indicated, all facts and statements set forth herein are based upon my personal experience and knowledge of the Debtor's operations and financial conditions, upon information supplied to me by other members of the Debtor's management, or upon my review of relevant documents. If I were called to testify, I

could and would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

3. Part I of this Affidavit describes the Debtor's business and the developments that led to the filing of this Chapter 11 Case. Part II sets forth the relevant facts in support of certain First Day Motions filed concurrently herewith, which the Debtor seeks to have heard as soon as possible after the commencement of this case. Part III sets forth the remaining First Day Motions filed concurrently herewith, which the Debtor does not seek to have heard at the "first day" hearing, but for which the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that an official creditors' committee appointed in this case may be heard with respect to such Motions. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the relevant First Day Motions.

## I.

## Background and Status of Debtor's Case

**B. Overview**

4. The Debtor is currently a defendant in over 155,000 asbestos-related personal injury claims, asserted by plaintiffs seeking damages for personal injuries allegedly caused by exposure to asbestos-containing products manufactured or distributed by the Debtor. As discussed below, the Debtor stopped its manufacturing and distribution operations in the mid-1980's. Since then, the Debtor has focused its business primarily on two areas: (i) managing and resolving its asbestos-related and environmental liabilities and (ii) increasing the value of its assets through realization of insurance coverage through negotiation, litigation and prudent

investment of financial assets, all with the objective of maximizing assets available to satisfy such liabilities. For the past 17 years, the Debtor has worked diligently to achieve these goals. However, given the dramatic increase of asbestos-related personal injury claims being asserted against the Debtor in recent years, and the impact of those claims on the Debtor's remaining assets, it has become apparent that the Debtor cannot hope to fairly and equitably address both its existing and future asbestos-related liabilities outside of bankruptcy.

5.     On May 1, 2004 (the "Petition Date"), the Debtor intends to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")(the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

6.     The Debtor's primary goal in filing this Chapter 11 Case is to confirm a plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a trust mechanism to address both current and future asbestos-related personal injury claims against the Debtor and provide a means by which to realize upon the value of the Debtor's assets for the benefit of such claimants, so that current asbestos claims and future demands that involve similar claims are treated in a fair and equitable manner.

## C.     Background Concerning the Debtor's Business

7.     The Debtor, a Delaware corporation, traces its origin to the Flintkote Manufacturing Company ("FMC"), which was founded in 1901. In 1912, the Debtor was incorporated in Massachusetts as a separate company from FMC, and was later incorporated in Delaware following a merger with another entity.

8.     From the time it commenced its independent operations in 1912 until around 1987, the Debtor was primarily engaged in the manufacture, processing and distribution of building materials. The materials were sold throughout the United States. As its mainstay product line, the Debtor manufactured roofing and insulation for use in commercial and residential construction. However, during the 1940's, the Debtor began to manufacture asphalt and plastic flooring materials. The Company later expanded its operations to the processing of limestone, aggregates, redi-mix concrete, cement, pre-fabricated chimneys, wallboard and water pipe. By the beginning of the 1980's, the Debtor's main business activities were grouped into four divisions: Building Products (including roofing and insulation, gypsum, and flooring products), Cement Products, Lime Products and Stone Products. Certain of the products manufactured, processed or distributed by the Debtor contained asbestos.

9.     In the early-1980's, the Debtor stopped manufacturing and selling asbestos containing materials. The Debtor ceased all of its remaining operations by 1987, when it disposed of the Building, Cement, Lime and Stone products divisions to various third parties through the sale or other disposition of its remaining divisions and operations.

10.     Although it ceased its manufacturing, processing and distribution operations, the Debtor has remained active. Since 1987, the Debtor has been engaged in complex claim resolution, litigation and insurance activities related to paying liabilities arising from its prior operations. The Debtor has focused its efforts on managing its asbestos-related liabilities (by way of litigation defense or settlement) and maximizing the value of its assets. This has proven to be a substantial undertaking, particularly given the rapidly escalating volume of asbestos related claims in recent years.

11.    Since 1987, the Debtor has paid in excess of $630 million in the defense and settlement of over 350,000 asbestos-related and environmental claims. During that same time period, it has generated cash in excess of $670 million, resulting primarily from the collection of insurance receivables, commutations of insurance policies and settlements with insurers, and investment income. Most recently, for the twelve month period ending March 31, 2004, the Debtor paid approximately $150 million for defense and settlement of asbestos-related claims and generated insurance receipts and investment income of approximately $125 million.

12.    Despite the voluminous and complex nature of its business, the Debtor has effectively and efficiently operated using a handful of employees and outside professionals. In conjunction with the sale of its manufacturing and distribution operations in 1987, the Debtor decided to employ a small staff and rely upon a team of outside professionals and consultants to assist the Debtor in managing its liabilities (including its asbestos-related liabilities) and its assets. I believe that this approach has resulted in significant cost savings to the Debtor over time (by, among other things, reducing the Debtor's fixed costs for employee salaries and benefits and permitting the Debtor to retain the most highly qualified employees and professionals) and has avoided the duplication of efforts between the employees and outside professionals.

13.    The Debtor currently employs seven (7) salaried employees, each of whom plays a vital role in processing and resolving asbestos claims, collecting from insurers, realizing maximum insurance coverage and managing the Company's assets and liabilities. The Debtor also utilizes several outside professionals and consultants (each of whom has a long-standing relationship with the Company) to assist it in defending against the myriad of asbestos

claims and related lawsuits filed against it and litigating and negotiating with insurers. Among these professionals is the law firm of Frantz Ward LLP ("Frantz Ward"), which serves as the Debtor's primary outside counsel in connection with all asbestos personal injury litigation against the Debtor, and Nossaman Guthner Knox & Elliott LLP ("Nossaman Guthner"), which represents the Debtor in connection with the Pru-Re Litigation (as defined below) involving a material insurance coverage and collection dispute. The Debtor has filed separate applications to retain each of Frantz Ward and Nossaman Guthner as special counsel to the Debtor, as more particularly described below. These employees and professionals are critical to the Debtor's ability to confirm a plan of reorganization under §§ 524(g) and 1129 of the Bankruptcy Code and maximize the value of its assets during this Chapter 11 Case.

## D. Description of Debtor's Financial Structure and Assets

14. As of March 31, 2004, the Debtor's financial statements report assets of approximately $160 million and liabilities of approximately $70 million (which does not reflect contingent asbestos liability). The financial statements do not reflect the remaining aggregate policy limits available to pay asbestos-related personal injury claims, which total several hundred million dollars (which includes approximately $95 million arising from a settlement with an insurer which currently is held in trust). The liabilities set forth on the financial statement relate primarily to settlement installments payable and provisions for minimum asbestos claims costs. The Debtor is not a party to any secured financing arrangements, and it does not presently intend to secure debtor-in-possession financing in this Chapter 11 Case.

15. The Debtor is the wholly-owned subsidiary of The Flintkote Trust (the "Trust"), which holds all of the stock of the Debtor in trust for the sole benefit of Long Beach

Memorial Medical Center. The Trust was established by the Debtor's former parent company, Genstar Pacific Company, on September 29, 2003. I am the sole trustee of the Trust.

16.     The Debtor's assets consist primarily of insurance assets, investments and cash on hand, stock in its wholly-owned Canadian subsidiary, Flintkote Mines Limited, and potential causes of action against third parties. The Debtor is the named insured under various policies covering all manner of liabilities, including, without limitation, liability for asbestos-related personal injury. Although the Debtor estimates that the remaining aggregate policy limits available to pay asbestos-related personal injury claims total several hundred million dollars, the Debtor's ability to realize upon the full value of such policies is subject to any number of factors, including, without limitation, the solvency of the insurers and the outcome of coverage disputes. Certain of the Debtor's insurers are subject to insolvency proceedings. The Debtor is actively pursuing claims against such insurers. Additionally, the Debtor is pressing what it believes are highly meritorious claims for substantial insurance coverage and collections against certain insurers including MMIC Litigation, which is described below.

17.     As further described below, the Debtor has approximately $43 million in cash and marketable securities as of the Petition Date, which are maintained, in part, in a general operating account with Wachovia Bank, National Association ("Wachovia") and a payroll account at Wells Fargo Bank, N.A. and is otherwise invested in overnight and short-term commercial paper managed by Wachovia and certain medium-term investment portfolios managed by Credit Suisse First Boston and Alliance Bernstein.

18.     Additionally, the Debtor owns all of the stock of Flintkote Mines Limited. Flintkote Mines Limited is a Canadian corporation located in Montreal, Quebec, Canada. It has

no operations but does manage assets consisting of various investments totaling approximately US $5 million (CAD $7 million). Asbestos personal injury claims have been asserted against Flintkote Mines Limited.

### E.    Description of Debtor's Liabilities

19.    The Debtor's most significant liability is the numerous current claims, and projected future demands, of plaintiffs seeking damages for asbestos-related personal injury. The Debtor's other pre-petition liabilities are relatively small in amount. As of the Petition Date, the Debtor was current on its trade payables to vendors and the rent due to its landlord under its lease of office space in San Francisco. I believe that the aggregate amount of accrued trade payables as of the Petition Date is less than $75,000.

20.    The Debtor has been named on occasion as a defendant in certain actions filed by plaintiffs seeking damages for asbestos-related property damage and environmental liability purportedly caused by the Debtor's products or prior operations. As of May 1, 2004, however, there exist only three (3) asbestos-property damage lawsuits and two (2) environmental actions pending against the Debtor. Some of these actions have been pending for years, and all are in various stages of litigation. I believe there is adequate insurance for the disposition of known environmental and asbestos property damage claims.

### F.    Events Precipitating This Chapter 11 Filing

21.    The Debtor has been forced to file for chapter 11 protection because of a growing number of asbestos-related lawsuits wherein the plaintiffs claim to have suffered personal injury due to asbestos-containing products manufactured, processed or sold by the Debtor. The first wave of asbestos-related lawsuits hit the Debtor in the mid-1970's. Since that

time, the number of claims (and the incremental cost to resolve such claims through settlement or litigation) has increased dramatically, with particularly large increases in the last five years. For example, in 1999, approximately 25,000 new claims were asserted against the Debtor. For the year ended December 31, 2003, approximately 44,000 new claims were asserted against the Debtor, representing an increase in claims of 76 % over 1999. In 1999, the Debtor paid approximately $57 million in asbestos personal injury claims and related defense costs. In 2003, the Debtor paid more than $127 million in claims and defense costs.

22.     The increase of litigation has been due to a number of factors, including the filing of chapter 11 petitions by numerous other parties alleged to be potentially responsible for the injuries suffered by asbestos plaintiffs. Many of these debtor parties are co-defendants with the Debtor in numerous lawsuits. The resulting stay of litigation against such parties has placed increased financial pressure on the Debtor, in the form of higher settlement demands from plaintiffs.

23.     The cost to defend against this litigation is overwhelming. For the twelve month period ending March 31, 2004, the Debtor spent approximately $12.5 million per month, on average, on primarily asbestos personal injury settlements and defense costs. Recently, recoveries from insurers have failed to keep up with such costs. The magnitude of this litigation has left the Debtor with no realistic alternative but to seek protection under chapter 11 of the Bankruptcy Code.

## II.

### First Day Motions and Applications

24. I believe that a critical and necessary element of the Debtor's efforts at reorganization is the approval of the First Day Motions submitted concurrently herewith. The factual background and support for each of these first day pleadings is provided below.

### Case Administration

**A. Motion Of The Debtor For An Order Approving Litigation Claimant Notice Procedures**

25. By this motion, the Debtor seeks approval of a procedure for sending all notices, mailings and other communications related to this Chapter 11 Case to tens of thousands of asbestos-related personal injury claims ("Asbestos PI Claims") in care of their counsel of record at such counsel's address.

26. To date, approximately 155,000 Asbestos PI Claims are pending against the Debtor. Such Claims have historically been processed by the Debtor's outside litigation counsel, the law firm of Frantz Ward, which maintains an extensive claims litigation database containing the names and addresses of the respective counsel for the Asbestos PI Claimants, rather than the names and addresses of each Asbestos PI Claimant. As a result, the Debtor has information only with respect to the counsel of record of each Asbestos PI Claimant. To date, all communication regarding the asbestos claims and the various pending lawsuits has been through and with such counsel of record. It would be a costly and a time-consuming exercise to attempt to ascertain the addresses of the Asbestos PI Claimants. Nor is it clear that the Debtor or Frantz Ward, in searching their respective files, would be able to identify current addresses for each of

the Asbestos PI Claimants. To provide notice to each Asbestos PI Claimant (as opposed to their counsel) could result in mass confusion on the part of such claimants, because the Debtor has never communicated directly with them in the past.

27. The Debtor asks this Court to approve a procedure for sending all notices, mailings and other communications related to this Chapter 11 Case to the Asbestos PI Claimants in care of their counsel of record at such counsel's address (the "Litigation Claimant Notice Procedures"). The Litigation Claimant Notice Procedures will ease the Debtor's administrative burden of sending notices to the more than 155,000 Asbestos PI Claimants, thereby resulting in a more cost-efficient notice procedure and a direct benefit to the Debtor, its estate and creditors.

**B. Application Of Debtor For An Order Under 28 U.S.C. § 156(C) Appointing Garden City Group, Inc. As Notice, Claims and Balloting Agent For The Court**

28. By this Application, the Debtor seeks to retain Garden City Group, Inc. ("GCG") as its notice, claims and balloting agent in this Chapter 11 Case. I have reviewed and been involved in the negotiation of the terms of GCG's engagement. A true and complete copy of the fully-executed engagement letter with GCG is attached as Exhibit B to the Application. I am advised that GCG is one of the country's leading noticing agents, with substantial expertise in the matters upon which it is to be engaged. I believe that the Debtor, its estate and creditors would benefit greatly from the services of GCG, given the large number of claims in this case.

**C.**     **Motion Of Debtor For An Order Authorizing
Debtor To Pay Pre-Petition Salaries And Employee Benefits**

        29.     Each of the Debtor's seven (7) salaried employees (collectively, the

"Employees") plays a vital role in processing asbestos claims, collecting from insurers, and

managing the Company's assets. These Employees perform a myriad of tasks in an economical

and efficient manner, including, among others: managing the Debtor's financial investment

portfolio; performing a variety of accounting functions (such as processing transactions,

maintaining records, preparing financial statements, reports, forecasts and financial plans);

reporting on and analyzing specialized insurance coverage projects; providing litigation support

(including document review and production); and performing the Debtor's corporate and

administrative functions. In addition, members of the Senior Management, in particular, play a

key role in negotiating with the Debtor's various insurers over coverage issues and pursuing

coverage disputes (such as in the Pru-Re Litigation, described herein). The long-term,

institutional knowledge and company specific skills of the Employees with respect to these and

other tasks is critical to the Debtor's ability to successfully navigate this Chapter 11 Case.

        30.     By this motion, the Debtor seeks an order authorizing, but not requiring,

the Debtor to pay and honor its pre-petition obligations with respect to the Employee Salaries,

Reimbursable Business Expenses and the Employee Benefit Programs (together, the "Employee

Salaries and Benefits"). I believe that it is essential for the Debtor to honor and pay any pre-

petition Employee Salaries and Benefits in the ordinary course of business, in order to maintain

Employee morale and each Employee's continued dedication to the significant task at hand and

to avoid the disruption of service. Without these Employees, I believe the Debtor cannot successfully accomplish its goal of maximizing the value of its assets for the benefit of its creditors and confirming a plan of reorganization in this Chapter 11 Case.

        (i)    <u>Employee Salaries and Reimbursable Business Expenses</u>

      31.    The Employees are paid twice a month from the Debtor's payroll account (the "<u>Payroll Account</u>") at Wells Fargo Bank ("<u>Wells Fargo</u>"). The total semi-monthly payroll is approximately $40,000. Prior to the Petition Date, the Employees were paid their respective salaries earned through April 30, 2004 through direct deposit. Given that the bankruptcy petition was filed the very next day, I do not believe that the Debtor owes any pre-petition Employee Salaries.

      32.    Furthermore, some of the Employees incur travel and transportation expenses which are reimbursable per Company policy (the "<u>Reimbursable Business Expenses</u>"). These Reimbursable Business Expenses typically are paid by the Debtor on a rolling basis as processed. As of the Petition Date, I believe that less than $10,000 was owed on account of Reimbursable Business Expenses.

        (ii)    <u>Payroll Tax Withholdings</u>

      33.    In the ordinary course of its business, the Debtor instructs Wells Fargo, as the administrator of the Payroll Account, to withhold and remit certain payroll taxes (such as income, FICA and Medicare taxes) from the Employees' paychecks to the appropriate taxing authorities.

(iii)     Vacation, Sick Leave and Other Paid Time Off

34.     The Debtor provides its Employees with benefits under various Employee Benefit Programs.  Among other benefits, the Employees accrue paid vacation leave on a semi-monthly basis and are permitted to take paid vacation each year.  The Employees must use all of their accrued vacation in the year in which it accrues, or lose it.  Thus, the Employees may have accrued vacation from January 1, 2004 through the Petition Date.  In addition to vacation, the Employees are entitled to certain holiday pay, sick leave pay for six (6) days per year, and one (1) floating holiday/personal day.

(iv)     Retirement Benefit Plans

35.     Depending upon their respective salary structure, certain Employees are eligible to participate in either (i) a 401(k) profit sharing plan (the "401(k) Plan") or (ii) an alternative retirement program (the "Alternative Program," together with the 401(k) Plan, the "Retirement Benefit Plans").  I do not believe that the Debtor owes any contributions or amounts under the Retirement Benefit Plans as of the Petition Date.

(v)     Workers' Compensation

36.     The Debtor maintains a workers' compensation policy to cover Employees' injury claims arising from or relating to their respective employment with the Debtor.  The policy coverage is not subject to a per occurrence deductible.  The Debtor is not aware of any outstanding claims under the workers' compensation policy as of the Petition Date.

(vi)     Medical and Insurance Benefits

37.     The Debtor offers to its Employees various medical, life, accidental death and dismemberment, and long-term disability insurance coverage (the "Group Plan").  The

Debtor pays all premiums for the Group Plan in advance, on a quarterly basis. Additionally, the Debtor also pays the premiums on separate medical and life coverage for certain Employees not otherwise eligible for the Group Plan. I believe that all pre-petition premiums due under these Plans were paid as of the Petition Date.

**D.      Motion Of Debtor For An Order (A) Authorizing Use Of
         Pre-Petition Accounts and Cash Management System and
         (B) Waiving Requirements of 11 U.S.C. § 345 On An Interim and Final Basis**

38.      By this motion, the Debtor seeks (i) authority to maintain and use its Pre-Petition Account and existing Cash Management System and (ii) a waiver of the investment and deposit guidelines set forth in § 345(b) of the Bankruptcy Code on an interim and final basis. For the reasons described below, I believe that granting the relief requested in the motion is in the best interest of the Debtor, its estate and creditors.

(i)      Description of the Cash Management System

39.      The Cash Management System (or the "System") provides the Debtor with the ability to control receipts and disbursements to ensure maximum availability of funds, to reduce the costs and administrative expenses inherent in moving and tracking such funds and to earn income on funds not immediately necessary to meet the Debtor's obligations. The Debtor is accustomed to using the Cash Management System on a daily basis. Continuing the Cash Management System will ease the administrative burdens imposed on the Debtor and will result in greater efficiency for the benefit of the estate.

40.      The System consists of two bank accounts: an operating account at Wachovia Bank (the "Operating Account") and the Payroll Account at Wells Fargo (collectively, the "Pre-Petition Accounts" or "Accounts"). These Accounts are integrally tied to the Debtor's

investment practices, which consists primarily of three separate investment portfolios (the "Investment Portfolios").

41.     Any funds received by the Debtor, including funds received from insurers, are deposited into the operating account at Wachovia Bank . The deposited funds are used (i) to pay the Debtor's current operating expenses, as well other liabilities of the Debtor, such as payroll and professional fees and (ii) to make investment purchases, as described below. Prior to the Petition Date, the Debtor also paid asbestos-related settlements from funds held in the Operating Account.

42.     Once a month, the Debtor transfers funds from the Operating Account to the Payroll Account in an amount sufficient to fund approximately three pay periods. Disbursements from the Payroll Account are made by direct deposit into each Employee's bank account. Wells Fargo automatically withholds taxes and Employee-specified 401(k) contributions, as well as any other amounts as directed by the Employees or the Debtor. Wells Fargo remits such withheld funds to the appropriate taxing authorities and forwards Employee contributions along with the Debtor's matching contribution to its 401(k) manager, Fidelity Investments.

43.     The Debtor proposes to keep in place all Pre-Petition Accounts, which would remain open, but would be designated as "Debtor-in-Possession" accounts. The Debtor will work closely with Wachovia and Wells Fargo to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. Going forward, the Debtor will maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be

documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date. Finally, to minimize expenses, the Debtor requests that it be authorized to continue to use all remaining checks and other business forms without reference to the Debtor's status as debtor in possession, until the same are exhausted.

(ii)     Description of Investment Practices

44.     In addition to maintaining the Cash Management System, I believe that it is in the best interest of the Debtor's estate and creditors that the Court waive the strictures of § 345(b) of the Bankruptcy Code. The Debtor maintains predictable investments with financial institutions with Moody's Rating of "A1" or better and employs a careful strategy for investing its assets. True and complete copies of the investment guidelines for each of the CSAM Portfolio and the Alliance Bernstein Portfolio (as such terms are defined below) are attached as Exhibit B and Exhibit C, respectively, to the motion. This investment program has yielded significant returns for the Debtor to date. The Debtor does not believe that liquidating its investments in order to comply with § 345(b) of the Bankruptcy Code will provide more certainty or a greater return on its investment. The Debtor therefore requests that the Court waive the requirement of § 345(b).

45.     At the end of each business day, Wachovia, by and through Wachovia Capital Management ("WCM"), automatically invests funds from the Operating Account in excess of $70,000, in Wachovia commercial paper that matures the following business day (the "Sweep Investment"). As of the Petition Date, approximately $7 million of operating funds were invested in the Sweep Investment. To the extent that funds in the Sweep Investment exceed anticipated near term cash requirements, the Debtor invests such funds in the Short-Term

Investment Portfolio managed by WCM, which has authority to invest in commercial paper, bankers' acceptances and certificates of deposit with terms up to 180 days.

46. Based on its liquidity needs, the Debtor also allocates certain funds in the Operating Account to the Investment Portfolios managed by Credit Suisse Asset Management ("CSAM") and Alliance Bernstein. As of the Petition Date, the CSAM Portfolio contained securities with a market value of approximately $27 million, and the Alliance Bernstein Portfolio contained securities with a market value of approximately $9 million. The investment guidelines followed by each of CSAM and Alliance Bernstein are described in detail in the cash management motion. Both of the Debtor's investment portfolios have overall investment grade credit ratings. I believe that WCM, CSAM and Alliance Bernstein and are well-regarded investing institutions that will continue to maintain prudent investment decisions throughout this Chapter 11 Case.

### III.

### Other First Day Motions

47. Described below are the remaining First Day Motions filed concurrently herewith. The Debtor does not seek to have these remaining First Day Motions heard at the "first day" hearing. Rather, the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that the official creditors' committee appointed in this case may be heard with respect to such Motions.

<u>Employee Retention and Severance</u>

**A. Debtor's Motion For Order Pursuant To 11 U.S.C. §§ 363 And 365(a) Authorizing (1) Implementation Of Retention And Severance Program; (2) Assumption Of Employment Agreements With Senior Management; And (3) Assumption Of Indemnification Agreement With Outside Director**

48.     The Debtor seeks authority of this Court to implement a Retention and Severance Program for its Employees and to assume the pre-petition Employment Agreements between the Debtor and its senior management and the pre-petition Indemnification Agreement with Jack West (the only non-employee member of the Debtor's Board of Directors).

(i)     <u>Implementation of the Retention and Severance Program</u>

49.     For the past 17 years, the Debtor and its Employees have focused their efforts primarily on managing and resolving the Company's considerable asbestos-related liabilities and increasing the value of its assets. The Employees understand that the Debtor intends to confirm a plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a trust mechanism to process and pay asbestos-related personal injury claims and provide a means to realize upon the value of the Debtor's assets. Although it is possible that the Trust may want the Debtor and its existing Employees to assist in its administration of the Trust assets and asbestos claims, the Employees are aware that they may lose their jobs after the plan is confirmed and the trust is established. The Retention and Severance Program outlined in the motion is intended to provide some measure of security and certainty to these Employees so that they will continue to provide their services to the Debtor during this Chapter 11 Case. I believe that the Retention and Severance Program will accomplish that goal and thereby will benefit the Debtor and its estate and creditors.

50.     The bankruptcy filing has created concerns among the Debtor's Employees regarding their future employment prospects. The Employees (including the members of Senior Management) are foregoing other employment opportunities by continuing to work for the Debtor. Also, many, if not all, of the Employees have undertaken significant additional duties in order to comply with the operating guidelines and disclosure requirements of the Bankruptcy Code and Rules.

51.     Historically, the Debtor has paid annual bonuses to its employees, with the amount of such bonuses fixed by the Board of Directors in its discretion. For example, in years past, the Board has tied the bonuses to the Debtor's performance in reducing payments to claimants or increasing its asset base through investment management, commutations of policies and settlements with insurers. However, because of the nature of the Debtor's operations post-petition, it is difficult to base the amount of such bonuses on any meaningful and objective financial targets. As a part of its bankruptcy, I believe that it is appropriate for the Debtor to discontinue its practice of paying "discretionary" bonuses at year end and instead implement a retention program aimed at encouraging the Employees to stay through the effective date of a plan of reorganization.

52.     In addition to the annual bonus, the Debtor offered a modified severance policy to its Employees prior to the Petition Date. The Debtor wishes to continue to offer this reduced severance to its Employees in the amount set forth in the motion. Historically, the amount of the pre-petition severance varied for each Employee, but it was primarily based upon the Employee's position within the Company and/or years of service. In contemplation of this Chapter 11 Case, the Debtor has reduced the amount of the severance being offered to each

Employee from the historical levels and built that reduction into the proposed retention payments for each Employee. I believe that the proposed retention payments, together with a reduced post-petition severance, will more effectively encourage the Employees to stay with the Company through this Chapter 11 Case, than would the prospect of a larger, one-time severance payment. Although the Employees understand that the proposed Retention and Severance Program is subject to Court approval, I believe that this program already has enhanced Employee morale and staved off, at least temporarily, the Employees from pursuing other job opportunities. I am concerned that the Employees will seek other jobs if the proposed Retention and Severance Program is not approved.

53. With respect to the Senior Management, the proposed retention payments and severance (as set forth in the motion) is the product of arms' length negotiation between the Debtor and each member of the Senior Management. Eric Bower has signed an affidavit, which is filed concurrently herewith, stating that my proposed retention payments and severance is the product of arms' length negotiation between the Debtor and me. For the other Employees, the Debtor fixed the proposed retention and severance payments based upon their years of service and position within the Company.

54. Based upon my review of the analysis performed by AON Corporation with respect to the proposed compensation (including retention and severance) for the Senior Management, and my personal business experience, I believe the terms of the proposed Retention and Severance Program are comparable to the incentive programs offered by comparable insurance companies and claim paying organizations.

(ii)     Assumption of Employment Agreements and Indemnification Agreement

55.     The Debtor also seeks to assume the pre-petition Employment Agreements between the Debtor and its Senior Management and the Indemnification Agreement with Director Jack West.  These Agreements are the product of arms' length negotiation between the Debtor and each member of the Senior Management.  The Board of Directors has reviewed and approved the terms and conditions of the Employment Agreements pursuant to a vote of the applicable disinterested Directors.  The Board of Directors also has reviewed and approved the terms of the Indemnification Agreement.  A true and complete copy of each Employment Agreement and the Indemnification Agreement is attached as Exhibits D through G, respectively, to the motion.

56.     I believe that the terms of each of the Employment Agreements and the Indemnification Agreement are fair and reasonable and will benefit the Debtor and its estate by allowing the Debtor to retain its Senior Management and maintain the current composition of its Board of Directors.  Under the terms of the Employment Agreements and the Indemnification Agreement, the Debtor has agreed to indemnify its Senior Management and Directors, as applicable, for their post-petition conduct.

## Professional Retention and Compensation

A.     **Motion Of Debtor For An Order Authorizing The Appointment Of A Futures Representative**

57.     The Debtor seeks authority to appoint a Futures Representative to represent the interests of Future Claimants in this Chapter 11 Case.  As part of this Chapter 11 Case, the Debtor hopes to confirm a plan of reorganization establishing a trust under § 524(g) of

the Bankruptcy Code, in order to deal with its current and future asbestos liability. Although the Debtor expects to negotiate the terms of such plan with the major constituencies in this case, including any official committee of creditors, the Debtor proposes that the interest of future asbestos claimants (who do not presently have claims pending) be represented by a Futures Representative.

58.     One of the key elements of any plan of reorganization proposed by the Debtor in this case will be a establishing a trust pursuant to which all current and future asbestos-related claims involving the Debtor will be channeled for liquidation and payment. Statistically speaking, I believe that future claims represent a greater portion of the Debtor's ultimate asbestos liability than do current claims. In order to best protect the interests of Future Claimants with respect to their asbestos-related Demands, a Futures Representative should be appointed.

59.     I believe that appointing a Futures Representative at the outset of this Chapter 11 Case will facilitate the negotiations between the various constituencies over the terms of a plan of reorganization and result in a more efficient process. The Debtor has considered the qualifications of various candidates, and has decided to recommend Lawrence Fitzpatrick to the Court as the most qualified candidate for Futures Representative. The Debtor has agreed to provide Lawrence Fitzpatrick with the Futures Representative's Liability Insurance to provide him with insurance coverage effective as of the date of his appointment as the Futures Representative. The Debtor has been advised by counsel to Lawrence Fitzpatrick that the Futures Representative's Liability Insurance has an annual premium of approximately $25,000,

which amount the Debtor has agreed to pay. I believe that appointing Lawrence Fitzpatrick as the Futures Representative is in the best interest of the Debtor, its estate and creditors.

**B.     Application Of Debtor For An Order Authorizing
The Retention Of Sidley Austin Brown & Wood LLP
As Attorneys For The Debtor And Debtor In Possession**

60.     This Chapter 11 Case will be complex, particularly given the nature and extent of the Debtor's asbestos-related liabilities and its insurance assets. The Debtor has chosen Sidley Austin Brown & Wood LLP ("Sidley") as its bankruptcy counsel for this case because of Sidley's extensive experience and knowledge in business reorganizations, in general, and in mass tort and asbestos-related bankruptcies, in particular.

61.     The partners and associates of Sidley who will advise the Debtor in this case have wide-ranging experience in insolvency and bankruptcy law, as well as in litigation and corporate law. I understand that Sidley serves as counsel to other companies in complex chapter 11 cases and, in those representations, the firm has advised those companies on many of the same or similar issues confronting the Debtor in this case. For all of the foregoing reasons, I believe that Sidley is well-qualified to represent the Debtor as debtor in possession in this Chapter 11 Case.

**C.     Application Of Debtor For An Order Authorizing The Retention And
Employment Of Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
As Attorneys For The Debtor And Debtor In Possession**

62.     The Debtor seeks to retain the firm of Pachulski Stang Ziehl Young Jones & Weintraub, P.C. ("Pachulski Stang") as Delaware bankruptcy co-counsel to the Debtor. Pachulski Stang will serve primarily as local counsel, but it has the capability to provide full representation to the Debtor, as may be required from time to time in the event of potential

conflicts. Given its proximity to the Court, Pachulski Stang will be able to respond quickly to emergency hearings and other emergency matters in this Court.

63.     I believe that Pachulski Stang's appearance before this Court for the miscellaneous applications, motions and matters in this Chapter 11 Case will be efficient and cost-effective for the Debtor's estate. Sidley and Pachulski Stang will endeavor to avoid duplication of efforts. In preparing for this case, Pachulski Stang has become familiar with the Debtor's business and with many of the potential legal issues that may arise in the context of this Chapter 11 Case. Accordingly, I believe that Pachulski Stang is both well-qualified and able to represent the Debtor in its Chapter 11 Case.

**D.     Application Of Debtor For An Order Authorizing
The Debtor To Employ Frantz Ward As Special Asbestos
Litigation Counsel Pursuant To 11 U.S.C. § 327(e)**

64.     The Debtor requests authority to employ and retain Frantz Ward as special asbestos litigation counsel to the Debtor. The Debtor seeks to retain Frantz Ward as its special counsel because of the long-standing familiarity of Barbara Arison and Patrick Haggerty, both Frantz Ward partners, with the business and asbestos-related liabilities of the Debtor, as well as Frantz Ward's extensive experience in the field of asbestos litigation defense.

65.     I believe that Ms. Arison and her colleagues are intimately familiar with the Debtor's business affairs, including its alleged asbestos-related personal injury liabilities. Moreover, Frantz Ward maintains an extensive database of all asbestos-related personal injury claims that have been asserted against the Debtor (including pending and settled claims). I believe that Ms. Arison's knowledge of these liabilities and this database is critical to the Debtor being able to determine the extent of its current and future asbestos liability. For these reasons, I

believe that it is necessary and in the best interests of its estate and creditors to employ and retain Frantz Ward as its special asbestos litigation counsel in connection with this Chapter 11 Case.

**E.  Application Of Debtor For An Order Authorizing The Debtor To Employ Nossaman Guthner Knox & Elliott LLP As Special Insurance Counsel In Matters Related To Pru-Re Pursuant To 11 U.S.C. § 327(e)**

66.  The Debtor seeks to employ and retain Nossaman Guthner as its special insurance counsel in matters related to the Pru-Re Litigation. Nossaman represents the Debtor with respect to its claims for substantial insurance coverage under several primary policies written by Everest Reinsurance Company, formerly known as Prudential Reinsurance Company, and Mt. McKinley Insurance Company, formerly known as Gibralter Casualty Company, (collectively referred to as, "MMIC") and issued to the Debtor at various times from 1975 through 1980. MMIC currently owes the Debtor in excess of $25 million for unpaid insurance claims, which MMIC disputes. In May 2002, MMIC filed an action for declaratory relief in San Francisco Superior Court and the Debtor answered and counter-claimed (the "Pru-Re Litigation"). Extensive discovery has occurred and several court days of the first phase of the trial have been completed. The potential recovery from the Pru-Re Litigation represents a significant asset of the Debtor's estate.

67.  I believe that Nossaman's continued representation of the Debtor in connection with the Pru-Re Litigation and will provide a substantial benefit to the Debtor, its estate and creditors. Nossaman is well-qualified to represent the Debtor as its special insurance counsel with respect to the Pru-Re Litigation and related matters.

**F.     Motion Of Debtor For An Order Under
        11 U.S.C. §§105(a) and 331 Establishing Procedures for
        Interim Compensation and Reimbursement of Expenses for Professionals**

68.     The Debtor requests that the Court establish procedures for compensating and reimbursing Court-approved, professionals on a monthly basis.  Such procedures will streamline the professional compensation process and enable the Court, the Debtor and all other parties to more effectively monitor the professional fees incurred in this Chapter 11 Case.  I believe that an order establishing interim compensation procedures is in the best interest of the Debtor and its estate and creditors.

**G.     Motion Of Debtor For An Order Authorizing The
        Debtor To Employ And Compensate Certain Professionals
        For Services Rendered In The Ordinary Course Of Business**

69.     Prior to the Petition Date, the Debtor employed, from time to time, various consultants, attorneys and/or law firms and other professionals in the ordinary course of its business (the "Ordinary Course Professionals").  The Debtor wants to continue to retain certain of these professionals post-petition.  The Debtor seeks to retain the Ordinary Course Professionals identified in Exhibit A to the motion.  Notably, these Ordinary Court Professionals were culled out from a much larger group of outside professionals who formerly provided services to the Debtor.  The Debtor recognizes that each of the Ordinary Course Professionals provides specialized services and unique experience and knowledge of the Debtor's assets and liabilities that are necessary to the Debtor's operations and its ultimate success in this Chapter 11 Case.  Because each of these Ordinary Course Professionals has worked with the Debtor for years, each has obtained a particular level of expertise and knowledge of the Debtor and its liabilities and assets (including its insurance assets) that cannot be easily replaced.

70.     The Debtor desires to continue to retain the Ordinary Course Professionals to render services to the estate similar to those services rendered prior to the Petition Date. Given the limited scope of the services provided by each Ordinary Course Professional, and the relatively small amount of fees paid to each Professional on a monthly basis, I believe it would be inefficient to submit an individual application and proposed retention order to the Court for each such Ordinary Course Professional.  Retaining the Ordinary Course Professionals in this manner will result in savings to the Debtor and its estate, by avoiding the need to file monthly fee applications and the associated preparation costs charged to the estate and providing a stream-lined procedure for compensating such Professionals each month.  The uninterrupted services of the Ordinary Course Professionals are vital to the Debtor's continuing operations and its ultimate ability to reorganize.  For these reasons, I submit that approval of relief requested in the motion is in the best interest of the Debtors and its estate and creditors.

## IV.

### Conclusion

71.     Based upon my personal knowledge, and my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the Debtor to continue to operate effectively as a debtor in possession following the filing of this Chapter 11 Case.  For all the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of April, 2004.

_____

David J. Gordon
President and Chief Executive Officer
The Flinkote Company

SWORN to and subscribed before
me this 28 day of April, 2004

_____
Notary Public

My Commission Expires: April 1, 2007
    (SEAL)

LEANDRA DIXON
COMM. #1408685
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. April 1, 2007