UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                         .    Case No. 04-11300 (JKF)
                               .
THE FLINTKOTE COMPANY and.
FLINTKOTE MINES LIMITED, .
                               .
                               .    824 North Market Street
                               .    Wilmington, DE 19801
                               .
           Debtors.            .    July 14, 2010
. . . . . . . . . . . . ..          10:15 a.m.


                     TRANSCRIPT OF HEARING
          BEFORE HONORABLE JUDITH K. FITZGERALD
           UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Pachulski, Stang, Ziehl and Jones
                          By: JAMES E. O'NEILL, ESQ.
                          919 North Market Street, 17th Floor
                          Wilmington, DE  19801

                          Sidley Austin LLP
                          By:  KEVIN T. LANTRY, ESQ.
                          555 West Fifth Street
                          Los Angeles, CA  90013




Audio Operator:           Brandon McCarthy



Proceedings recorded by electronic sound recording, transcript
               produced by transcription service
_____

               J&J COURT TRANSCRIBERS, INC.
                    268 Evergreen Avenue
                 Hamilton, New Jersey 08619
                 E-mail:  jjcourt@optonline.net

          (609) 586-2311    Fax No. (609) 587-3599

APPEARANCES (CONT'D):

For the Debtors:               Sidley Austin LLP
                               By:  GUY NEAL, ESQ.
                               1501 K Street, N.W.
                               Washington, DC  20005

For the Future                 Young Conaway Stargatt &
Claimants                      Taylor, LLP
Representatives:               By:  EDWIN J. HARRON, ESQ.
                               The Brandywine Building
                               1000 West Street, 17th Floor
                               Wilmington, DE  19899

For Aviva Insurance            Crowell & Moring LLP
Company of Canada:             By:  MARK PLEVIN, ESQ.
                               1001 Pennsylvania Avenue, N.W.
                               Washington, DC  20004

                               Marks, O'Neill, O'Brien & Courtney
                               By:  MICHAEL F. DUGGAN, ESQ.
                               913 North Market Street, Suite 800
                               Wilmington, DE  19801

For ACC:                       Campbell & Levine
                               By:  MARK HURFORD, ESQ.
                               800 North King Street, Suite 300
                               Wilmington, DE  19801

                               Caplin & Drysdale
                               By:  PETER LOCKWOOD, ESQ.
                               One Thomas Circle, N.W., Suite 1100
                               Washington, DC  20005

For Imperial Tobacco:          King & Spalding
                               By:  MARK M. MALONEY, ESQ.
                                    JAMES A. PARDO, JR., ESQ.
                               191 Peachtree Street, N.E.
                               Atlanta, GA  30303

                               Morris, James, Hitchens and
                               Williams, LLP
                               By:  STEPHEN M. MILLER, ESQ.
                               PNC Bank Center
                               222 Delaware Avenue, 10th Floor
                               Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES:

For the Debtors:          Sidley Austin LLP
By:  JEFFREY BJORK, ESQ.
      CHRISTINA M. CRAIGE, ESQ.
555 West Fifth Street
Los Angeles, CA  90013

Irell & Manella
By:  MARC MAISTER, ESQ.
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660-6324

For Certain London     Walker Wilcox Matousek, LLP
Market Insurance      By:  FRED ALVAREZ, ESQ.
Companies:           225 West Washington Street, Suite 2400
Chicago, IL  60606

Tucker Arensberg, PC
By:  MICHAEL SHINER, ESQ.
1500 One PPG Place
Pittsburgh, PA  15222

For Imperial Tobacco   King & Spalding
Canada Limited:      By:  MICHELLE CARTER, ESQ.
      JEFFREY DUTSON, ESQ.
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521

For Aviva Insurance    Crowell and Moring LLP
Company of Canada:    By:  LESLIE A. DAVIS, ESQ.
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004

Marks, O'Neill, O'Brien and
Courtney, PC
By:  BRIAN L. KASPRZAK, ESQ.
913 North Market Street, Suite 800
Wilmington, DE  19801

For FFIC:            Stevens & Lee, PC
By:  JOHN D. DEMMY, ESQ.
1105 North Market Street, 7th Floor
Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

## I N D E X

| EXHIBITS | ID. | EVD. |
|---|---|---|
| --   Declaration | -- | 44 |

J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  The next matter is Flintkote, 04-11300.

2   I have a list of participants by phone, Fred Alvarez, Jeffrey

3   Bjork, Michelle Carter, Christina Craige, Leslie Davis, Michael

4   Duggan, Jeffrey Dutson, Brian Kasprzak, Peter Lockwood, Mark

5   Maloney, James Pardo, Mark Plevin, Michael Shiner.  That's all.

6          MR. PARDO:  Your Honor, a goodly number of us are in

7   the courtroom.

8          THE COURT:  I see.

9              (Court spoke on another matter)

10         THE COURT:  I'm sorry.  I'll take entries in court

11  please.

12         MR. O'NEILL:  Good morning, Your Honor.  James

13  O'Neill, Pachulski, Stang, Ziehl and Jones on behalf of the

14  debtor.

15         MR. LANTRY:  Kevin Lantry from Sidley on behalf of

16  the debtor.

17         MR. HARRON:  Good morning, Your Honor.  Ed Harron

18  from Young Conaway on behalf of the future claimants

19  representative.

20         MR. PLEVIN:  Good morning, Your Honor.  Mark Plevin

21  on behalf of Aviva Insurance Company of Canada, and with me is

22  my Delaware counsel, Michael Duggan.

23         THE COURT:  Thank you.

24         MR. HURFORD:  Good morning, Your Honor.  Mark

25  Hurford, Campbell Levine for ACC.  Peter Lockwood is here as

1 well.  He'll be in the courtroom in a second.

2          THE COURT:  All right, thank you.

3          MR. NEAL:  Good morning, Your Honor.  Guy Neal,

4 Sidley Austin for the debtors as well.

5          MR. MALONEY:  Good morning, Your Honor.  Mark Maloney

6 on behalf of Imperial Tobacco.

7          MR. PARDO:  Good morning, Your Honor.  Jim Pardo also

8 on behalf of Imperial.

9          MR. MILLER:  Good morning, Your Honor.  Stephen

10 Miller also on behalf of Imperial Tobacco.

11          THE COURT:  Mr. -- I'm not sure who's doing this.

12 Mr. Lantry?

13          MR. LANTRY:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. LANTRY:  Kevin Lantry on behalf of the debtors.

16 Your Honor, this $150 million settlement with Aviva is a major

17 victory and turning point in these Chapter 11 proceedings.

18 Prior to this settlement the debtors had approximately $200

19 million in cash and promised payments from insurers under

20 insurance settlements that you've approved that we could

21 transfer promptly to the 524(G) trust upon confirmation.  With

22 this settlement, the 200 million goes to 350 million.  That's a

23 big deal and we're proud of it.

24          Your Honor, the debtors commenced this litigation a

25 couple of weeks before filing the petitions in 2004 after some

initial venue battles.  The case ended -- or began in front of
Judge Marilyn Patel, one of the senior district court judges in
San Francisco and also a chief judge in that district.  Over
the past six years Judge Patel has issued four reported
opinions including a number of cutting edge decisions in
insurance law that have been cited and quoted in treatises and
opinions across the country.

In addition, she's issued a number of important
decisions on jurisdiction, choice of law and the exclusion of
certain expert testimony.  She's also involved as special
master, the prior insurance commission of the State of
California, to make factual determinations on allocation issues
between the Aviva policies and approximately 120 other
policies.  In each of the decisions that Judge Patel has made
as well as the determinations by the special master have been
decidedly in favor of Flintkote, so decidedly, in fact, that
they have increased the debtor's estimated ultimate damage
recoveries by tens of millions of dollars.

Unfortunately, Your Honor, the outcome of Flintkote's
extremely successful in cutting age litigation is that Aviva
has made it perfectly clear that it intends to appeal every
single one of these Flintkote favorable decisions to the Ninth
Circuit.  In our disclosure statement which Your Honor approved
in 2008 Aviva rightfully asked us to tell all of our creditors
that indeed each of these very favorable rulings in that

1  litigation were going to be appealed.

2      As Aviva set forth in its reply papers that were
3  filed on Monday in support of this settlement, Aviva has
4  identified at least six areas, issues that it intends to
5  appeal.  If Aviva were to win on any one of these six issues,
6  depending on which one, our recovery could be reduced to zero.
7  It could be reduced to as little as one-tenth of the damages
8  we're currently seeking.  The case could start over again in
9  terms of discovery, all over again, or the case could be sent
10 to Canada.  The risks that all of our victories could be
11 reduced to zero has been a very material consideration of the
12 plan proponents deciding to settle this case for 150 million.

13     Your Honor, another important consideration is that
14 the Aviva litigation which was scheduled to go to a six- to
15 eight-week jury trial this summer only involved the issue of
16 compensatory damages.  Judge Patel had indicated she would
17 bifurcate the bad faith damages issue.  Given the high stakes
18 nature of the litigation and Aviva's promises to appeal
19 everything, our lead counsel from Irell in this case has
20 estimated that right now, after six years of litigation, we're
21 probably not farther than the midpoint in the ultimate
22 litigation as this goes up on appeal and remand and may be
23 appealed again before we would get to the point of a final non-
24 appealable judgment against Aviva.

25     And, Your Honor, we have spent -- the estate has

1  spent $15 million, more than 15 million now in terms of just

2  the cost for the expertise and services of the Irell firm in

3  prosecuting this litigation, not counting the rest of the plan

4  proponents who have been monitoring this litigation from the

5  beginning of the case and participating throughout the case in

6  the negotiations and mediation.

7          Your Honor, three other factors have been considered

8  by the plan proponents in reaching this settlement besides the

9  risk of a total loss on appeal and besides not wanting to spend

10 another six or eight years in the wilderness of litigation with

11 Aviva.  First, the outcome of this litigation was going to a

12 jury trial.  The jury trial would involve at least eleven

13 experts testifying on extremely complex insurance issues and

14 issues of statistics.  And in front of this jury, Aviva was

15 going to have permission to put into evidence the fact that the

16 debtors only paid $7,000 in premiums for these polices that we

17 were now seeking hundreds of millions of dollars in damages.

18 This so-called $7,000-throw up factor was something that even

19 in the face of San Francisco jury trials, we took very

20 seriously in terms of deciding to settle for 150 million.

21         Also, Your Honor, even if we were to win in front of

22 the jury and even if we were to win on every one of these

23 appeal issues that might go back to remand and win on that,

24 there was also the issue of collectability.  We don't know if

25 Aviva would be around as a solvent insurer six to eight years

1  from now.  And furthermore, we would have to enforce and

2  collect whatever ultimate judgment we would get in Canada where

3  Aviva is located and where it conducts its business.

4          Finally, Your Honor, one of the factors was settling

5  the Aviva litigation is a very material progress in our

6  movement toward plan confirmation.  Aviva is one of the two

7  major objectors to confirmation, or has been.  Although most of

8  its objections were of the kind of generic insurance objection

9  things that you're used to ruling on or ruling against, it had

10  a number new issues, one of which is that it asserts that the

11  Aviva policies should be interpreted and applied according to

12  Canadian law.  And as you may recall, in December you observed

13  that although you had ruled on a lot of these things, you had

14  not yet ruled on whether the bankruptcy codes assignment

15  provisions preempted Canadian law.

16          And so again, settling with Aviva smooths the pathway

17  to confirmation.  But most importantly, when you think of the

18  four-part <u>Martin</u> test, Your Honor, it's the paramount interest

19  of creditors.  And so, Your Honor, the involvement in

20  decision-making of the ACC and FCR in this mediation in

21  settlement is probably the most important part of our story.

22          At the early stage of the case Judge Patel suggested

23  that the parties get a mediator and the parties selected Judge

24  Daniel Weinstein or prior Judge Daniel Weinstein, one of the

25  most experienced and reputable mediators in this country.  And

1 Judge Weinstein has brought the parties together on six

2 separate and extensive mediation sessions over the past many

3 years.  Throughout these mediation sessions the ACC and FCR

4 have each involved both their special insurance counsel and

5 their bankruptcy counsel, as well as have the debtors.  And so

6 the expertise of six law firms has been brought to bear in

7 these negotiations and settlement decisions.

8         Just to illustrate, Your Honor, the ACC has asked

9 (indiscernible) himself to participate in giving four of his

10 days to two of the most important mediation sessions, one in

11 December and another just recently in April that were critical

12 in bringing this to ultimate settlement.

13         In making the decision to settle, Your Honor, it's

14 important that the debtors in the ACC and FCR did not settle on

15 the first, second or third round of mediation.  It took six

16 rounds before we had convinced ourselves that we had squeezed

17 everything we could possibly get out of Aviva in light of the

18 risks of the complex and cost of litigation, the delays in that

19 litigation, the collection risks and all the other factors that

20 were brought to bear.

21         Accordingly, Your Honor, although Courts regularly

22 hold that a 9019 settlement should be approved so long as it

23 falls within the lowest point in the range of reasonableness,

24 the plan proponents are proud to tell you that we believe that

25 this settlement is at the higher ranges of reasonableness in

1 light of the cost risk, delays and complexity of this

2 litigation.

3        Against this backdrop, Your Honor, of full creditor

4 support and participation in this settlement and against the

5 fact that we noticed this settlement to every single law firm

6 in the United States representing asbestos claimants by direct

7 notice and the fact that we put notice of this settlement out

8 in 11 national and large metropolitan newspapers, there is only

9 one party standing in this courtroom today that's objecting,

10 and that's ITCAN, of course.

11        Your Honor, you recall ITCAN, the prior parent

12 company that after acquiring and selling off the majority of

13 the businesses and assets of the debtors, took 600 million plus

14 in illegal dividends and we've been suing them, as you know,

15 for the last four years in California to recover those

16 dividends and interest and to hold them as Flintkote's alter

17 ego.

18        So what is ITCAN's objection in objecting?  We

19 submit, Your Honor, that ITCAN has no legitimate grounds to

20 object.  It is not a co-insured under the Aviva policies,

21 doesn't allege it is, it can't be.  As you know, after Genstar

22 acquired Flintkote, they used to be a publicly-trade company in

23 '79.  For the period 1980 to '86 Genstar and Flintkote as

24 parent shared quite a bit of their insurance asbestos cover.

25 And so during these cases ITCAN and Genstar have asserted some

1  rights with the co-insured to those policies from 1980 to 1986.

2  Aviva is not one of those policies. The Aviva

3  policies were purchased in the late 1950s and provide coverage

4  for individuals who are harmed or exposed to the asbestos

5  products of the debtors during the period of coverage from 1958

6  to 1961. Under the terms of the Aviva policy, there's no

7  grounds by which it can and Genstar can claim co-insureds.

8  So what its standing? What is its interest in

9  objecting? Your Honor, we spent the last six years of this

10  case with ITCAN not ever having filed a proof of claim and not

11  ever asserting creditor status, just being a defendant in the

12  litigation we're bringing against it on behalf of our

13  creditors. But last -- yesterday afternoon ITCAN decided in a

14  last-minute effort to try to change the game by filing a

15  request for leave to file late claims, two late claims in

16  particular. It sought after, you know, saying that it didn't

17  have any indirect asbestos claims as late as December to assert

18  that if it ever is -- let me describe it specifically. It can

19  assert a contingent claim for contribution indemnity against

20  Flintkote to the extent any party recovers against ITCAN on the

21  grounds ITCAN is Flintkote's alter ego.

22  Again, you recall it's vigorously contesting that it

23  has alter ego liability yet it finally has decided to change

24  course and assert that it has a contingent claim for alter ego

25  liability. Your Honor, it probably doesn't take too much to

1 imagine that we will be objecting under 502(e)(1)(b) that this

2 is not a legitimate contingent claim. It's just not

3 appropriate for a contribution claim brought by the alter ego

4 to try to dilute the recovery of the actual direct asbestos

5 claims so you will see that later on.

6      The second alleged or proposed group of claim that

7 they might file if you give them leave is asserting again a

8 contingent claim for contribution and indemnity to the extent

9 ITCAN is ever found to be liable or have to remediate a certain

10 site for environmental damage in New York. Apparently, in

11 early June -- June 3 was the date apparently the notice New

12 York has sent a notice to ITCAN saying that it might be

13 partially -- potentially responsible party for a site. ITCAN

14 asserts that that site was once owned and operated by

15 Flintkote.

16      Your Honor, if ITCAN had intended to try to mitigate

17 its damages and not try to fabricate, ITCAN would have

18 immediately notified the debtors that hey, this is your site,

19 please take care of it, contact New York. We've been doing --

20 handling environmental claims for decades. They didn't do

21 that. They didn't ever notice us for that last five, six

22 weeks. They first notified us in the pleadings of last night.

23 In the meantime they've drummed up $9,400 worth of a claim

24 trying to decide how to respond to that demand from the State

25 of New York. That's not how you try to handle a legitimate

1  claim.  You quickly notice the party that you're seeking to be

2  indemnified with, which they didn't.

3         So, Your Honor, what they've done last night is

4  nothing but a little bit of litigation gamesmanship filing on

5  the eve of this hearing in trying to assert some little

6  scintilla of evidence why they might have some standing but it

7  doesn't change the game.  ITCAN is still the same ITCAN that

8  we've seen throughout the last six years.

9         Its sole purpose is to win the California litigation

10 and it believes that in order to do that, it needs to prevent,

11 delay confirmation of this plan and ultimately try to convert

12 these cases to Chapter 7, that's its goal.  And so, Your Honor,

13 it wants to resist the Aviva settlement because Aviva is one of

14 the last compatriots who was before this settlement objecting

15 with ITCAN confirmation.  That's what it wants to stop this

16 for.

17        It has another ulterior motive, Your Honor.  If you

18 look at the objection, all it's really asking for is to delay

19 to give them time to conduct voluminous discovery.  But the

20 discovery is aimed at trying to understand the entirety of all

21 of Flintkote's insurance, both settled insurance, unexhausted

22 insurance, the full panoply of its insurance, not any insurance

23 related specifically or not limited to the Aviva insurance.

24        More than that, in addition to sizing the entire

25 amount of insurance available, it's trying to size up the

1 entirety of all asbestos claims, not just current asbestos
2 claims which are over 200,000 based on the vote, not just
3 future asbestos claims, but also all past settled claims
4 pre-petition which were over 250,000.  It wants every document
5 pertaining to all of those claims in order to assess the
6 liability.  And why does it want that?  Not to understand
7 whether this settlement is reasonable, but to use that as a leg
8 up in the (indiscernible) litigation that's going on in
9 California.  It can seek that discovery in due course if it
10 wants in California though, you know, it may not be appropriate
11 there either, I don't know.  But this isn't the time and place
12 -- these Chapter 11 proceedings are not the place for it to do
13 that discovery.

14        So, Your Honor, if they had really been interested in
15 trying to discover the merits and reasonableness of this
16 settlement, they wouldn't have waited until five days ago to
17 propound discovery on the debtors and they would have aimed it
18 in a way that was relevant and narrowed to what they're really
19 doing in terms of trying to understand the reasonableness of
20 this settlement but we don't think that's what they're here
21 for.  We think they're here just to delay and to play the
22 strategic game that they've been doing for the last six years.
23 Your Honor, these ulterior motives are not appropriate.

24        Your Honor, in closing, I would ask you to think
25 about two of your prior rulings.  In the summer of 2008 Your

1  Honor ruled that ITCAN did not have standing to challenge the

2  business judgment of the debtors in deciding to purchase and

3  lease three fast food restaurant properties.  They, like now,

4  sought voluminous discovery in hopes of second guessing the

5  debtor's business judgment and you ruled they did not have

6  legitimate standing to do that, either to object or to conduct

7  that discovery.

8         And then again in December, Your Honor, you ruled

9  that ITCAN did not have standing to assert the best interests

10 of creditor's (indiscernible) objection to confirmation.  Then,

11 as now, ITCAN sought voluminous discovery to support its

12 objection and you ruled that they did not have standing to

13 object or to conduct that discovery.

14        And so, Your Honor, I think what we're asking for

15 today is the same kind of ruling, that notwithstanding whatever

16 gamesmanships that ITCAN might have attempted last night, that

17 it is still without legitimate standing to be objecting to this

18 Aviva settlement which is having the full support of the

19 creditor constituency, the official creditor constituency, of

20 the asbestos claimants in the futures rep.  We believe that the

21 evidence that we've submitted is more than enough to satisfy

22 the 9019 standards in terms of the involvement of the asbestos

23 committee and the futures rep and the debtors in looking at

24 this settlement and deducing that this settlement is in the

25 best interests of the debtor's estate.  Thank you, Your Honor.

1          THE COURT:  Mr. Lockwood?

2          MR. LOCKWOOD:  Just a few quick points in support of

3 Mr. Lantry's remarks, Your Honor.  First, at bottom, what

4 ITCAN's objection amounts to is the assertion without ever

5 actually saying so that the counsel and their various clients

6 of the debtor, the ACC and the FCR either have some

7 undescribed, improper motivation to give Aviva a sweetheart

8 deal on its insurance or, alternatively, that the six law firms

9 that Mr. Lantry referred to are collectively incompetent at

10 determining what would be a fair settlement in the interest of

11 their clients.

12          I suggest to Your Honor that absent a heck of a lot

13 greater showing in the ITCAN papers than they have even

14 remotely attempted to provide that they cannot possibly come in

15 here and ask this Court to reject this settlement, specifically

16 with respect to the ACC.  We have, as Your Honor knows,

17 separate, special insurance counsel precisely from the

18 beginning of this case because the bulk of the Flintkote assets

19 were represented by unsettled insurance of one sort or another.

20 And Aviva has been one of the most tenacious, as Your Honor is

21 well aware, non-settlers in this case.  And the idea that after

22 having spent the kind of money and the amount of time fighting

23 with Aviva, both in insurance litigation and in this court, all

24 of a sudden we would all go into the tank on this when my

25 client's constituency and Mr. Harron's constituencies are the

1 principal beneficiaries of any settlement and therefore have

2 the ones with the greatest incentives to maximize the amount of

3 that settlement is, on the face of it, absurd, and certainly is

4 not substantiated by any papers that ITCAN has filed in this

5 case.

6 Secondly, in an effort -- in an apparent effort to

7 avoid the problem that they don't have any evidence to proffer

8 in support of their objection, ITCAN asserts that they want to

9 take discovery putting aside the correct points that Mr. Lantry

10 made about the scope of that discovery. In essence, what ITCAN

11 is going to want to try to find out is why the parties agreed

12 to the settlement and particularly why the debtors and the ACC

13 and FCR agreed to the settlement because at the end of the day

14 given the standards for 9019 settlements under TMT Trailer and

15 numerous other cases, they have to show not that, you know, it

16 might have been possible if somebody really, you know, wanted

17 to litigate this to the end that you could get more money by

18 winning at trial or, alternatively, that ITCAN believes it has

19 some lawyer experts that it could put on the stand that said we

20 could have gotten more money if we were the ones representing

21 the debtor, the ACC and the FCR.

22 They have to show that it is below the range of

23 reasonableness. And in order to do that, it's pretty clear

24 that they're going to be trying to get into discovery that's

25 going to involve work product privilege, attorney-client

**J&J COURT TRANSCRIBERS, INC.**

1  privilege and potentially expert debates, all of which is being

2  done as a giant -- (a) it won't be possible because we will

3  object to it and Your Honor will, I'm sure, sustain objections

4  to invasions of work product and attorney-client privilege and,

5  (b) at the end of the day it's a fishing expedition because, as

6  I said earlier, they have no possible explanation for either

7  why we're venal in going into the tank and agreeing to this or

8  why we're incompetent.

9       But ITCAN's lawyers who have -- who stated that

10  notwithstanding that this litigation in California has been

11  going on for years in a public forum profess to be so ignorant

12  of it that they can't produce anything more in support of their

13  analysis that the settlement isn't good enough, then the

14  citation of some random numbers about what the potential

15  maximum damages might be if he prevailed.

16       THE COURT:  Well, I don't know that I need to even

17  get into that.  I'm not sure that ITCAN has any standing to

18  object to this if they're not co-insureds, they haven't filed

19  proofs of claim.  Whether they'll be able to file proofs of

20  claim several years after the bar date is debatable at best.

21  But nonetheless, I haven't seen the motions.  Maybe there are

22  some grounds for it but it's a pretty touch standard in this

23  circuit, I think, to be able to do that.  So at this point I'm

24  really not sure what ITCAN's interest is here and I think what

25  I need to hear is how they have any ability to object at all.

1          MR. LOCKWOOD:  Well, we certainly agree with that

2    point.  I just might mention before I turn the podium over to

3    Mr. HARRON and then to ITCAN that while if the motion for leave

4    were actually granted by the Court, we would have the

5    objections to the claim, among others, that Mr. Lantry

6    mentioned.  We also intend to oppose the motion for leave

7    because they've known about all -- they've known about the

8    alter ego litigation and talked about it before this Court for

9    years.  And the idea that -- I mean I don't want to get into

10   merits --

11         THE COURT:  No.

12         MR. LOCKWOOD:  -- but the idea that they can claim a

13   late claim at this point at this time is ludicrous.

14         THE COURT:  Mr. HARRON?

15         MR. HARRON:  Thank you, Your Honor.  Just a few quick

16   points.  The suggestions made by the ITCAN objection that the

17   settlement somehow fails to account fully for the interest of

18   future claimants, I want to assure the Court that the future

19   representative takes its job very seriously to protect the

20   interest of future claimants.  Indeed, Your Honor, the futures

21   representative and his counsel did work diligently and hand in

22   hand with the debtor and the committee throughout the

23   negotiations that led up to this settlement.  And indeed we

24   employed our own expert insurance coverage counsel who's a

25   member of Mr. McGonagle's firm, McMonagle, pardon me.

1          Your Honor, it's important for the Court to note in
2     the context of the settlement when you think about future
3     claims that not only did we have to weigh the success in the
4     current litigation that's pending before Judge Patel, and we
5     also had to consider the likelihood of appeal, the likelihood
6     of Aviva prevailing on any arguments it would raise on appeal,
7     and we worked closely with the debtor and the committee in
8     evaluating those issues, but another issue that's relevant to
9     the futures is that even if the debtor prevailed in litigation
10    and we prevail on the appeal, we're still faced with the
11    challenges of accessing the Aviva coverage in the future in a
12    context where claims are being channeled to a trust.  And I
13    don't want to make Aviva's confirmation objections for them
14    here today in the context of a settlement hearing, Your Honor,
15    but if you recall, Aviva lays out what it believes some of
16    these challenges would be in its confirmation objection.

17         And two facts that I think are relevant and
18    illustrative of the types of issues that the trust will face in
19    accessing coverage for future claimants are that, as Mr. Lantry
20    mentioned, this Aviva policy provides coverage for exposure
21    that occurred around 1960, so we're talking about exposure that
22    occurred more than 50 years before the effective date of the
23    trust.  And also, the terms of the Aviva policy contain
24    aggregate limits of $100,000 Canadian per claim which, again,
25    is something that the trust would have to deal with in the

1  event it was trying to tender claims in the future to Aviva.

2  So I just wanted to remind the Court of those issues and it was

3  in that context when we considered the settlement and the

4  impact of future claimants that those issues weigh heavily on

5  the interest of the future claimants representative.

6          THE COURT:  Okay, thank you.  Mr. Plevin?

7          MR. PLEVIN:  Your Honor, briefly, I just want to

8  emphasize for the record that the choice here is not between

9  the existing settlement and some higher settlement that Aviva

10  would agree to pay if only more pressure were brought to bear

11  on Aviva.  Mr. Lantry used the analogy that every last penny

12  had been wrung out of Aviva after the six mediation sessions

13  that took place over a period of years and I believe that to be

14  the case.

15          I think the alternative here is between this

16  settlement and years of litigation.  Not only does the

17  disclosure statement indicate Aviva's intent to appeal as early

18  as 2008, but Aviva's own plan objections said that several

19  times.  We did, in fact, lose almost every issue before Judge

20  Patel.  Some of those we think were clearly erroneous and we

21  think should be reversed by the Ninth Circuit.  Of course, we

22  bear some litigation risk as well which is why we've agreed to

23  settle here.  But we're quite confident that she was wrong on a

24  number of the issues that we laid out in our reply brief.  And

25  so I think that's really the alternative that ought to be

1  weighed here.  It's not this settlement or some richer

2  settlement but this settlement or years of litigation and risk.

3        THE COURT:  But what's ITCAN's interest in these

4  policies because if there is none, then the entities who do

5  have an interest in the policy have agreed -- policies have

6  agreed that this is a fair and reasonable settlement and

7  they're willing to deal with the proceeds of this settlement

8  through the trust.  So what's ITCAN's role with Aviva?

9        MR. PLEVIN:  Your Honor, I know of no role that ITCAN

10 has with Aviva other than the fact that they're both located in

11 Canada, which is not enough for standing.

12        THE COURT:  Okay, I'm not sure who's arguing for --

13 Mr. Pardo?

14        MR. PARDO:  Well, we both may, Your Honor.  Your

15 Honor, for the record, Jim Pardo with King and Spalding.  Mr.

16 Maloney is going to handle the substance assuming we get to the

17 substance.  I've been allocated the standing opportunity again

18 to discuss with Your Honor which I believe is either the third

19 or the fourth time we've been down this road.

20        THE COURT:  Yes.

21        MR. PARDO:  Let me see if we can make progress by

22 backtracking a bit to our prior discussions but doing so in a

23 fairly summary manner because the Court knows the issues.  We

24 start with 109.  We continue to believe that we're a

25 party-in-interest under 109 and under the Third Circuit's

<u>Amitex</u> decision because we have a practical interest in the

outcome of the matter before the Court.

THE COURT: Not this matter.

MR. PARDO: Yes, Your Honor, we do, and --

THE COURT: Which is what?

MR. PARDO: Okay, that's the --

THE COURT: And I'm not sure practical is the right

word. I think economic is the issue and I'm not sure how ITCAN

has anything to do with policies as to which it has no ability

to tap.

MR. PARDO: We have an interest in the proceeds of

those policies under the proposed settlement. And hear me out.

THE COURT: How? If you can't tap the policy

proceeds independently, how can you tap them through a

settlement?

MR. PARDO: All right, let's go back to Burger King.

You remember our Burger King discussion?

THE COURT: I do.

MR. PARDO: Okay, let's go back to Burger King and

I'm going to get -- remember, we used a hypothetical and I'm

going to use different numbers this time just because I don't

remember what the numbers were we used last time. But I think

it was telling and then the Court went off and thought about it

for a bit.

Assume for the benefit of just discussion that there

1   are 500 units worth of liability sitting here that this debtor

2   has and assume that it has 100 units of assets today, liquid

3   assets, and they're going to propose to augment that 100 units

4   of assets with an additional 150 so that at the end of the day

5   they would have 500 units of liability, 250 units of -- I'm

6   sorry, 500 units of liability, 250 units of assets.

7        My client continues to be the alleged alter ego.  And

8   I've got, under the debtor's theory and under the committee's

9   theory, responsibility, or my client has responsibility for the

10   shortfall.

11        THE COURT:  Yes.

12        MR. PARDO:  So as we sit here today, if the

13   settlement were to be approved, I would have -- my client would

14   have potential liability for the remaining 250, 500 minus 250.

15        THE COURT:  Right.

16        MR. PARDO:  If the right number for this settlement

17   is not 150 but is 175 or 200 or 225 or 250 or whatever the

18   discovery might suggest at the end of the day and this Court

19   determine, my client's economic risk is lower dollar for dollar

20   by every increased dollar that this settlement brings.

21        THE COURT:  No, that's not the case.  I mean your

22   economic risk to the extent that you are -- your client is ever

23   determined to be an alter ego is whatever it is as the alter

24   ego.  But you -- but as a non-creditor, non-debtor,

25   non-policyholder, non-beneficiary of these proceeds, even as

**J&J COURT TRANSCRIBERS, INC.**

1   the alter ego, you would have -- your client would have no

2   standing to object to a settlement that benefits the

3   beneficiaries who accept the settlement.  I mean --

4          MR. PARDO:  Your Honor, I believe we do because under

5   the terms of the plan -- go back to the plan, Your Honor,

6   please.  There is a defined term, indirect asbestos personal

7   injury claimant -- did I get it right, Mr. Lantry?

8          THE COURT:  Yes, as to which your clients have never

9   filed a proof of claim so you don't have a standing there

10  either.

11         MR. PARDO:  Your Honor, we haven't been able to file

12  the proof of claim before the Third Circuit's decision in

13  Grossmans.

14         THE COURT:  Oh, of course, you could.

15         MR. PARDO:  No, Your Honor, we could not.

16         THE COURT:  I'm sorry.

17         MR. PARDO:  Under the Third Circuit's decision in --

18         THE COURT:  Please don't yell at me.

19         MR. PARDO:  I'm sorry.

20         THE COURT:  I'm not yelling at you.  Don't yell at

21  me.

22         MR. PARDO:  Your Honor, I apologize.  I did not

23  intend to yell at you.

24         THE COURT:  All right.

25         MR. PARDO:  I have great deference for the Court.

1 I've been here many times, as you know.  I think the world of
2 you and of this Court.  Your Honor, under <u>Frenville</u>  we did not
3 have a claim as <u>Frenville</u> defined the claim in the context of
4 <u>Frenville</u> which was itself an indemnity case.  <u>Grossmans</u> has
5 changed the law.

6          THE COURT:  But you had a contingent claim.

7          MR. PARDO:  No, Your Honor, not --

8          THE COURT:  Yes, absolutely.  Even --

9          MR. PARDO:  Excuse me, I interrupted again.

10          THE COURT:  Even <u>Frenville</u> doesn't deal with the
11 concept of the contingent claim filing.  It was a relief from
12 stay case.  The concept of whether or not you had to file a
13 claim and under what circumstances was not an issue in
14 <u>Frenville</u>.  And <u>Frenville</u> has that famous footnote that says
15 and we're not saying that <u>Frenville</u> would apply to mass tort
16 context anyway.  So there is nothing in <u>Frenville</u> that
17 prohibits a creditor from filing a contingent claim.

18          Now, it may have been disallowed because it was
19 contingent at that time?  Maybe.  I don't know, but
20 nonetheless, it doesn't prohibit the client from filing the
21 claim as a contingent unliquidated whatever type of claim this
22 client thinks it has.

23          So to the extent that the creditor felt that somehow
24 there was a claim, surely it could be filed.  And now under
25 <u>Grossmans</u> it's clear that to the extent that there was a claim

1   that arose pre-petition, that it will be considered to be a

2   pre-petition claim despite the language in <u>Frenville</u> that was,

3   as you said, an indemnity case based on New York law in a

4   relief from stay context.

5       MR. PARDO:  Which said and focused upon the right to

6   payment language as opposed to all the other modifiers and as a

7   result -- our view has consistently been, and the Court has

8   heard us on any number of occasions, indicating that <u>Frenville</u>

9   prohibited us from filing a claim.  We did not -- we have now

10  asked the Court for permission and leave to do so.  Let me be

11  clear to the Court.  We disagree with the Court's prior

12  statement that our economic interest under my hypothetical is

13  not a real and tangible economic interest that gives us the

14  Amitex standing.  I want the record to be clear on that issue.

15      THE COURT:  I understand that.  Yes.

16      MR. PARDO:  I also want the Court to recall back to

17  the Burger King discussion on standing.  My client is trying to

18  take a very practical approach to this litigation.  Whether

19  that gets us anywhere or not, I'm not sure, but the Court

20  expressed great concern on the record regarding the standing of

21  my client in the context of the Burger King motion.  But it's

22  clear from a fair reading of that transcript that the Court's

23  ruling was somewhere on the spectrum of largely influenced by

24  to -- mildly influenced by what the Court referred to as the de

25  minimis nature of the use of assets that the debtor was

1  proposing that day.

2      My client could have, had it chosen, to have been the

3  proverbial stick in the mud and engaged in scorched earth

4  litigation and sought a stay of that $3 million utilization of

5  money and taken the Court up on those issues and we would have

6  been within our right to assert those.  We took a very

7  practical approach.  You remember my standing up at that

8  hearing and said, Your Honor, you don't need to worry about

9  protecting the record.  We're not going up on a $3 million

10 issue.  This is a different issue.  This is by the debtor's own

11 admission on the first page of its pleading the most

12 significant thing it's done in this case today.

13      THE COURT:  I agree, but it still has no benefit to

14 Aviva.  Aviva could not stop --

15      MR. PARDO:  I'm --

16      THE COURT:  I'm sorry, to ITCAN.

17      MR. PARDO:  Right.

18      THE COURT:  I apologize.  ITCAN could not -- if this

19 were not a bankruptcy proceeding and the settlement of all of

20 these policies -- the purchase of this policy was agreed to

21 between Aviva and the debtor outside this Court, ITCAN would

22 have no capability of stopping that settlement because it's not

23 a party-in-interest with respect to that transaction.  And I

24 can't see how you can come into the bankruptcy court and stop

25 something that you couldn't have stopped outside the bankruptcy

**J&J COURT TRANSCRIBERS, INC.**

1 court under the same circumstances.

2      MR. PARDO: Because the debtor is a debtor in a

3 bankruptcy case.

4      THE COURT: Yes, the debtor is.

5      MR. PARDO: And because 109 and <u>Amitex</u> give us that

6 right under the economic loss that we're about to suffer or

7 potentially suffer.

8      THE COURT: Okay, I disagree. First of all, I don't

9 know that it's all clear that your client is going to suffer an

10 economic loss so that's the first aspect. But assuming that

11 there is the prospect that your client will suffer an economic

12 loss because it will be determined to be an alter ego and it

13 has assets which somehow or other will then be committed to the

14 use of the debtor for purposes of figuring out the debtor's

15 liability under the plan, all of which is pretty hypothetical

16 as I sit here now, but assuming that all that happens, this

17 insurance settlement still does not affect ITCAN.

18      ITCAN isn't a policyholder, it's not a co-insured,

19 it's not an insured, it's not a beneficiary under the policies

20 and so this settlement, to the extent that it is fair and

21 reasonable for the creditors who are affected by it, I think,

22 is the standard that this Court should judge. Does ITCAN have,

23 you know, some interest in this case? Your client seems to

24 think so. At this point in time I don't think you have <u>Amitex</u>

25 and 109 standing but I'll look at that in the context of your

1  motion to file the late proof of claim because I haven't fully

2  absorbed the consequences of <u>Grossman</u> and what it does to the

3  <u>Frenville</u> status either.  And so I'm not trying to make rulings

4  about that today.

5  But here today, your client has not filed a proof of

6  claim, is not an owner of this business, isn't affected by the

7  insurance litigation one way or the other and so I just don't

8  see that there's any standing.

9  On the merits, it seems to me that the motion gives

10  me no information that suggests that the parties who were

11  involved in the negotiations did not come to a fair and

12  reasonable settlement under these circumstances.  There are

13  caps on each of the policies that the claimants could access.

14  Now, just assuming --

15  MR. PARDO:  Your Honor, that's not fully --

16  THE COURT:  I was just told my Mr. -- I'm not sure --

17  MR. PARDO:  I understand, but that's not fully and

18  completely accurate.  Mr. Maloney would address that if we got

19  to the merits.

20  THE COURT:  All right, even if there are no aggregate

21  limits, even if that were the case, the parties certainly have

22  the capability, particularly when they're looking at funding, a

23  524(G) trust of determining that they don't want to litigate

24  those issues going forward and it can be very expensive,

25  costly, and lengthy litigation.  That will simply hold up more

distributions to the creditors who would be entitled to the
insurance proceeds. And the one thing that 524 does I think
that at this stage of asbestos litigation is, I think, probably
uncontested is that it takes the rights of any beneficiary to a
specific amount of insurance and transfers that to the trust so
that the trust can then adjudicate the rights of all of those
entities within the confines of the trust policy rather than
what would have happened in specific insurance coverage
litigation -- not coverage, but demand litigation in the state
courts, the demand by a plaintiff for coverage by an insurer.
So --

MR. PARDO: And we're not contesting that.

THE COURT: Okay, so if this policy has -- policies
-- if these policies have been looked at by the debtor who owns
them, by the beneficiaries of them which are both the asbestos
claimants and the futures because the trust will have to figure
out how to divide that asset equally among them but,
nonetheless, they clearly all have some claim to assert against
the policy rights, and they've all determined that this is fair
and reasonable in their best interest to avoid everything
that's been put on the record so far about the horribles that
could happen, I don't see how ITCAN has the capability or the
standing to be able to change that analysis.

It seems to me that the debtor, in dealing with the
entities who are affected by those proceeds, has exercised its

business judgement.  It sent notice out to the world.  No
creditors have objected.  The only entity that has objected is
ITCAN and I don't know how ITCAN is here with standing in that
capacity regarding this settlement because of what it is.  It's
an insurance settlement that ITCAN could not affect one way or
the other outside this court anyway.

MR. PARDO:  Again, Your Honor, I do not believe that
our ability to affect the settlement outside of bankruptcy has
any relevance whatsoever to this analysis.

THE COURT:  Well, I understand that that's your
client's view because of the Amitex and 109 arguments that I'm
not sure they're exactly the same one in this circumstance, but
you've made them before and I think they translate pretty well
to this record that had been made before.  I just don't see it
here.  Mr. Maloney?

MR. MALONEY:  Your Honor, if you don't mind, and I
understand, in fact, appreciate what the Court's already said,
but if the Court would indulge me on a couple of points, and we
can call this a proffer of what I would say and what I would
hope the Court to consider assuming you thought we had
standing.

THE COURT:  All right.

MR. MALONEY:  First of all, let me address a point on
standing because you touched on something and then I'll circle
back, but it does relate to the merits, Your Honor.  In any

1  bankruptcy case where you've got a creditor at the table that

2  says I'm owed a lot of money and this debtor owes it to me and

3  this debtor wants to settle a cause of action, outside of

4  bankruptcy a creditor doesn't have the ability to jump in and

5  get into the debtor's business about settlement.  But it has an

6  interest in whatever the debtor brings in because it's an asset

7  of the debtor.  We all understand that.

8        And so, Your Honor, what I would analogize that to is

9  that debtor in my hypothetical doesn't have a specific interest

10 in the lawsuit.  It wasn't a party to the lawsuit.  It had an

11 interest in the proceeds.  I think what my partner, Mr. Pardo,

12 was saying and what I would like to reiterate it and I want to

13 tie it to the merits, is we do have an intense interest in this

14 settlement and the proceeds of the settlement because it bears

15 on the very fabric the fundamental issue of litigation that is

16 being pursued against us in part through a mechanism through

17 the bankruptcy court.

18       It's always been our contention that features of the

19 litigation that they are bringing and the effects of that

20 litigation out in California are driven by the bankruptcy code.

21 You heard that presentation in December from Mr. Bernick.  I'm

22 not going to go over it, but it's there.  There are dynamics

23 about this litigation that are impacted by the bankruptcy and

24 by the potential confirmation of the plan, all of which we will

25 be saddled with along with this settlement if things go forward

according to the plan proponent's plan.

But the point is, and the merits to this, is that what we don't know and what is not in any of the papers that have been filed and wasn't even in the presentation of the parties is what are we settling?  $150 million is an awful lot of money and I can't deny that and no one can.  But I look at it this way, Judge, if I've got a Mega Millions winning lottery ticket and I want to hand it to Mr. Miller here and he decides well, gosh, Mega Millions, that's a lot of money, I'll pay a million dollars for it, we have no idea whether that's reasonable.  A million dollars is an awful lot of money. Nobody can deny it.  But what if I'm holding a lottery ticket that's worth $350 million?  That's not reasonable.  Or at least wouldn't you want to know that this is a $350 million ticket before we decide whether it's reasonable?

THE COURT:  There isn't any way to know whether or not the specific number of people who at some point in time will claim policy proceeds under these policies.  That's the whole reason why there's a trust because you can't figure out in detail how many claimants there will be as to any particular policy, and that's the reason why insurers have some interest in settling so that they know that their liability is fixed and why the debtor -- and the creditors have some interest in settling because they then know what pot will be available to distribute among all creditors as opposed to just the

1 particular creditor who has to prove a claim under that

2 insurance policy. It makes perfect sense to try to settle

3 these insurance policies en masse so that everyone knows what

4 the outcome will be.

5     If it can have something like a level of excess

6 insurance that for these particular policy proceeds that were

7 going to be impacted by these settlements so that you could say

8 look, if this settlement includes, for example, a determination

9 that the policies are exhausted and as a result our insurance

10 stands next, then you'd have an economic interest perhaps.

11     ITCAN, just a potential alter ego, does not have the

12 ability at this point in time to interfere with these

13 settlements and, frankly, I think that's all I'm going to hear

14 because nothing you can say at this point is going to have me

15 change my mind. I've read the papers. Just so it's clear on

16 the record, I have read the arguments. If there's something

17 supplemental to what's in your papers that you'd like to say,

18 Mr. Maloney, I'd be happy to hear that, but if what you're

19 going to tell me is in the papers, I have read them. They're

20 not convincing me.

21     MR. MALONEY: Your Honor, what is not in the papers

22 at all, again, just for the record, and I disagree

23 respectfully. I think part of what goes on in these courts all

24 the time is an estimation of what future liabilities might be

25 in the offing.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Oh, sure, in general terms but not as to

2    a specific policy.

3           MR. MALONEY:  I think that --

4           THE COURT:  And never -- in probably 30 bankruptcy

5    cases, major asbestos cases now, I've never seen even a request

6    for an estimation of liability of one particular policy.

7           MR. MALONEY:  In this case, Your Honor, all that

8    would be required is an estimation of what claims would be

9    forthcoming in the future that would trigger this policy based

10   upon the date of first exposure.

11          THE COURT:  But even that doesn't make a difference

12   to ITCAN because the people who are entitled to benefit from it

13   have determined that they'll take that hit.  If, in fact, each

14   of the -- I'll use hypotheticals too.  Let's go back to your

15   500 policyholders.  Let's assume there are 500 policyholders

16   who could tap the maximum ability of Aviva to pay under the

17   policies for their benefit and then Aviva for whatever reason

18   has either exhausted or not exhausted the policy limits and

19   another 500 people come up but there's no money to pay them.

20   Five hundred people got paid in full, 500 people didn't get

21   anything.  The whole purpose to the settlement is to make sure

22   that through the trust those distributions to all thousand

23   people are equalized.  They're the entities who have a direct

24   economic stake in this, not ITCAN.

25          MR. MALONEY:  Your Honor, I would just hearken back

1   to the analogy you were just making which I do not believe is

2   appropriate in all context, but you talked about an excess

3   insurer. That is actually the way they have -- Mr. Lockwood

4   has tried to describe this relationship here. Because what the

5   insurance policy doesn't cover, and we take the position that

6   based upon the rulings by Judge Patel, the insurance policies

7   cover an awful lot, perhaps an unlimited amount of liability

8   for certain dates and claims --

9         THE COURT: You're going to tell me ITCAN is an

10   excess insurer?

11         MR. MALONEY: I'm not telling you that --

12         THE COURT: Okay.

13         MR. MALONEY: -- ITCAN is an excess insurer. I'm

14   telling you that based upon the alter ego liability which is

15   based on, in part, Judge, whether the debtor has enough money

16   to pay its claims. If the debtor has enough money to pay

17   claims, they aren't going to get anywhere in California and

18   there's not going to be any liability to us.

19         THE COURT: Well, I don't know what's happening in

20   the alter ego.

21         MR. MALONEY: I understand.

22         THE COURT: Whether ITCAN has any liability, even if

23   there's a ruling that says it's an alter ego, is an economic

24   issue, maybe, down the road, maybe. But this settlement ITCAN

25   could not affect whether or not this bankruptcy is going on.

1  It has no meaning as to ITCAN, this settlement.  ITCAN cannot

2  force anybody to make a claim against these policies.  It can't

3  force the adjudication under those polices.  It can't force a

4  settlement or non-settlement of the policies.  The only

5  entities who can do that are those who are benefitted --

6  beneficiaries of and parties to that policy.  They've all

7  agreed that this is in their best interest and they're willing

8  to take the hit.  If Aviva would have been liable for more on

9  an individual basis, then they lose.  If Aviva would have been

10 -- had defenses that would limit its liability, then they've

11 benefitted.  That's their decision, and they've made it.

12       MR. MALONEY:  Your Honor, I'll yield to Mr. Pardo.

13 He has more to say.

14       MR. PARDO:  Your Honor, I assume you've ruled.

15       THE COURT:  I have ruled.

16       MR. PARDO:  Okay.  Two issues then.  First is a

17 personal -- at the point where we were talking over one

18 another, I truly hope that the Court understood I wasn't

19 intending to yell and to the extent my voice --

20       THE COURT:  Yes, and neither was I so mutual

21 apologies and mutual acceptance, is that acceptable?

22       MR. PARDO:  Thank you, Your Honor.  That's perfectly

23 acceptable.

24       THE COURT:  All right.

25       MR. PARDO:  Here's the substantive issue.  The

proposed form of order does not by its terms seek a waiver of the 6004(H) 14-day automatic stay. My understanding, from reading the papers and I'm sort of asking for confirmation from my colleagues to the light, is that Aviva's payment obligations coming out of escrow would occur once the order becomes final and non-appealable but that it remains subject to the 6004(H) 14-day period.

MR. LANTRY: Your Honor, we did not seek a waiver of 6004(H).

THE COURT: All right, so yes, that's --

MR. LANTRY: His representations about the interpretation of the agreement relative to the final non-appealable order I'm not going to speak to at this time, but the four corners of the document speak for itself.

MR. PARDO: All right, and in that case, let me simply ask the Court a practical question. Do you want me to make an order motion for stay while we're here or do you want me to await the entry of the order, make a written motion for stay and expedited hearing or do you want to do it on papers?

THE COURT: I think it would be better to file the written motion in expedited hearing so that I can, in fact, determine what the parties' either opposition or agreement to it is, whatever. I think that would be better. So I'll get an order from the debtor, enter it and then file your motion at that time.

1    MR. PARDO:  Okay, I do not -- let me be clear on the

2  record.  I do not know that this one will -- that the client

3  will elect to take this one up.  We have not discussed that.

4  But I wanted to know what the Court's procedure -- desired

5  procedure was.

6    THE COURT:  Yes, that's fine.  If you do intend to

7  file a motion, then I think it would be better to put it in --

8    MR. PARDO:  And we'll let your chambers know so that

9  they could be planning for it.

10    THE COURT:  Okay, that would be helpful and that way,

11  I can give you a date that you might be able to -- my staff,

12  that is, could give you a date that could perhaps be put into

13  the notice.

14    MR. PARDO:  Squeeze in.

15    THE COURT:  Yes.

16    MR. PARDO:  That would be great.

17    THE COURT:  Okay.

18    MR. PARDO:  Thank you, Your Honor.

19    THE COURT:  You said two things.  Is that the only

20  one?

21    MR. PARDO:  No.  My first was the apology.

22    THE COURT:  Oh, oh, okay.  All right, Mr. Lantry,

23  I'll take an order from the debtor.

24    MR. O'NEILL:  Your Honor, may I approach?  This is

25  the same form of order that was attached to the motion.

1          THE COURT:  All right.

2          MR. O'NEILL:  I've just written the docket numbers.

3          THE COURT:  Thank you.  Sherry, just for Mr. Pardo's

4 benefit, do you expect to docket this today?

5          SHERRY:  Yes.

6          THE COURT:  It will probably be docketed today, Mr.

7 Pardo.

8          MR. PARDO:  That would be fine, Your Honor, thank

9 you.

10          SHERRY:  (Inaudible).

11          THE COURT:  Some time today.  They'll check the

12 docket.

13          MR. PARDO:  You could always wait for 30 or 40 days.

14 That would be fine as well.

15          THE COURT:  Is today the 13th, I'm sorry, 14th?

16          MR. PARDO:  14th.

17          THE COURT:  The only thing I'm adding to this order

18 is that I'm granting it for the reasons expressed on the record

19 which I incorporate herein.  And I guess as a shorthand way of

20 saying it, I accept the representations of the moving parties

21 and the parties who have joined with the moving parties in this

22 motion that the cost and expense of on-going litigation, the

23 inherent risk of the uncertainty of appeals, the possibility

24 that the debtor will result in nothing or reduced benefits as a

25 result of that litigation with Aviva as opposed to a settlement

1  that will, in fact, almost double the assets that are available

2  for the creditors who will benefit from the trust all seem to

3  me to make this a fair and reasonable settlement.

4          It has been fully and fairly vetted through the

5  mediation process over a lengthy period of time and I will

6  accept those representations and make those findings thereon.

7  I think the Martin standards have all been satisfied.  Did I

8  miss any Martin standard in this recitation?  No?  I think I'm

9  okay.  All right, so I've signed the order.  Thank you.

10  Sherry, he'll give it back to you.

11          MR. LANTRY:  Your Honor, just one clarification.  We

12  had submitted the declaration of John Bay (phonetic) and I'd

13  ask that that be put into evidence as well given the potential

14  appeal.  They didn't make any objections in their papers to the

15  --

16          MR. PARDO:  No objection to that, Your Honor.

17          THE COURT:  All right, it will be made part of the

18  record.  Thank you.  And let me make a note to that effect.

19  Okay, thank you.

20          MR. PARDO:  Thank you, Your Honor.

21                    *  *  *  *  *

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# **C E R T I F I C A T I O N**

        I, MARY POLITO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Mary Polito

MARY POLITO

J&J COURT TRANSCRIBERS, INC.     DATE:  July 19, 2010


**J&J COURT TRANSCRIBERS, INC.**