## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

| | |
|---|---|
| The Flintkote Company and Flintkote Mines Limited, | Bankruptcy No. 04-11300 (JKF) Chapter 11 |
|       Debtors. | **Related to Doc. No. 6336**, Amended Joint Plan of Reorganization in Respect of the Flintkote Company and Flintkote Mines Limited (As Modified November 16, 2011), filed November 16, 2011. |

## MEMORANDUM OPINION OVERRULING OBJECTIONS TO THE AMENDED JOINT PLAN OF REORGANIZATION, CONFIRMING PLAN AND RECOMMENDING THE AFFIRMATION OF CONFIRMATION AND OF THE § 524(g) INJUNCTION[1]

*Introduction*

      Before the Court is the confirmation of The Flintkote Company ("Flintkote") and

Flintkote Mines Limited's ("Mines," and collectively with Flintkote, the "Debtors") Amended

Joint Plan of Reorganization (as modified November 16, 2011), docketed at Doc. No. 6336[2] (the

"Plan").[3]  The Plan[4] is supported by the Official Committee of Asbestos Personal Injury

---

[1] This Memorandum Opinion constitutes this Court's findings of fact and conclusions of law with respect to the unresolved objections to confirmation.

[2] We shall use "Doc. No." as an abbreviation for "Docket Number" in citing to the record.  Unless otherwise specified, all citations to a docket number shall be to Bankruptcy Case No. 04-11300.

[3] Previous versions of the Plan were filed on September 9, 2008, at Doc. No. 3628 (the "Original Amended Plan"), June 22, 2009, at Doc. No. 4328 (the "6/22/09 Plan"), July 20, 2009, at Doc. No. 4393 (the "7/20/09 Plan"), August 5, 2010, at Doc. No. 5220 (the "8/5/10 Plan"), and August 30, 2011, at Doc. No. 6122 (the "8/30/11 Plan").

[4] The Debtors have filed several supplements to the Plan containing additional information and certain exhibits to the Plan.  *See* Plan Supplement to Amended Joint Plan of Reorganization in Respect of The Flintkote Company and Flintkote Mines Limited on November 18, 2008, (the "Plan Supplement"), Doc. No. 3826, as amended on September 24, 2009, (the

(continued...)

1

Claimants ("ACC") and the Future Claimants' Representative ("FCR," and together with the

ACC and the Debtors, the "Plan Proponents"). Confirmation hearings were held on October 25

and 26, 2010, and continued on September 12, 13, and 19, 2011.[5] Post-trial briefing was

completed on January 20, 2012. The Court heard closing arguments on March 28, 2012, after

which it accepted supplemental briefing on the issue of whether Flintkote may formally abandon

its alter ego claim in the Plan. The supplemental briefing was completed on May 15, 2012,

making this matter ripe for disposition. The only unresolved objections to Plan confirmation are

lodged by Imperial Tobacco Canada Limited ("ITCAN").[6] We address in this Memorandum

---

[4](...continued)
"First Amended Plan Supplement"), Doc. No. 4547; July 21, 2010, (the "Second Amended Plan Supplement"), Doc. No. 5183; September 16, 2010, (the "Third Amended Plan Supplement"), Doc. No. 5317; May 11, 2011, (the "Fourth Amended Plan Supplement"), Doc. No. 5873; September 23, 2011, (the "Fifth Amended Plan Supplement"), Doc. No. 6207; February 10, 2012, (the "Sixth Amended Plan Supplement"), Doc. No. 6580; and March 19, 2012, (the "Seventh Amended Plan Supplement"). These Supplements reflect amendments or additions to Plan exhibits and Plan-related materials with the following exceptions. Exhibit A to the Fourth Amended Plan Supplement contains the Amended and Restated Executive Consulting Agreement, dated January 11, 2011, (the "Amended Plant Agreement") between Plant Insulation Company ("Plant") and Flintkote. This Amended Plant Agreement superceded and replaced Flintkote's previous agreement with Plant, which was filed as Exhibit F to the Supplemental Disclosure Document Regarding Amended Joint Plan of Reorganization (As Modified), Doc. No. 4327. Also, the First and Second Amended Plan Supplements contained only lists of Settling Asbestos Insurance Companies, which were replaced by an updated list contained in the Fifth Amended Plan Supplement, and thus the First and Second Amended Plan Supplements have been superceded in their entirety.

[5] The transcripts for the confirmation hearings can be found at the following docket entries: Doc. No. 5454 (October 25, 2010); No. 5455 (October 26, 2010); Doc. No. 6190 (September 12, 2011); Doc. No. 6195 (September 13, 2011); and Doc. No. 6206 (September 19, 2011).

[6] Owens-Illinois, Inc. ("Owens") objected to Plan confirmation on November 6, 2008. Doc. No. 3772. However, Owens did not seek any discovery in respect of its objections, and failed to appear at the confirmation hearings either in October 2010 or September 2011. They filed no post-trial briefs, and counsel for Owens filed a withdrawal of appearance in this case on February 17, 2011. Doc. No. 5688. Accordingly, Owens-Illinois, Inc. has abandoned its

(continued...)

Opinion only the provisions of the Bankruptcy Code alleged not to be satisfied by the Plan.[7]

Findings regarding uncontested matters will be set forth separately.  For the reasons that follow,

we find that the Plan complies with § 1129[8] and § 524(g) in all respects and recommend that the

District Court affirm confirmation of the Plan and the § 524(g) injunction.

### Background

From 1917 until 1987, Flintkote was primarily in the business of manufacturing,

processing, and distributing building materials.[9]  Between the 1930s and the 1980s, a wide

variety of those materials contained asbestos.  Flintkote was acquired by Genstar Corporation

("Genstar") in 1979.  In 1986, Genstar was acquired by ITCAN.  Flintkote remained an indirect,

wholly-owned subsidiary of ITCAN until 2003, when ITCAN transferred Flintkote's stock to a

charitable trust.[10]

Mines was founded in 1945 as a Canadian subsidiary of Flintkote.  Mines operated an

asbestos mining facility as Flintkote's subsidiary until 1971, when it was sold.  From its

founding until 1980, when it ceased major operations, Mines engaged in mining and brokering

---

[6](...continued)
objections.
    [7] The Court's jurisdiction was not at issue.  The Court has jurisdiction pursuant to 28 U.S.C. § 157 and § 1334 over this core proceeding.  *See* 28 U.S.C. § 157(b)(2).  Each Debtor is qualified to be a debtor under 11 U.S.C. § 109.  Venue is proper under 28 U.S.C. § 1408.
    [8] All citations to statutes in this Memorandum Opinion are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise specified.
    [9] Affidavit of David J. Gordon in Support of First Day Motions (the "First Day Affidavit"), Doc. No. 2, ¶ 8; Disclosure Statement Regarding Amended Joint Plan of Reorganization in Respect of The Flintkote Company and Flintkote Mines Limited ("Disclosure Statement"), Doc. No. 3629, at 10.
    [10] Disclosure Statement, at 10.

raw asbestos.[11]

Asbestos-related lawsuits were filed against Flintkote beginning in the early 1970s[12] and increased in number over the following decades.  The lawsuits caused Flintkote to incur costs in excess of $500 million in settling or defending asbestos-related claims in the years leading up to the petition date.  Beginning in 2001, the costs of defending or settling asbestos-related liability claims exceeded Flintkote's recovery from its insurers, which caused Flintkote to file for protection under Chapter 11 on May 1, 2004.  Flintkote's filing caused certain asbestos claimants to seek recovery from Mines and the insurance Mines shared with Flintkote.  Flintkote defended Mines against such claims before Flintkote's bankruptcy filing, but could not continue to do so post-petition, which forced Mines to file for Chapter 11 protection itself.  Mines filed its bankruptcy petition on August 25, 2004.  As of the petition dates, approximately 157,000 asbestos personal injury claims were pending against Flintkote and approximately 2,800 were pending against Mines.[13]

***The Plan***

The key component of the Plan is the creation of a § 524(g) trust, which will assume all liability for current and future asbestos personal injury claims against both Flintkote and Mines.  Plan § 4.4.  The majority of the Debtors' assets will be transferred to the trust, including (1) all of the stock of reorganized Flintkote; (2) all cash held by the Debtors as of the effective date, less approximately $49 million in reserve cash and real estate holdings; (3) the Trust Causes of

---

[11] *Id.* at 21-22.
[12] First Day Affidavit, ¶ 21.
[13] Disclosure Statement, at 23-24.

Action and all proceeds thereof; (4) all funds on deposit in the Qualified Settlement Fund;[14] (5)

$20 million in insurance proceeds from settlements conditioned upon entry of a final, non-

appealable order confirming a § 524(g) plan; (6) the Litigation Note obligating Reorganized

Flintkote to remit 98% of the net recovery on account of Third Party Causes of Action

Recoveries to the Trust; (7) all Asbestos Insurance Actions and related recoveries; and (8) all of

the Debtors' rights with respect to Asbestos Insurance Policies.  *See* Plan §§ 1.1.117; 4.5.

     The Trust will use these assets to pay holders of Asbestos Personal Injury Claims in

accordance with the "Asbestos Personal Injury Trust Agreement" (the "Trust Agreement") and

the "Asbestos Personal Injury Trust Distribution Procedures" (the "TDP").  The Trust

Agreement and TDP provide for the valuation and payment of asbestos personal injury claims.

Plan § 4.1.2.

     The Trust will serve as a liquidating trust for Mines, which is not seeking a discharge

under § 1141 or protection under § 524(g).  *Id.*  As noted above, Mines ceased major operations

in 1980 and, as of Flintkote's petition date in 2004, had ceased all operations.[15]  A single trust for

both Flintkote and Mines is appropriate and cost-efficient because there is overlapping asbestos

liability between the two companies, a parent-subsidiary relationship, and shared insurance

assets available to pay the liabilities.  No one has objected to the one-trust structure.

     Holders of secured, administrative, and priority claims will be paid in full under the

Plan.[16]  Holders of allowed unsecured claims other than Asbestos Personal Injury Claims

---

[14] Capitalized terms and phrases used but not otherwise defined herein shall have the meanings given to them in the Plan.

[15] First Day Affidavit, ¶ 18.

[16] *See* Plan §§ 2.1, 2.2, 3.2.1-3.2.4.

(Classes 5 (Flintkote) and 6 (Mines)) will each receive either: (a) a total cash payout of 35% of the Allowed Amount of such claim; or (b) a cash payout of 5% of the Allowed Amount of such claim followed by subsequent distributions, if any, at the time and at the same percentage amount (less the 5% already paid) as to Class 5, as paid by the Trust to Claims in Class 7 (Flintkote Asbestos Personal Injury Claims) and as to Class 6, as paid by the Trust to Claims in Class 8 (Mines Asbestos Personal Injury Claims), respectively. *See* Plan §§ 1.1.35, 3.2.5, 3.2.6. Note, however, that there are no allowed claims in Class 6.

The Plan is designed to be "insurance neutral," and provides that all Asbestos Insurance Actions and related claims and causes of action are preserved for the benefit of the Trust. *See* Plan § 11.7. Nothing in the Plan limits in any way the ability of any Asbestos Insurance Company to assert any available coverage defenses.[17] The insurance neutrality provisions were negotiated between the ACC, FCR, and representatives of several of the Asbestos Insurance Companies. No insurer objects to the Plan.

***The Vote***

The Debtors solicited votes on the Original Amended Plan from the holders of Claims and Equity Interests in Classes 5 (Unsecured Claims Against Flintkote), 6 (Unsecured Claims Against Mines), 7 (Flintkote Asbestos Personal Injury Claims), and 8 (Mines Asbestos Personal

---

[17] The insurance neutrality provisions of the Plan in § 11.8.1 apply to every Asbestos Insurance Company except for Certain London Market Companies ("LMC"). The Plan contains special provisions applicable only to LMC, which are essentially the same insurance neutrality provisions that were approved by the Court of Appeals in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). *See* Plan § 11.8.2; Stipulation By and Between Plan Proponents and Certain London Market Companies, Doc. No. 5426.

6

Injury Claims), (together, the "Voting Classes").[18]  On January 7, 2009, the Garden City Group, Inc.[19] ("GCG") filed the Declaration of Jeffrey S. Stein of the Garden City Group, Inc. Certifying the Methodology for the Tabulation of Votes and Results of Voting With Respect to the Debtors' Amended Plan of Reorganization (the "First Voting Declaration"), at Doc. No. 3958.  As described in the First Voting Declaration, three classes of claimants voted on the Original Amended Plan: Class 5 (Unsecured Claims against Flintkote), Class 7 (Flintkote Asbestos Personal Injury Claims), and Class 8 (Mines Asbestos Personal Injury Claims).[20]  All classes voted to accept the Original Amended Plan by the required statutory majority; however, less than the required super-majority (pursuant to § 524(g)) of Class 7 Flintkote Asbestos Personal Injury Claimants and Class 8 Mines Asbestos Personal Injury Claimants voted to confirm the Original Amended Plan.  *See* the First Voting Declaration, at 12.

Because the first plan could not encompass a § 524(g) injunction, the Plan Proponents made certain changes to the Original Amended Plan and the TDP in an attempt to acquire the necessary super-majority of votes from Class 7.  The Plan Proponents filed new versions of the Plan on June 22, 2009, and July 20, 2009, along with the Supplemental Disclosure Document

---

[18] Votes were solicited pursuant to the Order (I) Approving Disclosure Statement Regarding Amended Joint Plan of Reorganization, (II) Setting Date of Confirmation Hearing with Respect to Amended Joint Plan of Reorganization, and (III) Establishing Objection Procedures for Amended Joint Plan of Reorganization (the "Disclosure Statement Order"), Doc. No. 3601, and the Order: (I) Establishing Procedures For Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization; (II) Approving Form of Ballots; (III) Approving Form and Scope of Notice of the Plan and Confirmation Hearing; (IV) Establishing Record Date for Voting Purposes Only; and (V) Setting Certain Deadlines (the "First Solicitation Procedures Order"), Doc. No. 3615.

[19] On May 5, 2004, the Court approved the Debtors' retention of the Garden City Group, Inc., as the noticing, claims and balloting agent.  *See* Doc. No. 25.

[20] Class 6 did not contain any qualifying members, and thus no votes were cast in Class 6 (Unsecured Claims Against Mines).

Regarding Amended Joint Plan of Reorganization ("Supplemental Disclosure Document"), at

Doc. No. 4327, as further modified on July 20, 2009, at Doc. No. 4392. This Court approved the

Supplemental Disclosure Document and on July 31, 2009, ordered the Plan Proponents to re-

solicit votes from Classes 7 and 8.[21]  On October 5, 2009, GCG filed the Declaration of Jeffrey S.

Stein of The Garden City Group, Inc. Certifying the Methodology for the Tabulation of Votes

and Results of Voting with Respect to the Debtors' Amended Plan of Reorganization (as

Modified) (the "Modified Voting Declaration"), Doc. No. 4572. As reported in the Modified

Voting Declaration, Class 7 accepted the Plan by the required super-majority. No other class

required a super-majority vote.

*Flintkote's Post-Confirmation Operations*

Flintkote intends to pursue what it alleges are five separate business lines[22] upon

emerging from bankruptcy: (1) purchasing and leasing real estate; (2) consulting and executive

management services; (3) claims processing; (4) trust services; and (5) pursuit of the Dividend

Recovery Litigation ("DRL"). We will examine each of the five in greater detail below.

*Real Estate*

Flintkote's real estate operations consist of owning and managing the leasing of six

"quick-service restaurant properties," which Flintkote purchased with portions of its recovered

insurance assets, upon Court approval, during the course of the bankruptcy proceedings. All of

---

[21] *See* Order Approving (I) Scope of Resolicitation for Amended Joint Plan of Reorganization (As Modified); (II) Supplemental Voting Procedures; (III) Forms of Ballots and Master Ballots; (IV) Form and Manner of Notice; and (V) Establishing Certain Deadlines (the "Supplemental Solicitation Procedures Order"), Doc. No. 4427.

[22] Although we refer to Flintkote's five separate "business" lines, as discussed, *infra*, not all of Flintkote's purported businesses are necessarily sufficient, standing alone, to satisfy § 1141(d).

these properties are leased under triple-net leases through 2023 with quick-service restaurant operators such as McDonald's USA and Carrols Corporation.[23]  Flintkote intends to allocate $10 million of the working capital it will hold under the Plan for the purchase of seven additional properties by the end of the second year, post-effective date, with the goal of securing similar long-term, triple-net leases for each property.[24]  David J. Gordon, Flintkote's C.E.O., has extensive experience in the quick-service restaurant industry.[25]  Flintkote contends that these holdings will provide a steady, reliable stream of rental income for the trust estimated at $1.3 million in annual revenue beginning in the third year, post-effective date.

*Consulting and Executive Management Services*

Flintkote has a contract with Plant Insulation Company ("Plant"), which is itself subject to a confirmed plan in bankruptcy, to provide consulting and executive management services. The bankruptcy court presiding over Plant's bankruptcy case approved the renegotiation of the executive consulting agreement between Flintkote and Plant.  Plant paid Flintkote $968,000 for consulting and executive management services as of October 31, 2011, and Flintkote is eligible to receive a $1 million dollar success fee upon Plant's successful emergence from bankruptcy. On March 15, 2012, Plant's § 524(g) plan was confirmed by Bankruptcy Judge Thomas Carlson. *See In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N. D. Cal. 2012).[26]  Flintkote intends to

---

[23] Carrols Corporation is Burger King Corporation's largest franchisee.  *See* Hr'g Tr. 128:17-20, Oct. 25, 2010 (Gordon).

[24] The Court notes that we state the facts as they existed at the time of trial.  Since then, this Court has authorized the purchase of additional real property parcels (*See* Doc. Nos. 6868, 6920), but that fact has no bearing on this Opinion and is not considered by this Court in making its ruling.

[25] Hr'g Tr. 50:20-56:14, October 25, 2010 (Gordon).

[26] On October 9, 2012, the U.S. District Court for the Northern District of California

(continued...)

seek other clients for its consulting and executive management services.

*Claims Processing*

The Plan contemplates that Flintkote will provide claims management services to the Trust created under its Plan pursuant to a Trust Services Agreement,[27] which will be executed on the effective date of the Plan.  Under the agreement, Flintkote will manage and process asbestos claims on behalf of the Trust.  Flintkote asserts that the Trust will benefit from the agreement because Flintkote will perform these services at cost, where otherwise the Trust would have to hire a third party claims processing company at higher market rates.  The operation will also provide Flintkote with practical experience in this market niche.  Flintkote has two employees in place to manage the claims processing arm of its business and has secured a workspace in Cleveland, Ohio.  Flintkote also asserts that it is developing proprietary claims processing software which should help it attract new clients.  As of the close of the Confirmation hearings, Flintkote has been unsuccessful in attracting any new clients, though Flintkote contends that by continuing to pitch its business it is increasing its profile in the market.

*Trust Services*

Under the Trust Services Agreement, Flintkote will also provide services to the Trust beginning on the effective date.  Flintkote will assist with trust management and control, dispute and litigation management, accounting and financial services, insurance recovery, and records and logistics services.  These activities will also be provided by Flintkote at cost, which will save

---

[26](...continued)
affirmed confirmation of Plant's plan of reorganization.  *See* Civil Case No. 3:12-cv-01887-RS, Doc. No. 110 (N.D. Cal. Oct. 9, 2012).  That decision has been appealed to the Ninth Circuit Court of Appeals.  *See id.*, Doc. No. 142, 144, 147.
[27] *See* Doc. No. 5317, Ex. A.

the Trust from having to pay market rates to third party vendors.  Flintkote is pursuing other

clients for these services, but, as of yet, none has been retained.

*Dividend Recovery Litigation*

Post-confirmation, Flintkote will continue to manage the Dividend Recovery Litigation

("DRL") against ITCAN in the California Superior Court.  The DRL will be described in greater

detail below, but it suffices to say here that Flintkote is pursuing damage claims against ITCAN

for fraudulent conveyance, wrongful dividend, breach of fiduciary duty, recission and other

related theories, arising in connection with ITCAN's alleged hostile takeover of Flintkote.

Flintkote will be entitled to retain 2% of any net recovery from the DRL to fund its ongoing

business operations.  The remaining 98% will be transferred to the Trust.  Under the Plan, the

Trust will fund all of Flintkote's expenses related to the DRL and may join Flintkote as co-

plaintiff.

**Standing**

The issue of whether ITCAN has standing to raise its objections has been extensively

briefed by the parties.  We will address the standing issue before turning to the merits of

ITCAN's objections.  "To object to the confirmation of a reorganization plan in bankruptcy

court, a party must, in the first instance, meet the requirements for standing that litigants in all

federal cases face under Article III of the Constitution." *In re Global Indust. Techs.*, *Inc.*, 645

F.3d 201, 210 (3d Cir. 2011) ("*GIT*").  There are three elements that must be established for a

party to establish standing under the Constitution.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992).  First, constitutional standing requires an "injury in fact" that is "concrete," "distinct

and palpable," and "actual or imminent."  *Id.* (quoting *Whitmore v. Ark.*, 495 U.S. 149, 155

(1990)).  Second, "there must be a causal connection between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, which means that the injury must be "fairly trace[able] to the challenged action."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Here, the challenged action is confirmation of the Plan.  Third, there must be a likelihood that a favorable decision will redress the injury.  *Lujan*, 504 U.S. at 561.

Parties in interest also have standing to object to confirmation of a plan under § 1109(b), which states: "[a] party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  The court in *GIT* defined a "party in interest" as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding"[28] or "has a sufficient stake in the proceeding so as to require representation."[29]  The standard for "party in interest" standing under § 1109(b) is no more exacting than the standard for constitutional standing.  *GIT*, 645 F.3d at 211.  Thus, if ITCAN has constitutional standing under Article III, it has standing under § 1109(b).

ITCAN argues first that it is a creditor, and thus by definition a "party in interest" with standing to object to confirmation.  Secondly, ITCAN argues that even if it is not a creditor of the estate it is still a "party in interest" because the Plan impairs various rights and defenses it has with respect to both Flintkote and individual asbestos plaintiffs in the DRL.  A summary of the DRL will be helpful before turning to the merits of ITCAN's standing arguments.

---

[28] *GIT*, 645 F.3d at 210 (quoting *In re James Wilson Assocs.*, 965 F.3d 190, 214 n.21 (3d Cir. 2004)).
[29] *GIT*, 645 F.3d at 210 (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)).

**The DRL**

In April of 2006, two years into bankruptcy, Flintkote along with Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (the "Hopkins Plaintiffs")[30] commenced the DRL against ITCAN in the Superior Court of California, San Francisco County (Case No. CGC-06-450944) (the "Superior Court"). On April 27, 2006, this Court authorized the ACC and FCR to join in the DRL as co-representatives of the Debtors' estates.[31] In the Second Amended Complaint, the Plan Proponents alleged, in summary, that ITCAN, subsequent to acquiring Flintkote, improperly dominated and controlled Flintkote as part of a hostile takeover, causing Flintkote to sell off its assets and pay the proceeds to ITCAN, with the goal of shielding ITCAN from Flintkote's asbestos liability. The Plan Proponents seek recovery of damages from ITCAN in excess of $600 million on fraudulent conveyance, wrongful dividend, breach of fiduciary duty, recission, and related grounds.

The Plan Proponents also sought a declaration that ITCAN was Flintkote's alter ego for purposes of determining liability for asbestos personal injury claims against Flintkote. The purpose of the Hopkins Plaintiffs joining in the DRL was that, at the time the DRL was commenced, California law was unclear whether a bankruptcy trustee (or debtor-in-possession) or an individual asbestos claimant was the proper party to bring an alter ego claim. Flintkote and the Hopkins Plaintiffs jointly asserted the claim, so that at least one of the plaintiffs would be the

---

[30] The Hopkins Plaintiffs are the legal heirs of Norman Hopkins, who died of mesothelioma in 2005 allegedly as a result of exposure to asbestos containing products manufactured or distributed by ITCAN as Flintkote's alter ego. *See* Second Amended Complaint, at 2, ¶ 1, Doc. No. 6386, Ex. D.

[31] *See* Order Approving Certain Joint Prosecution Agreement in Connection with the Dividend Recovery Litigation, Doc. No. 1479.

proper party, which would facilitate the Superior Court in reaching the merits of the alter ego

claims.  The Plan Proponents opined that if they were successful in their alter ego suit, res

judicata and collateral estoppel would prevent ITCAN from denying its alter ego status in

separate alter ego actions, to the benefit of all current and future creditors of Flintkote.[32]

On January 6, 2012, Judge Richard Kramer of the Superior Court issued an official

Statement of Decision in the DRL, holding that the Plan Proponents lacked standing to pursue

alter ego relief against ITCAN (the "California Decision").[33]  The crux of the California Decision

is that the Hopkins Plaintiffs have standing to pursue alter ego claims against ITCAN, but "under

California law, Flintkote must own an independent cause of action against [ITCAN] in order to

assert this derivative claim for alter ego relief.  In other words, Flintkote must have a substantive

claim against [ITCAN] – *e.g.*, tort claim – to which to attach the alter ego remedy."[34]

The Plan Proponents elected not to appeal the California Decision[35] or seek alter ego

relief in other jurisdictions.  Instead, the Plan Proponents amended the Plan on November 16,

2011, to reflect their intent to formally abandon any alter ego claim against ITCAN that might be

construed as estate property, in order to avoid impairing the ability of the Hopkins Plaintiffs to

assert their own alter ego claims against ITCAN.  ITCAN strenuously objects to Flintkote's

purported abandonment of the alter ego claim, and the Court agreed during closing arguments on

---

[32] *See* Debtors' Motion For Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay in Connection with the Dividend Recovery Litigation, Doc. No.1433, ¶¶ 13-15.

[33] *Hopkins et al. v. Plant Insulation Co.*, Case No. CGC-06-450944, Statement of Decision on Whether Flintkote Can Pursue Its Alter Ego Declaratory Relief Claim Against Imperial - filed January 6, 2012.  Judge Kramer's initial ruling on this issue came in a tentative decision on October 5, 2011.

[34] California Decision, at 4.

[35] *See* discussion of abandonment of Flintkote's alter ego claim, *infra.*

March 28, 2012, to accept additional briefing on this issue.  The parties' arguments with regard to the abandonment issue will be discussed in greater detail below.

In summary, the Plan Proponents will continue to pursue, post-confirmation, their pending claims in the DRL other than the alter ego claim.  The alter ego claim will not be pursued against ITCAN post-confirmation by the Plan Proponents, but the question remains whether the Plan Proponents can formally abandon it in the Plan when it has already been determined that Flintkote lacks standing to assert that claim under California law.

**ITCAN's Alleged Creditor Standing**

We now turn to ITCAN's arguments that it has standing to object to confirmation.  ITCAN argues that it is a "party in interest" because it is a "creditor," which is an express category of parties in interest under § 1109(b).  ITCAN asserts creditor status based upon: (i) an alleged claim for contribution and indemnity against Flintkote in the event that any party recovers from ITCAN on grounds that ITCAN is Flintkote's alter ego for purposes of asbestos liability; and (ii) an alleged claim for contribution and indemnity against Flintkote to the extent ITCAN has to pay to remediate environmental contamination at a property formerly owned by Flintkote.

Prior to the decision in *JELD-WEN, Inc. v. Van Brunt* (*In re Grossman's Inc.*), 607 F.3d 114 (3d Cir. 2010) ("*Grossman's*"), ITCAN maintained that it held a future demand for contribution and indemnification in the event it was ever liable under an alter ego theory.  ITCAN's position was that, under *Avellino & Biens v. M. Frenville Co.* (*In re M. Frenville Co.*), 744 F.2d 332 (3d Cir. 1984) ("*Frenville*"), it could not file a proof of claim until a right to payment arose—*i.e.* until ITCAN was adjudicated to be Flintkote's alter ego.  After *Grossman's*

was decided, ITCAN argued that the change in law as to when a claim arises meant that it could file a proof of claim when it could not previously, and so sought leave to file a late proof of claim.[36] This Court disagreed with the proposition that *Frenville* prevented ITCAN from filing a claim in the bankruptcy. In our view, *Frenville* did not *prohibit* the filing of a claim, it related only to when a claim would be considered "pre-petition." *Frenville* was decided in a case raising an issue concerning the application of the automatic stay in a situation where pre-petition conduct formed the basis for a lawsuit but where the cause of action itself did not arise until after the petition was filed. Thus, we denied the motion[37] and so no claim has been filed relating to alter ego liability.

ITCAN cites to the recent decision in *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012), as support for its argument that, despite this Court's Order denying ITCAN's request to file a late proof of claim, the ruling in *Grossman's* should nevertheless allow ITCAN to assert its alter ego contribution claim.[38] *Wright* involved two plaintiffs who had each installed roof shingles manufactured by Owens Corning. Patricia Wright installed her shingles in 1999, before Owens Corning filed for bankruptcy, while the other plaintiff, Kevin West, installed his shingles in 2005, after the filing of the petition but before plan confirmation. *Wright*, 679 F.3d at 103. Neither plaintiff discovered defects in the shingles until 2009, long after the filing of the petition in 2000 and the bar date in 2002, and thus at the time of the bankruptcy filing both plaintiffs

---

[36] *See* Order Granting in Part and Denying in Part Imperial Tobacco Canada Limited's Amended Motion for Leave to File Out-of-Time Proof of Claim, Doc. No. 5425.

[37] *Id.*

[38] *Wright* was issued subsequent to the completion of briefing and arguments regarding confirmation. ITCAN filed a Notice of Subsequent Authority, Doc. No. 6804, directing the Court's attention to the case. The Court takes notice of *Wright* and analyzes ITCAN's arguments in light of the holdings in that case.

were unknown future creditors.  *Id.*  When the defects in the shingles were discovered in 2009,

the plaintiffs filed a putative class action against Owens Corning.  *Id.*  Owens Corning moved for

summary judgment, which was granted by the District Court on the grounds that the plaintiffs

had claims under the new rule in *Grossman's*, and that those claims were discharged in the

bankruptcy.  *Id.* at 104.  The Court of Appeals agreed that the plaintiffs held claims but disagreed

that the plaintiffs were afforded due process, and thus held that the confirmation order did not

discharge the plaintiffs' claims.  *Id.* at 109.  The Court of Appeals reasoned that Wright and

West should not be treated differently simply because Wright happened to install her shingles

pre-petition while West installed his post-petition but pre-confirmation.  *Id.* at 107.  Thus, the

Court of Appeals extended *Grossman's* by holding that an individual has a "claim" under the

Bankruptcy Code if he or she is exposed to a debtor's product or conduct pre-confirmation.  *Id.*

at 109.

The Court of Appeals reasoned that, by the time *Grossman's* was decided, "the bar date

had passed, the Confirmation Order had been entered, and the Confirmation Date had occurred,

each of which affected the Plaintiffs' newfound claim status without an opportunity for them to

be heard.  Due process affords a re-do in these special situations to be sure all claimants have

equal rights."  *Id.* at 108.  However, the situation facing ITCAN is inapposite to the situation

facing the plaintiffs in *Wright*.  In *Wright*, the plaintiffs were unknown and had no idea at the

time of Owens Corning's bankruptcy that they had any right of payment against the debtor.  In

this case, ITCAN has been fully involved in the Debtors' bankruptcy case since 2006, and did

not seek to file a late proof of claim until four years after the DRL was commenced, despite this

Court's announcement to ITCAN in 2008 that this Court's view is that *Frenville* did not excuse

ITCAN from filing its contingent claim.  Flintkote suggests that ITCAN strategically chose not

to file a proof of claim because it wanted to avoid submitting to the jurisdiction of this Court.

Regardless of whether that is the case, the fact remains that this is not a "special situation" where

ITCAN was an unknown claimant who was unaware of the fact that Flintkote is in bankruptcy or

that ITCAN might eventually be liable as Flintkote's alter ego with respect to Flintkote's

asbestos liability.  ITCAN has always held a contingent claim with respect to its alter ego

contribution theory, and nothing in *Frenville* states that the law prohibits it from filing that

claim.

Furthermore, a belief that filing a proof of claim would be futile,[39] or a belief that the law

does not allow the filing of a proof of claim[40] does not constitute excusable neglect.  Although

the District Court declined to review this Court's Order denying ITCAN leave to file its alter ego

claim on the grounds that the order was interlocutory, the District Court agreed that ITCAN was

appealing this Court's "fact-intensive" application of the *Pioneer*[41] standard for excusable

neglect and that ITCAN's appeal did not present any controlling question of law.  *See Imperial*

*Tobacco Canada Ltd. v. The Flintkote Co.* (*In re The Flintkote Co.*), 471 B.R. 95, 102-03 (D.

Del. 2012).[42]  Thus, we must reject ITCAN's argument under *Wright*.

To the extent that ITCAN may have a claim in the future against Flintkote related to alter

---

[39] *In re LAN Assocs. XIV, L.P.*, 193 B.R. 730, 737 (Bankr. D.N.J. 1996).

[40] *Mich. Self-Insurers' Sec. Fund v. DPH Holdings, Corp.* (*In re DPH Holdings, Corp.*), 434 B.R. 77, 85 (S.D.N.Y. 2010)

[41] In *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993), the U.S. Supreme Court established the standard for what constitutes "excusable neglect" sufficient to allow a bankruptcy court to accept late filings.

[42] ITCAN appealed the District Court's ruling to the Court of Appeals for the Third Circuit.  *See* Notice of Appeal to the United States Court of Appeals for the Third Circuit, Case No. 1:11-cv-00063-LPS, Doc. No. 26.

ego liability, that claim is speculative and cannot confer "party in interest" standing to object to plan confirmation.  As noted above, the injury in fact must be "actual and imminent," and here the injury is far from imminent.  The following contingencies exist and must be satisfied before an injury exists: (1) an asbestos plaintiff must establish the merits of the asbestos personal injury claim; (2) an asbestos plaintiff must prevail on alter ego grounds against ITCAN;[43] (3) a court must fashion an equitable remedy based upon the alter ego finding; (4) the plaintiff must recover from ITCAN on the personal injury claim; (5) ITCAN must have a right to seek subrogation or contribution from Flintkote.

Whether or not all these events will come to pass at some time in the future is entirely speculative.  Thus, the alleged injury is simply not "actual and imminent."  In addition, ITCAN has denied throughout this entire bankruptcy case that it is Flintkote's alter ego.  Moreover, ITCAN has stated several times that even if it is found to be Flintkote's alter ego, it will not pay anything to asbestos victims because, as a Canadian company with its assets in Canada, no judgment would be enforceable against it.[44]  Lastly, even if it were to compensate an asbestos

---

[43] As noted above, Flintkote lacks standing to seek alter ego relief against ITCAN, so whether ITCAN is adjudicated to be Flintkote's alter ego will depend, in the first instance, on an individual plaintiff, such as the Hopkins plaintiffs, bringing a successful claim.

[44] *See* Notice of Motion and Memorandum in Support of Defendant Imperial Tobacco Canada Limited to Dismiss for Lack of Personal Jurisdiction or in the Alternative to Abstain," Case No. 06-03051-MHP (N.D. Cal., June 19, 2006), Doc. No. 62, at 1:4-6 ("Even if the plaintiffs were successful . . . it will be a waste of time for the Court and all parties involved because this 'success' is apt to result in nothing more than a worthless paper judgment against [ITCAN].").  *See also* Notice of Motion And Memorandum In Support Of Defendant Imperial Tobacco Canada Limited ("ITCAN") To Re-Notice Its Motion To Dismiss For Lack Of Personal Jurisdiction Or To Abstain Filed While This Action Was Pending On Removal In The United States District Court For The Northern District of California (Civil Action No. C 06-03051-MHP) Before Remand To This Court, filed in the Superior Court of California, County of San Francisco, Case No. CGC 06 450994, at 3 ("[ITCAN] is a Canadian company with substantially
(continued...)

victim based on a finding of alter ego, it is questionable whether ITCAN could assert

contribution or subrogation rights against Flintkote.  Flintkote cites to several cases indicating

that a party found liable on an alter ego theory cannot seek indemnification from the alter ego,[45]

and that subrogation is not available to a party that pays a debt on which it has primary

liability.[46]  The mere unlikely possibility of ITCAN holding a claim against Flintkote by virtue of

eventually compensating an asbestos plaintiff for Flintkote's actions on an alter ego theory is too

remote to constitute an "injury in fact" for purposes of constitutional standing and/or "party in

interest" standing under § 1109(b).

In ITCAN's motion to file a late proof of claim based upon an alter ego contribution and

indemnity theory, ITCAN also sought leave to file late proofs of claim with respect to two claims

under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.

§ 9607 *et seq.* ("CERCLA").  The first claim under § 107 of CERCLA sought approximately

$13,000 in attorneys' fees incurred in identifying Flintkote as a potentially responsible party

with respect to a site that Flintkote previously owned and on which there was environmental

contamination.  The second was a contingent claim for contribution and indemnity against

Flintkote for cleanup costs that ITCAN might have to incur in the future in remediating

environmental contamination at the site.

---

[44](...continued)
all of its assets in Canada and the Canadian courts will not recognize any judgment that might be
rendered against [ITCAN] on the plaintiffs' claims in this action.").

[45] *See Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 464 (7th Cir. 1991); *U.S. Fire Ins.
Co. v. Nat'l Union Fire Ins. Co.*, 107 Cal. App. 3d 456, 468 (1980).

[46] *See* § 509(b)(2); *Rubenstein v. Ball Bros. Inc.*, (*In re New England Fish Co.*), 749 F.2d
1277, 1281 (9th Cir. 1984); *In re Fiesole Trading Corp.*, 315 B.R. 198, 207 (Bankr. D. Mass.
2004); *Cornmesser v. Swope* (*In re Cornmesser's, Inc.*), 264 B.R. 159, 163 (Bankr. W.D. Pa.
2001).

The Court granted ITCAN leave to file the CERCLA claim for contribution and indemnity related to cleanup costs under § 502(e)(1)(B), which provides that claims for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor shall be disallowed to the extent that "such claim . . . is contingent as of the time of allowance or disallowance of such claim." As ITCAN's claim was contingent, the Court disallowed the claim.[47]

As to the claim for attorneys' fees under § 107 of CERCLA, the Court granted ITCAN leave to file an out-of-time proof of claim, though the Order granting leave deemed that claim disputed and provided that the claim would be adjudicated as long as the Debtors objected to the proof of claim. The Debtors did object to the proof of claim, the claim was adjudicated, and the Court ultimately disallowed the claim on the grounds that attorneys' fees incurred in "identifying" Flintkote to the New York Department of Environmental Conservation (NYDEC), when Flintkote was already known to NYDEC as a potentially responsible party, were not recoverable under § 107. In disallowing the § 107 CERCLA claim, the Court held that ITCAN did "not have standing to object to the plan of reorganization on the basis of that claim."[48] Thus, the Court has determined that ITCAN cannot assert "party in interest" standing based upon its disallowed environmental claims, and ITCAN is not a creditor in these cases.

**Impairment of Rights/Defenses**

---

[47] The Court also denied ITCAN leave to file a late proof of claim on behalf of the New York Department of Environmental Conservation ("NYDEC"). *See* Doc. No. 5425.

[48] *See* Order Sustaining Debtors' Objection to Claim No. 2262 Filed By Imperial Tobacco Canada Limited and Overruling ITCAN's Objection to Plan Confirmation, Doc. No. 6227. This order is on appeal in the District Court of Delaware. *See* Civil Case No. 1:11-cv-01299-LPS (D. Del. Dec. 29, 2011).

Although ITCAN is not a creditor, that does not preclude a finding that it is a "party in interest" with standing to object to Plan confirmation under § 1109(b). ITCAN contends it is a "party in interest" regardless of whether it is a creditor because the Plan impairs its rights in several ways, which will be described in greater detail below.

ITCAN points to the recent decision in *GIT* as a basis for its argument that it has broad, "party in interest" standing. Before addressing ITCAN's arguments in this regard, a brief background on *GIT* will be helpful.

In *GIT*, the Court of Appeals reversed the district court's affirmance of this Court's holding that a group of insurers of silica claims did not have standing to object to plan confirmation, and its affirmance of this Court's confirmation of the debtors' § 524(g) plan. In 1998, GIT acquired a company, A.P. Green Industries, Inc. ("APG"), which, until the mid 1970s, had manufactured various refractory products, many including asbestos, resulting in massive asbestos liability and ultimately forcing APG and GIT (and other related entities) into chapter 11. As of 2002, approximately 235,000 asbestos personal injury claims were pending against APG. APG also faced silica-related personal injury claims, though on a much smaller scale. As of 2002, APG had only one silica-related lawsuit pending against it.

The *GIT* plan called for the creation of two trusts, one for asbestos claims and one for silica claims. Both trusts were to be funded through insurance, either through cash from insurance policy settlements or by assigning certain insurance policies to the trusts. It was the silica trust that drew insurers' objections to confirmation. The plan was designed to be "insurance neutral," in the vein of *Combustion Engineering*, as to the insurers whose policies were assigned to the trusts, so that all contractual rights and coverage defenses would be fully

22

preserved.  We held that certain non-creditor insurers lacked standing to object to confirmation.

We reasoned, *inter alia*, that any harm these insurers faced was speculative, because the relevant

insurers had been required to pay nothing toward the liability as of that time.  We also rejected

the argument that the insurers were harmed by the assignment of the policies to the trusts in

contravention of the anti-assignment provisions written in the policies, because those provisions

were made null and void by virtue of the bankruptcy and other state law.  The insurers' ability to

raise defenses was preserved to coverage litigation should it ever occur.  The District Court

affirmed our holding with respect to standing and affirmed confirmation of the plan.

The Court of Appeals reversed, reasoning that insurance neutrality "is a meaningful

concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of

liability that the insurers would be called to absorb."[49]  *GIT*, 645 F.3d at 212.  The court noted,

*inter alia*, that, in *GIT*, the plan's "promise of an APG Silica Trust appears to have staggeringly

increased – by more than 27 times – the pre-petition liability exposure.  Thus, on the record here,

it cannot fairly be said that the GIT plan is 'insurance neutral' in the same sense as was the plan

at issue in *Combustion Engineering*."  *Id.*  The alleged harm that may arise from the increase in

asserted silica-related claims was not too speculative to deny standing in the Court of Appeals'

---

[49] The appellate court's rationale apparently failed to consider the fact that the insurers' liabilities were fixed as of the date injuries were incurred that were covered by the policies. Nothing in the bankruptcy case could affect the "quantum of liability" when that concept is measured by the number of injuries and damages owed due to coverage under the policies, the periods of coverage for which were all pre-petition.  Moreover, nothing in the policies imposed any duty on the objecting insurers to investigate any claims that were not presented to it.  How many claims ultimately would have been submitted to and paid by the trust, then presented to the objecting insurers, was and is entirely speculative.  *GIT*, 645 F.3d at 216-220 (Nygaard, J., dissenting).  We note that the confirmation hearing on GIT's amended plan has been concluded and that the objecting insurers have settled with the debtor and no longer object to confirmation.

23

view.  The court ruled that even if the insurers would never have to pay any indemnity to the trusts, the money the insurers would have to spend investigating all the "new" silica claims that voted on the Plan gave the insurers "party in interest" standing to object to its confirmation.  *Id.* at 214.

Turning back to the present case, ITCAN argues that, like the objecting insurers in *GIT,* it has a legally protected interest that is adversely affected by the Plan such that ITCAN has standing to object to confirmation.  We disagree.  First, *GIT* addressed a silica trust formed pursuant to § 105, not an asbestos trust under § 524(g).  Secondly, no assets of ITCAN are being transferred to the Trust, unlike the insurance at issue in *GIT*.  Further, most of what ITCAN complains of with respect to the Plan arises from the operation of § 524(g), other provisions of the Bankruptcy Code, or the fact that Flintkote is a co-insured with ITCAN's subsidiary, Genstar.  None of the harm ITCAN complains of is created by the Plan or the TDP.  For instance, ITCAN complains that "the Plan, through the creation of the proposed Trust and the related channeling injunction, will effectively remove Flintkote, as the asbestos tortfeasor, from any future litigation involving its role in the underlying torts themselves."[50]  We agree that this will be the effect, as this is what § 524(g) is designed to do in every case.  The debtor liable for asbestos claims is able to reorganize without the need to defend suits or to deal with the crushing weight of asbestos liability, which is channeled to a trust created by the plan.  *Combustion Engineering*, 391 F.3d at 234.

ITCAN advances several other arguments as to how the Plan allegedly affects its rights and defenses with respect to asbestos liability which are sometimes based on a misapprehension

---

[50] Opposition Brief, at 44.

of the Plan and, sometimes, are simply incorrect.  For example, ITCAN argues that the Plan "threatens to impose asbestos tort liability on ITCAN and compromise ITCAN's ability to defend itself against that liability."  Opposition Brief, at 44.  First, nothing in the Plan *imposes* tort liability on ITCAN.  Any liability of ITCAN's, as may be determined in suits pending in other courts, is the result of its own pre-petition conduct.  Regardless of whether or not this Plan is confirmed, individual asbestos victims may still bring alter ego claims against ITCAN in the tort system.  Section 524(g) does not protect non-debtor entities unless, pursuant to § 524(g)(4), such entities qualify and contribute to the funding of the trust, which ITCAN elected not to do in this case. The Plan itself does not increase ITCAN's tort liability in any way.

Secondly, while ITCAN argues that it will not have "Flintkote's defenses available to it, as the Plan transfers to the proposed Trust the ability to assert and waive Flintkote's defenses in its discretion,"[51] this is simply not correct.  The Plan expressly provides the trust a *non-exclusive* right to waive or assert Flintkote's tort defenses.[52]  Thus, if sued in the tort system, ITCAN can waive or assert those same defenses in its own discretion.  ITCAN also complains that it will not have "Flintkote, its hundreds of millions of dollars or its insurance coverage by its side at the defense table"[53] to help it defend against asbestos creditors in the tort system.  Again, Flintkote will not be at the defense table by virtue of its discharge, supplemented by the § 524(g) channeling injunction, not because of any unique provision in this Plan.  *See In re W.R. Grace & Co.*, 475 B.R. 34, 161 (D. Del. 2012) (noting that impairment must be the result of what the plan itself does, not of the operation of the Bankruptcy Code).  Thus, there is no merit to ITCAN's

---

[51] *See* Opposition Brief, at 44.
[52] *See* Plan § 11.4.
[53] *Id.*

objection on this basis.

### Flintkote's Abandonment of its Alter Ego Claim

As noted above, Judge Kramer determined in the California Decision that the individual Hopkins Plaintiffs could bring an alter ego claim against ITCAN, but under California law, Flintkote could not.  The Plan Proponents, rather than appealing or filing suit in other jurisdictions, instead sought to formally abandon the estate's alter ego claim against ITCAN, on the premise that they did not wish to inadvertently impair the ability of the individual Hopkins' Plaintiffs or any other individual asbestos personal injury plaintiffs to bring their own alter ego claims against ITCAN.  The Plan Proponents cite *St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989) (*"St. Paul"*), and *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir. 1987) (*"Koch"*), as two cases that stand for the proposition that if an alter ego claim is part of a debtor's estate, the estate must abandon the claim before it can be asserted by individual creditors of the debtor.  To avoid inadvertent prejudice to individual asbestos plaintiffs, on November 16, 2011, the Plan Proponents amended the Plan to reflect the abandonment of Flintkote's ITCAN-related alter ego claim.  Flintkote then moved under Fed. R. Bankr. P. 3019 for an order that the modifications made to the second amended plan do not materially and adversely affect voting creditors.[54]  ITCAN and Flintkote stipulated to an Order, subject to ITCAN reserving certain of its rights, granting the motion on December 12, 2011.  *See* Doc. No. 6426.

ITCAN objects to Flintkote's purported abandonment of its alter ego claim.  In ITCAN's

---

[54] Plan Proponents' Motion for Order Finding that Modifications to the Amended Joint Plan of Reorganization of the Flintkote Company and Flintkote Mines Limited (As Modified August 30, 2011) Do Not Materially and Adversely Affect Voting Creditors, Doc. No. 6386.

view, Flintkote's alter ego claim against ITCAN is non-existent by virtue of the California

Decision.  ITCAN contends that only property of the estate can be abandoned under § 554, and

because Flinktote's alter ego claim cannot be property of the estate if it does not exist, Flintkote

cannot abandon the alter ego claim.  ITCAN argues that even if Flintkote's alter ego claim

constitutes property of the estate, it can be abandoned only to Reorganized Flintkote, not to

individual creditors.  ITCAN argues that the California Decision created res judicata and

collateral estoppel defenses that are impaired by Flintkote's purported abandonment.  ITCAN

asserts it is impaired by the abandonment to the extent such abandonment bolsters the alter ego

claims held by individual plaintiffs.

Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any

property of the estate that is burdensome to the estate or that is of inconsequential value and

benefit to the estate."  § 554(a).  What constitutes "property of the estate" is generally

determined by state law.  *Butner v. United States*, 440 U.S. 48, 55 (1979).

The Plan Proponents point out that there is a great deal of ambiguity regarding whether

an alter ego claim or remedy constitutes property of the estate.  First, "alter ego" is sometimes

treated not as a cause of action or claim, but rather as an equitable remedy.[55]  The California

Decision makes clear that, under California law, the question of whether such a remedy is

available depends on whether there is an underlying cause of action to which the remedy can

---

[55] *See S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*),
817 F.2d 1142, 1152 n.11 (5th Cir. 1987) ("Under Texas law it is proper to refer to an alter ego
claim as a remedy rather than a cause of action because the fact that a corporation may be an
alter ego of a control entity does not create a substantive cause of action against either the
corporation or control entity.").

attach.[56]  Whether the underlying cause of action is property of the estate under § 541 depends

upon (i) whether under state law a corporation is permitted to bring an alter ego claim; and (ii)

"whether the claim is a general claim that is common to all creditors."  *Rosener v. Majestic*

*Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 136 (Bankr. D. Del. 2005).  Thus, because the

issue of whether alter ego claims constitute estate assets turns on state law, courts in different

jurisdictions have come to different conclusions.[57]  Moreover, the analysis implicates conflicts of

law issues governing which state's law applies.

      The Plan Proponents argue that it is precisely this ambiguity that makes abandonment

appropriate here.  The Plan Proponents do not seek any rulings on the merits of ITCAN-related

alter ego claims or any of ITCAN's defenses to such claims.  The Plan Proponents seek only to

make clear in the Plan that to the extent either of the Debtors' estates hold ITCAN-related alter

ego claims, it is the Debtors' intention to abandon those claims to avoid potentially impairing the

interests of creditors.  The Plan Proponents assert that any alter ego claim can be abandoned

without a determination of whether it is an estate asset, if abandoning the claim will prevent

undue prejudice or confusion as to who has standing to bring the claim.  In support, the Plan

---

[56] *See* California Decision, at 4.

[57] *Compare Tsai v. Bldgs. By Jamie, Inc.* (*In re Bldgs. By Jamie, Inc.*), 230 B.R. 36, 43-44 (D.N.J. 1998); *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 759 (S.D.N.Y. 2008); *Krasny v. Bagga* (*In re Jamuna Real Estate, LLC*), 365 B.R. 540, 562-64 (Bankr. E.D. Pa. 2007); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.*, (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1152-53 (5th Cir. 1987) (alter ego claims can be pursued by corporate debtors under state law and are property of the debtors' estates) *with Spartan Tube and Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co.*), 102 F.3d 223, 226-27 (6th Cir. 1996); *Mixon v. Anderson* (*In re Ozark Rest. Equip. Co.*), 816 F.2d 1222, 1225-26 (8th Cir. 1987); *Elegant Custom Homes, Inc. v. Dusharm* (*In re Elegant Custom Homes, Inc.*), No. CV 06-2574-PHX-DGC, 2007 U.S. Dist. LEXIS 35564, at *5-11 (D. Ariz. 2007); *Mar-Kay Plastics, Inc. v. Reid Plastics, Inc.* (*In re Mar-Kay Plastics, Inc.*), 234 B.R. 473, 481-82 (Bankr. D. Mo. 1999) (alter ego claims are not property of the estate because corporate debtors could not pursue such claims under state law).

Proponents cite *In re De Hertogh*, 412 B.R. 24 (Bankr. D. Conn. 2009). In *In re De Hertogh*, individual Chapter 7 debtors sought to sue their bankruptcy attorney for malpractice, but had their suit dismissed without prejudice for failure to name the bankruptcy trustee as plaintiff. *De Hertogh*, 412 B.R. at 27. The trustee then attempted to abandon the estate's interest in the suit so that the debtors could pursue the claim. The Court held that the claim arose post-petition and thus did not belong to the estate, but to the individual debtors. Notwithstanding that finding, the Court approved the abandonment "in the interest of clarity and to preclude the potential for further litigation concerning the Debtors' standing to proceed in state court." *Id.* at 31.

We agree with the Plan Proponents that abandonment of the alter ego claim, to the extent the estate holds one, is appropriate in this instance in order to avoid potentially impairing the interests of individual plaintiffs. ITCAN argued in the California Superior Court, and Judge Kramer specifically held, that the Hopkins Plaintiffs, but not Flintkote, have standing to pursue alter ego relief against ITCAN.[58] The threat of impairment to the rights of individual plaintiffs to bring such an action absent abandonment is well illustrated in the cases of *St. Paul* and *Koch*. Both cases held that where alter ego claims constitute property of the estate, the trustee or the debtor must abandon the claims before individual creditors have standing to assert them. ITCAN admits in its post-trial briefing on this issue that it intends to raise defenses based on *St. Paul* and *Koch* if Flintkote's alter ego claims are not abandoned.[59] Having won in state court on the issue of Flintkote's lack of standing to pursue alter ego relief, ITCAN cannot now use that ruling to estop all other individual plaintiffs from pursuing similar relief, should they so choose.

---

[58] California Decision, at 2.
[59] *See* Imperial Tobacco Canada Limited's Post-Argument Brief Regarding the Debtors' Proposed Abandonment of the ITCAN-Related Claims, Doc. No. 6760, at 5.

Furthermore, a fair reading of the California Decision indicates that while Flintkote cannot currently bring an alter ego claim against ITCAN, that does not necessarily mean that such a claim does not exist. The California decision provides that "[a]s of now, Flintkote has no present, liquidated, and precisely framed claim against [ITCAN]."[60]  Should that circumstance change and a cause of action develop to which Flintkote can attach an alter ego remedy, it may very well have standing to pursue alter ego relief under California law. Moreover, because Flintkote's right to seek alter ego relief against ITCAN depends on state law, it is possible that Flintkote may be able to pursue alter ego relief in other jurisdictions. Thus, the Court finds that to the extent Flintkote has an alter ego claim against ITCAN, Flintkote is permitted to formally abandon any interest therein through the Plan.

The parties also disagree on the effect of abandonment. Section 554 does not specify to whom property may be abandoned. ITCAN contends that property of the estate that is abandoned by the trustee or debtor-in-possession may only be abandoned to the debtor. The Plan Proponents take the position that the abandoned property does not necessarily go back to the debtor, but rather to whomever has a possessory interest in the property. We note that the Plan does not attempt to abandon the claim to anyone in particular, nor do the Plan Proponents seek a determination as to whom the claim should be abandoned.

We agree that "abandonment is to the person having the possessory interest in the property." *White v. Coon* (*In re Purco, Inc.*), 76 B.R. 523, 532 (Bankr. W.D. Pa. 1987). *See also Collier's on Bankruptcy*, § 5-554[3], Fitzgerald, Gonzalez, & Walrath, *Rutter Group Practice Guide: Bankruptcy* § 6:416 (The Rutter Group 2012) ("Although section 554 does not

---

[60] California Decision, at 3.

specify to whom property is abandoned, property may be abandoned by the trustee to any party

with a possessory interest in it."). As noted above, the determination of who may have a

possessory interest in the alter ego claim is not a question for today. The Plan Proponents want

only to disclaim any interest in pursuing alter ego relief so as not to cause inadvertent prejudice

to anyone else, which the Court finds to be proper.

As ITCAN's objections to Plan confirmation with respect to the DRL have revolved

around the alter ego aspect, now that Flintkote has elected not to continue to pursue the alter ego

claim against ITCAN, the Court finds that the Plan does not adversely impact ITCAN and is not

a basis for "party in interest" standing. The Court finds no basis on which to sustain ITCAN's

objection to the Plan by virtue of the abandonment of the alter ego claims, and that objection is

overruled.

### Shared Insurance

ITCAN also objects that its rights are impaired by the Plan because Flintkote shares

certain insurance assets with ITCAN's subsidiary, Genstar. ITCAN claims that once a plan is

confirmed, the TDP accompanying the Plan will allow the Trust to deplete the insurance

coverage. We find the TDP is not the source of insurance depletion. First, the shared insurance

assets have always been available to either Genstar or Flintkote on a first-come, first-served

basis, which will continue to be the case post-confirmation. Thus, shared insurance will be used

in that fashion to pay Flintkote's asbestos liabilities and Genstar's insured liabilities regardless of

whether Flintkote's Plan is confirmed. Flintkote's "Asbestos Insurance Actions" are being

transferred to the Trust under the Plan, but "without prejudice to the rights of any co-insureds."

Plan § 11.7 Section 12.3.2(b) of the Plan makes clear that it preserves "the rights of any co-

31

insured of the Debtors (x) with respect to any Asbestos Insurance Policy or Asbestos Insurance

Settlement Agreement or against any Asbestos Insurance Company and (y) as specified under

any Final Order of the Bankruptcy Court approving an Asbestos Insurance Settlement

Agreement." Thus, the Court finds that any injury caused by depletion of shared insurance

assets is not traceable to the Plan but is the result of the sequence in which insurance claims have

been and will be made, processed, and paid under the terms of the policies.

For these reasons, ITCAN has not shown an injury caused by the Plan for which this

Court can provide a remedy. Thus, ITCAN is without "party in interest" standing.

### ITCAN's Objections to Confirmation

Despite ITCAN's lack of standing, the Court has fully considered ITCAN's objections to

confirmation. The Court agrees with ITCAN that the Court has an affirmative duty to determine

whether each provision of § 1129 is satisfied, regardless of the absence of valid confirmation

objections. *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del.

2003). ITCAN raises either purely legal issues that require no discovery or fact questions as to

which the Court authorized discovery and conducted a trial. Thus, there is a full and complete

record on which to rule.

ITCAN objects to Plan confirmation on two principal grounds. First, ITCAN argues that

the Plan is not confirmable because under *Jeld-Wen, Inc. v. Van Brunt* (*In re Grossman's Inc.*),

607 F.3d 114 (3d Cir. 2010) ("*Grossman's*"): (1) the Debtors cannot show that they will likely

be subject to "substantial future demands as required by § 524(g)(2)(B)(ii); and (2) the Debtors

failed to provide additional notice to, and solicit votes from, what ITCAN calls "exposed yet

unimpaired creditors."[61]  Secondly, ITCAN objects to Plan confirmation on grounds that

Flintkote does not have a viable, going concern business and thus does not qualify for the

protections afforded by § 524(g).  We address ITCAN's objections.

> **I.      Flintkote cannot show that it is likely to be subject to "substantial future demands" as required by § 524(g)(2)(B)(ii).**

ITCAN's § 524(g)(2)(B)(ii) objection stems from the decision in *Grossman's*, which held

that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct

giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."

*Grossman's*, 607 F.3d at 125.[62]  ITCAN argues that as a result of *Grossman's*, individuals who

have been exposed to Flintkote's asbestos products pre-petition, whether symptomatic or not, all

hold "claims" against the Debtors.[63]  ITCAN then points to § 524(g)(5), which provides that "the

term 'demand' means a demand for payment, present or future, that– (A) was not a claim during

the proceedings leading to the confirmation of a plan of reorganization."  § 524(g)(5)(A).

Although ITCAN's argument distinguished between pre-petition and post-petition manifestation

based on *Grossman's*, we consider the argument to distinguish between pre-confirmation and

post-confirmation manifestation based on *Wright*.  Thus, the argument is that if a "demand"

---

[61] "Exposed yet unimpaired creditors" as used in this Opinion refers to those who have been exposed to the Debtors' asbestos products pre-confirmation but have yet to manifest any symptoms of asbestos-related illness.

[62] The holding in *Grossman's* thus abandoned the much-criticized "accrual test" from *Frenville*, which provided that a claim arose in bankruptcy when the underlying state law cause of action accrued.  *Frenville*, 744 F.2d at 337.

[63] As discussed *supra*, since ITCAN filed its objection, the holding in *Grossman's* was extended by *Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012), which held that "a claim arises when an individual is exposed *pre-confirmation* to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code."  We therefore analyze ITCAN's objection in light of *Wright* and use the pre-confirmation, rather than pre-petition, standard.

cannot be a "claim" per § 524(g)(5)(A), and if *Wright* provides that individuals exposed pre-confirmation to a debtor's asbestos all hold claims against the debtor under § 101(5), then it must follow that the only individuals possibly holding "demands" are those exposed to Debtors' asbestos products *post*-confirmation.  According to ITCAN, because Debtors produced no evidence as to amounts or likelihood of post-confirmation exposure, the Debtors cannot show that they are likely to be subject to "substantial future demands," which is required under § 524(g)(2)(B)(ii).[64]  As further discussed below, we disagree with ITCAN's analysis of § 524(g)(5).

Before we turn to the statutory text, we note that this argument was rejected by this Court in our recent decision in *In re W.R. Grace*, where we held that "future demand holders are those who have been exposed to asbestos but whose disease or other injury, sufficient to prove damages, has not yet manifested."[65]  As we will explain more fully below, we must again utilize this same approach.  ITCAN's interpretation of § 524(g) with respect to "claims" and "demands" defeats the purpose of the statute by removing the protections for "exposed yet unimpaired" asbestos creditors and depriving them of just compensation for their future injuries and illnesses, which was the primary goal behind the enactment of § 524(g).

"A court's primary purpose in statutory interpretation is to discern legislative intent." *Morgan v. Gay*, 466 F.3d 276, 277 (3d Cir. 2006).  "The plain meaning of the text should be conclusive, except in the rare instance when the court determines that the plain meaning is

---

[64] Section 524(g)(2)(B)(ii)(I)-(II) requires that the debtor likely be "subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction" and that "the actual amounts, numbers, and timing of such future demands cannot be determined."

[65] *In re W.R. Grace & Co.*, 446 B.R. 96, 130 n.58 (Bankr. D. Del. 2011), *aff'd*, 475 B.R. 34 (D. Del. 2012).

ambiguous," *Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 317 (3d Cir. 2008), or where

"the literal application of a statute will produce a result demonstrably at odds with the intentions

of its drafters." *United States v. Ron Pair Enterprises., Inc.*, 489 U.S. 235, 242 (1989).  In the

latter situation, "the intention of the drafters, rather than the strict language, controls."  *Id.*

Furthermore, "statutory language cannot be construed in a vacuum.  It is a fundamental canon of

statutory construction that the words of a statute must be read in their context and with a view to

their place in the overall statutory scheme." *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809

(1989).

   With respect to § 524(g)(5), we find the statute to be ambiguous and that its literal

application produces a result that cannot be reconciled with the intent of its drafters.  The statute

states that "[i]n this subsection, the term 'demand' is a "demand for payment, present or future

that – (A) was not a claim during the proceedings leading to the confirmation of a plan of

reorganization." Section 524(g)(5)(A).  The term "claim" is not qualified in any way, so

presumably "claim" is intended to be governed by its definition in § 101(5), which provides:

> (5) The term "claim" means—
>  (A) right to payment, whether or not such right is reduced to judgment,
> liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
> undisputed, legal, equitable, secured, or unsecured; or
>  (B) right to an equitable remedy for breach of performance if such breach
> gives rise to a right to payment, whether or not such right to an equitable
> remedy is reduced to judgment, fixed, contingent, matured, unmatured,
> disputed, undisputed, secured, or unsecured.

Furthermore, as ITCAN contends, it appears from a literal reading of § 524(g)(5) that the terms

"claim" and "demand" are meant to be mutually exclusive.  However, the definition of "demand"

in § 524(g)(5) describes a "present or future" demand for payment, and given the expansive

definition of "claim" in § 101(5), the Court cannot fathom a situation where an individual could

hold a "present" demand for payment that is not technically a "claim" under § 101(5).  Thus, if construed as ITCAN suggests, the qualifier, "present or future [demand]," in § 524(g)(5) is superfluous, and "[i]t is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous." *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005).

   ITCAN's literal interpretation of § 524(g)(5) produces a "result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242.  In part because of long latency periods of certain asbestos-related illnesses, Congress enacted § 524(g) to protect the due process rights of the exposed yet unimpaired.  The purpose of § 524(g) is to provide those whose illnesses manifest post-petition, regardless of pre- or post-petition exposure, with a fund for recovery equivalent to what currently ill claimants will be paid.  Section 524(g) thus removes the risk that the size of payment in compensation for injuries will depend on how quickly a victim gets sick or manifests an injury.  It is impossible to include all individuals who are asymptomatic in the "known, exposed" category because those individuals, themselves, do not know that they may become ill and thus, hold a right to payment, contingent on manifesting an illness.[66] Without the existence of a trust to handle future demands, when asymptomatic individuals eventually manifest an injury the debtor may no longer have available funds with which to compensate them.  Section 524(g) requires funds to be placed in trust so that if and when exposed individuals manifest illnesses in the future that are attributable to the debtor, a source of

---

[66] Future demands for payment are based on "claims" that are unliquidated, possibly disputed, and held by unidentified individuals who may not know that they hold claims in the first place.  Whether such a claim will be disputed cannot be known until, at a minimum, the individual who holds the claim is identified and asserts an injury allegedly caused by a debtor.  Indeed, these claims are contingent on manifestation of an injury.  Thus, the claims are always subject to estimation for § 524(g) purposes.

compensation remains available.[67]  In the meantime, § 524(g) provides for the appointment of a

future claims representative to protect their interests.[68]

Because asbestos production in this country largely ceased many decades ago, the

number of individuals who will face first-time, post-petition or post-confirmation exposure will

be negligible for almost every debtor facing asbestos liability.  Under ITCAN's interpretation of

§ 524(g)(5), the result of that fact is that no debtor would qualify for protection under § 524(g).

No § 524(g) injunctions could ever issue because the requirement that the "actual amounts,

numbers, and timing of such future demands cannot be determined" could never be met.  Instead,

knowing that all those who manifest injury in the future were nonetheless exposed pre-

confirmation and thus have claims under § 101(5), the court would likely always be in a position

of finding that there would be no future demands that were not "claim[s] during the proceedings

leading to the confirmation of a plan of reorganization."  *See* § 524(g)(5)(A).[69]  Thus,

---

[67] *See Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co., Inc.*), 676 F.3d 45, 58-59 (2d Cir. 2012).

[68] ITCAN has argued that, based on *Grossman's*, the FCR, James J. McMonagle, no longer represents the interests of the exposed yet unimpaired.  In ITCAN's view, all those exposed to asbestos pre-petition are represented by the ACC, and the FCR represents only those exposed post-petition.  But even *Wright,* which restated and expanded the holding in *Grossman's*, recognized that "in some bankruptcy proceedings a future claims representative is appointed to represent and protect the interests of persons with future unknown claims . . . . Indeed, future claims representatives have been appointed by courts notwithstanding their conclusion that those unknown persons did not hold 'claims' under the Bankruptcy Code." *Wright*, 679 F.3d at 108 n.7.  In so stating, the Court of Appeals recognized that an FCR represents both those individuals already exposed but with unmanifested disease and those who are not yet known to be creditors at all.  Appointing an FCR is an appropriate method of providing due process for unknown individuals who have yet to make demands for payment, regardless of whether they technically hold "claims" as defined in § 101(5) or merely "future demands."

[69] We note that in § 524(g) cases, estimates of "future demands" are based largely on the known, pre-petition exposed population, even though, in ITCAN's view, those individuals cannot possibly have "future demands" having been exposed pre-confirmation.  This estimation

(continued...)

congressional effort, supported by courts that have confirmed plans and issued § 524(g) injunctions over the years, would be terminated – all due to the inartful styling of a "future demand for payment" as something that is "not a claim" during the case, rather than as a demand for payment that can be made only after injury manifests and damages can be established.[70]

Moreover, because ITCAN's interpretation of § 524(g)(5) frustrates the statute's purpose of protecting the due process rights of exposed yet unimpaired creditors, ITCAN's interpretation runs contrary to the Bankruptcy Code as a whole, which strives to treat similarly situated creditors equitably. Thus, we find, as we did in *W.R. Grace*, that for purposes of § 524(g), "future demand holders are those who have been exposed to asbestos but whose disease or other injury, sufficient to prove damages, has not yet manifested." *In re W.R. Grace*, 446 B.R. 96, 130 n. 58 (Bankr. D. Del. 2011).

Further complicating matters is the fact that courts, including this Court, have inartfully

---

[69](...continued)
method is used even in circuits in which the law provides that upon exposure to asbestos, an individual holds a "claim" (in accord with the law in the Third Circuit by virtue of *Grossman's*). *See, e.g.*, Fifth Amended and Restated Disclosure Statement with Respect to Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Case No. 04-15739-SMB, Doc. No. 1124, Ex. I, at 1. (Bankr. S.D.N.Y. June 7, 2007) ("To estimate potential future claims, experts begin with a projection of the exposed population."); Second Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of Plan of Reorganization of Porter Hayden Company, Case No. 02-54152-RAG, Doc. No. 804, at 75 (Bankr. D. Md. Sept. 16, 2005) ("[S]ome holders of Asbestos Bodily Injury Claims may have manifested injuries, but have not yet filed suit against Porter Hayden. Still other Persons *have not yet manifested injuries and thus have only demands*.") (emphasis added).

[70] We are cognizant of the Supreme Court's admonition in *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) that courts should not "read an absent word into [a] statute." However, unlike in *Lamie*, here there is not a "plain, nonabsurd meaning in view." *Id.* Here, as we stated, the literal meaning is absurd because the definition of "demand" in 524(g)(5) describes a "present or future" demand for payment that is "not a claim during the proceedings." One cannot hold a "present" demand for payment against the debtor that is not technically a "claim" under § 101(5). Thus, "future demand for payment" must mean something other than "claim" as defined in § 101(5).

used the words "claim" and "demand" interchangeably in the § 524(g) context. This has added

to the confusion arising from the apparent conflict between the definition of "demand" in §

524(g) and the definition of "claim" in § 101(5). For instance, in *Combustion Engineering*, the

Court of Appeals described the requirement of § 524(g) that a debtor must be likely to be subject

to "substantial future demands" as follows:

> To qualify for [protections under § 524(g)], a court must find that the debtor has
> been named in an action for damages allegedly caused by asbestos, that the debtor
> is likely to be subject to **substantial demands** for payment in the future arising
> out of the same or similar conduct, that the amounts and timing of **such future
> claims** are uncertain, and that permitting the pursuit of such **claims** outside the
> trust mechanism would threaten the plan's attempts to deal equitably with
> **current and future demands.** 11 U.S.C. §§ 524(g)(2)(B)(i)(I), (ii)(I-III). The
> trust itself must also satisfy certain standards under § 524(g) in order to qualify
> for the issuance of a channeling injunction directing all **future claims** to the trust:
> the trust must assume the liabilities of the debtor for **current and future claims**
> and must be funded at least in part by the securities of the debtor; the trust must
> either own, or be entitled to own, the majority of the voting shares of the debtor,
> its parent, or its subsidiary; the trust must use its assets to pay **future claims and
> demands**; and the trust must provide for mechanisms ensuring its ability to value
> and pay **present and future claimants** in substantially the same manner.

*Combustion Engineering*, 391 F.3d at 234 n.45 (emphasis added).

Indeed, *Grossman's* itself, while not a § 524(g) case, nevertheless endorsed the above

language from *Combustion Engineering* by quoting it in articulating the requirements of §

524(g).[71] *Grossman's*, 607 F.3d at 126 n.12. In addition, the District Court for the District of

Delaware, in affirming our confirmation order in *W.R. Grace*, held that "a demand [in the

context of § 524(g)] is a claim that is either already present or may arise at some point in the

---

[71] As we noted in *W.R. Grace*, the court in *Grossman's* recognized that the purpose of §
524(g) is to protect the due process rights of future claimants or future demand holders, and did
not in any way suggest that because individuals exposed to asbestos pre-petition have "claims"
under § 101(5), a company with asbestos liability cannot qualify for § 524(g) unless it can show
substantial post-petition exposure. *W.R. Grace*, 446 B.R. at 130 n.58.

future."[72]

Ultimately, what Congress was attempting to do with § 524(g) was to ensure that everyone unfortunate enough to contract asbestos-related illnesses as a result of exposure to a bankruptcy debtor's products, thereby becoming entitled to compensation from that debtor, be subject to substantially the same treatment in bankruptcy. § 524(g)(2)(B)(ii)(V). Thus, Congress decided that whether one is currently a victim of such an illness or whether one will not fall ill for many more years, for bankruptcy-related purposes, a victim's compensation should not depend on how quickly he or she manifests illness. Section 524(g) channels all claims of this nature, present or future, to an asbestos personal injury trust. To that end, we are proceeding in this case in the same manner as we have in all other § 524(g) cases that have come before this Court, and as all courts that have confirmed § 524(g) plans across the country have proceeded.

Thus, notwithstanding any inartful language in § 524(g)(5), it is clear to this Court that the intent of § 524(g)(2)(B)(ii) is simply that, to qualify for a § 524(g) channeling injunction, there must be, among other things, a likelihood that a substantial number of people, who are not yet able to prove damages from an asbestos-related disease, will eventually demand payment from the debtor as compensation for asbestos-related illnesses contracted through exposure to the debtor's products. Whether referred to as "future demand holders" or "future claimants," the bottom line is that without a channeling injunction in place and an FCR appointed to protect their interests, by the time their injuries manifest there will be a high probability that the debtor will lack funds to provide them with just compensation. ITCAN's interpretation of the requirements of § 524(g) would all but ensure that most if not all people holding future demands would

---

[72] *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012).

receive no compensation for their injuries, because, with asbestos production largely ending decades ago, it is nearly impossible for an asbestos debtor to demonstrate that a substantial number of people have been exposed to the debtor's asbestos products subsequent to the confirmation of their plan of reorganization.[73]  A result that would so clearly frustrate the purpose of § 524(g) cannot be accepted by this Court.

Having rejected ITCAN's narrow interpretation of "demand" in the context of § 524(g), the Court finds that, based on the long latency periods of asbestos-related diseases and the substantial number of asbestos personal injury claims lodged against Flintkote pre-petition, along with the substantial number of such claims that remained unresolved as of the petition date,[74] Flintkote will likely be subject to substantial future demands as required by § 524(g)(2)(B)(ii)(I). The parties agreed, and we determined, that no formal estimation hearing was necessary in this case in light of the overwhelming asbestos liability facing the Debtors.[75]  Experts for the ACC and the FCR estimated the combined amount of current and future liability at over $3 billion dollars.[76]

*Notice/Solicitation*

Based on its interpretation of *Grossman's*, ITCAN objects that Flintkote did not adequately provide notice and solicit votes from the "exposed but unimpaired creditors" as required under 11 U.S.C. §§ 342(a), 1125, and 1126.[77]  This Court approved Flintkote's notice

---

[73] Flintkote does not attempt to prove that such victims exist in this case.

[74] As of the petition date, there were over 157,000 asbestos claims pending against Flintkote.

[75] Hr'g Tr. 24:19-22, Apr. 22, 2008 (J. Fitzgerald).

[76] Hr'g Tr. 53:17-24, Oct. 26, 2010 (McMonagle).

[77] Section 342(a) requires generally that notice be given of an order for relief, but that requirement is imposed on the bankruptcy clerk.  Thus, § 342(a) is not implicated in the voting

(continued...)

and solicitation procedures pre-*Grossman's* and ITCAN concedes that nothing about Flintkote's notice or solicitation procedures was inadequate before *Grossman's* was decided.  We have rejected ITCAN's interpretation of *Grossman's* as it relates to § 524(g).  Thus, ITCAN's argument that *Grossman's* has transformed the adequate notice and solicitation procedures used in this case into inadequate ones is without merit.  The fact of the matter is that regardless of whether an exposed asbestos creditor who has not yet manifested an injury is said to have a "claim" or a "future demand," that creditor is not a known creditor entitled to actual notice, and is one who is impossible to identify, such that providing actual notice is, itself, impossible. Furthermore, there is no bar date for asbestos personal injury claims, there is an FCR to represent the interests of the exposed yet unimpaired creditors, and, if and when such a creditor becomes ill, there will be a trust in place to address claims for compensation.  There is nothing to be gained by requiring Flintkote to provide additional notice from what this Court has already approved.  Flintkote advertised a combined notice of solicitation and confirmation procedures twice in the national edition of USA Today; published a version of the notice specifically tailored to asbestos claimants twice in the national edition of USA Today, and once each in Mealey's Litigation Report: Asbestos, Mealey's Asbestos Bankruptcy Report, and two Canadian papers, The Globe and Mail and La Presse.  *See* Affidavit of Publications, Doc. No. 6524.  The claims and voting agent in this case, the Garden City Group, also maintained a website and telephone hotline on behalf of the Debtors to further the effectiveness of the notices.  We have reviewed the actual notices in these publications and find them to be adequate.

**II.      Flintkote cannot qualify for protection under § 524(g) because it does not**

---

[77](...continued)
solicitation process.

operate a "viable, going concern business."[78]

The heart of ITCAN's confirmation objections centers on Flintkote's planned post-confirmation business activity, which implicates a number of issues: whether there is an "ongoing business" requirement implicit in § 524(g); if there is an "ongoing business" requirement, what level of business activity is sufficient to satisfy it; and whether Flintkote's real estate business is profitable so that Reorganized Flintkote: (i) will be able to make "future payments, including dividends" to the Trust pursuant to § 524(g)(2)(B)(i)(II); and (ii) will satisfy the standard of no "need for further financial reorganization" or liquidation following confirmation of its Plan.[79]

## A. The "ongoing business" requirement

There are several indications that § 524(g) requires the debtor to engage in business post-confirmation. First, § 524(g)(1)(A) states that a bankruptcy court may issue a channeling injunction "to supplement the injunctive effect of a discharge under this section." It follows then that there must be a discharge for the channeling injunction to "supplement." Whether a corporate debtor receives a discharge is governed by § 1141(d), which states, as relevant here, that a debtor will not receive a discharge upon confirmation if "the debtor does not engage in business after consummation of the plan" and "the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."[80] Section

---

[78] Opposition Brief, at 15.

[79] Section 1129 states that a plan can be confirmed only if, *inter alia*, "[c]onfirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." § 1129(a)(11).

[80] Section 1141(d)(3)(C) is always satisfied for corporate debtors, as they cannot receive discharges in chapter 7. *See* § 727(a)(1). Thus, to be denied a discharge, Flintkote must be liquidating substantially all of its assets *and* not engaging in business post-confirmation. Here,

(continued...)

1141(d)(3)(A)-(C).  As a corporation, Flintkote would not receive a discharge in a Chapter 7.  §

727(a)(1).  Furthermore, § 524(g)(2)(B)(i)(II) provides that the trust "is to be funded in whole or

in part by the securities of 1 or more debtors involved in such plan and by the obligation of such

debtor or debtors to make future payments, including dividends."  Thus, the statutes, read

together, suggest that when a plan provides for substantial liquidation, to qualify for a channeling

injunction, the debtor must engage in business post-confirmation.

The Court of Appeals in *Combustion Engineering* stated, in dicta, that the "implication of

[§ 524(g)(2)(B)(i)(II)] is that the reorganized debtor must be a going concern, such that it is able

to make future payments into the trust to provide an 'evergreen' funding source for future

asbestos claimants." *Combustion Engineering*, 391 F.3d at 248.  In *Combustion Engineering*,

the debtor's business activity consisted of owning and leasing an environmentally contaminated

piece of land.  *Id.*  The debtor was in a cash neutral position, with no products and services and

no employees.  *Id.*  The Court of Appeals described this business activity as "at most, minimal,"

and opined that it was "debatable" whether or not such activity could satisfy §

524(g)(2)(B)(i)(II), but noted that no party with standing had raised the issue.  *Id.*  On remand,

this Court held that Combustion Engineering's business activity was sufficient for obtaining a

discharge under § 1141(d) and that the funding requirements of § 524(g)(2)(B)(i)(II) were

satisfied, which was affirmed by the District Court.  *In re Combustion Engineering*, *Inc.*, 2005

Bankr. LEXIS 2623, *54-*57 (Bankr. D. Del. Dec. 19, 2005).

The Plan Proponents argue that § 524(g) contains no "ongoing business requirement,"

---

[80](...continued)
assuming, arguendo, that Flintkote is liquidating substantially all of its assets through the transfer
to the trust, Flintkote can receive a discharge only if it engages in business post-confirmation.
As noted, *supra*, Mines is liquidating and is not seeking a discharge.

and even if it does, Flintkote's business activities are more than sufficient to satisfy any such requirement. The Plan Proponents cite to *In re Quigley Co.*, 437 B.R. 102, 141 (Bankr. S.D.N.Y. 2010), as an example of a court declining to impose an "ongoing business" requirement through § 524(g). In the *Quigley* court's view, § 524(g)(2)(B)(i)(II) "implies an ability to make payments into the future – an 'evergreen' source of funding – and this is what the Third Circuit in *Combustion Engineering* undoubtedly meant when it referred to an 'ongoing business' requirement." *Quigley*, 437 B.R. at 141. The court recognized that "the more difficult questions surround the provision's silence regarding the amount and duration of the funding obligation. . . . [A]sbestos trusts can last for forty years. . . . A debtor would be hard-pressed to produce credible forty-year income projections. *Id.* The court reasoned that imposing an "ongoing business requirement" onto § 524(g) "could transform the funding requirement into a feasibility test, duplicating the requirement imposed under 11 U.S.C. § 1129(a)(11)." *Id.*

Combustion Engineering* itself contains language suggesting that while § 524(g)(2)(B)(i)(II) may imply that the debtor must be a "going concern" in order to meet its funding requirements, in certain situations the funding requirements may be met in other ways. *Combustion Engineering*, 391 F.3d at 248 n.70 ("From the claimants' perspective, it may make little economic difference whether the source of future funds comes from the debtor or a third-party, so long as a sufficient and reliable pool of assets remains available to pay their claims."). Nevertheless, we will assume without deciding that § 524(g)(2)(B)(i)(II) contains an "ongoing business" requirement. The question then remains as to the extent of business activity that will satisfy such a requirement.

### B.  Only debtors continuing viable, pre-petition businesses can qualify for § 524(g)

ITCAN contends that the requirements of § 524(g)(2)(B)(i)(II) can only be satisfied by a debtor continuing a viable, pre-petition business post-confirmation, because § 524(g) was intended only to protect otherwise successful companies from the threat of crippling asbestos liability.  In support of its position, ITCAN relies heavily on the legislative history behind § 524(g), and particularly the following statement made during the congressional debates describing the proposed amendment of § 524 to add subsection (g):

> In plain English, this means that when an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims.  The underlying company funds the trust with securities and the company remains viable.  Thus, the company continues to generate assets to pay claims today and into the future.  In essence, the reorganized company becomes the goose that laid the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.[81]

ITCAN argues that in this case, there is no "goose that lays the golden egg" worth saving because Flintkote is not continuing its pre-petition business, and it is improper, and against the spirit of § 524(g), for Flintkote to establish new business lines while in bankruptcy to satisfy § 524(g).  As will be explained further below, we disagree.  Nothing in § 524(g), § 1129, § 1141, or *Combustion Engineering* requires a debtor to continue to engage in a pre-petition (and possibly unsuccessful) business to the exclusion of any other.

As noted *supra*, the language of the statute is the starting point for any exercise in statutory construction.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).  "[W]here the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  *Ron Pair,* 489 U.S. at 241 (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).  Nothing in § 524(g) plainly and unambiguously requires a debtor to continue in a pre-

---

[81] *See* 140 Cong. Rec. S4523 (April 20, 1994) (stmt. Sen. Brown).

46

petition business, let alone a viable pre-petition business. Section 524(g)(2)(B)(i)(II) requires

that the trust be funded "in whole or in part by the securities of 1 or more debtors" and that the

debtor "make future payments, including dividends" to the trust, but it does not specify the

manner in which this must be accomplished.  In this case, all the stock of Reorganized Flintkote

will be transferred to the Trust.  Thus, the Debtor's securities are being used to fund the Trust

and any dividends declared will be paid to the Trust.

Moreover, § 524(g)(2)(B) includes several other express requirements to qualify for a §

524(g) injunction.  To name a few, the trust must assume the liabilities of a debtor "which at the

time of entry of the order for relief has been named as a defendant in personal injury, wrongful

death, or property-damage actions seeking recovery for damages allegedly caused by the

presence of, or exposure to, asbestos or asbestos-containing products;"[82] the trust is to own or be

entitled to own a majority of the voting shares of the debtor or its parent corporation;[83] and the

trust must use its assets or income to pay claims and demands.[84]  The court is also required to

find, *inter alia*, that:  "the debtor is likely to be subject to substantial future demands for

payment" arising from exposure to the debtor's asbestos;[85] "the actual amounts, numbers, and

timing of such future demands cannot be determined;[86] and "pursuit of such demands" outside of

bankruptcy would threaten the ability to "deal equitably with claims and future demands."[87]

In light of the many express requirements laid out in § 524(g), the Court finds that had

Congress intended § 524(g) to require a debtor to operate a viable, ongoing, pre-petition

---

[82] *See* § 524(g)(2)(B)(i)(I).

[83] *See* § 524(g)(2)(B)(i)(III).

[84] *See* § 524(g)(2)(B)(i)(IV).

[85] *See* § 524(g)(2)(B)(ii)(I).

[86] *See* § 524(g)(2)(B)(ii)(II).

[87] *See* § 524(g)(2)(B)(ii)(III).

47

business, it would have included statutory language to that effect in § 524(g)(2)(B).  However, such a specification is plainly absent, and thus the Court should not consider legislative history or statutory purpose in the face of unambiguous statutory language.  *Alli v. Decker*, 650 F.3d 1007, 1011 (3d Cir. 2011).  Even if the Court were to give weight to the legislative history behind § 524(g), the history does not contain this requirement.  The House Committee Report discussing § 524(g) states that "[t]he asbestos trust/injunction mechanism established in the bill is available for use by *any asbestos company facing a similarly overwhelming liability.*  House Report 103-835, Section 111, at 41 (emphasis added); *In re Plant Insulation Co.*, 469 B.R. 843, 864 (Bankr. N.D. Cal. 2012).

ITCAN cites two cases in support of its argument that a debtor must be continuing a pre-petition business in order to qualify for protection under § 524(g): *Grausz v. Sampson (In re Grausz)*, 63 Fed. Appx. 647 (4th Cir. 2003) ("*Grausz*"), and *In re S. Canaan Cellular Invs.*, 427 B.R. 44 (Bankr. E.D. Pa. 2010) ("*S. Canaan Cellular*").  *Grausz* is an unpublished case involving an individual Chapter 11 debtor whose plan called for the liquidation of his pre-petition businesses.  *Grausz*, 63 Fed. Appx. at 650.  The debtor argued that because, post-consummation, he would be working as a consultant for an entity unrelated to the bankruptcy, he was engaged in business sufficient to satisfy § 1141(d) and receive a discharge.  *Id.*  The Court of Appeals noted that the business Dr. Grausz worked for post-consummation was unrelated to the entities in bankruptcy, and that § 1141(d)(3)(B) "does not refer to basic employment by an individual debtor but to the *continuation* of a *pre-petition* business."  *Id.*  Thus, Dr. Grausz's pre-petition business was liquidating; there was no ongoing business at all.  Instead, Dr. Grausz simply became an employee for an entirely unrelated entity.  The circumstances here are clearly

inapposite, as Flintkote is: (1) not an individual debtor, (2) not liquidating, and (3) continuing to engage in business post-confirmation.

*S. Canaan Cellular* applied *Grausz*'s holding to corporate debtors.  However, in *S. Canaan Cellular*, there was a strong possibility that the debtors' partnership interests in their pre-petition businesses would be liquidated pursuant to their joint plan.  Were those interests sold, "the debtors would not be engaging in their prepetition business, which was to act as general and limited partners of SCCCC, LP" and thus the debtors would not be "entitled to receive a bankruptcy discharge" inasmuch as "a corporate or partnership debtor that is both liquidating and discontinuing its business does not receive a discharge when its plan is confirmed."  *S. Canaan Cellular*, 427 B.R. at 84-85 (citation omitted).

Neither *Grausz* nor *S. Canaan Cellular* control.  Neither case can be said to impose a requirement in § 524(g) that a reorganized debtor forever engage in a particular pre-petition business, as § 524(g) is not implicated in either case.  The business activity in those two cases is analyzed under the § 1141(d) standard.  Even applying the § 1141(d) standard here, the cases are not on point.  Unlike those debtors, Flintkote is not liquidating its business; it is reorganizing its business to pursue other ventures.  Further, there is no requirement under § 1141(d) that a debtor continue the same business lines and activities as it engaged in pre-petition.  The requirement under the statute, in order to receive a discharge, is simply to "engage in business after consummation of the plan."  § 1141(d)(3)(B)."[88]  There is no qualification in the statute that the business must be a pre-petition business, nor any language qualifying what level of business

---

[88] More specifically, a debtor will not receive a discharge upon plan confirmation if it does not engage in business upon consummation of the plan, and is liquidating all or substantially all property of the estate, and would be denied a discharge under § 727(a) if the case were in Chapter 7.  *See* § 1141(d); *supra* note 80.

activity is sufficient.

While preserving the going concern value of a viable business may be one of the means to achieve the goals of § 524(g), the point of engaging in business is to provide an evergreen source of funds for the trust.  This will ensure that in the face of long latency periods for asbestos-related illnesses, all claimants, current and future, receive just and comparable compensation for their injuries, which is a primary purpose of § 524(g).  The language of § 524(g)(2)(B)(i)(II) states only that the debtor is obligated to make "future payments, including dividends" to the trust, and in our view it is the ability of the debtor to do so that is relevant.[89]  The court finds nothing improper about a debtor adapting its business model while in bankruptcy.[90]  In fact, in this Court's experience, most companies that successfully reorganize undertake some type of business "reorganization."  Some divest business lines or corporate divisions or spin off subsidiaries.  Others buy businesses or form partnerships or limited liability companies to take strategic advantage of a blended business.  To stay viable, any corporation must assess its strengths and weaknesses and adapt its business, whether in or out of bankruptcy.  That is particularly so in cases such as this, where Flintkote's ability to make use of § 524(g) is the only means of providing recovery to the Debtors' exposed yet unimpaired asbestos

---

[89] ITCAN objects that the Plan does not provide for Reorganized Flintkote to pay any dividends to the Trust, and therefore that the Plan does not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).  However, there is no need for such a provision in the Plan because the Trust will own 100% of Reorganized Flintkote, and therefore the Trust may declare dividends.

[90] *See Fireman's Fund Ins. Co. v. Plant Insulation Co.* (*In re Plant Insulation Co.*), 2012 WL 4833148, *23 (N.D. Cal. Oct. 9, 2012) (addressing appellants' argument that the merger between Plant and Bayside was designed "merely for purposes of satisfying § 524(g)'s going-concern requirement," and stating that even if that is the case, "there is simply no authority in support of Appellants' argument that a merger transaction such as the one proposed here violates the code, particularly where, as here, it advances the ultimate objectives of § 524(g)").

creditors.[91]  We note that Chapter 11 is a "reorganization" chapter.  Here, Flintkote has

"reorganized" its business based on appropriate use of its resources, including its cash and the

skills of its personnel.  Every creditor agrees with the choice; ITCAN is the sole entity that does

not.  Moreover, we note that Flintkote's "new" business mirrors a prior undertaking.  Flintkote

formerly leased real property to third parties for several years in the 1980s, although that aspect

of its business was not operative by the time it filed bankruptcy.  *See* Disclosure Statement §

4.1(a)(3).

  The Court finds that Flintkote's business activity is sufficient to satisfy any "ongoing

business" requirement that may be imposed by § 524(g).  As will be explained in greater detail in

the next section, Flintkote now owns and leases real estate, and currently manages six

properties,[92] each of which is subject to a long-term, triple-net lease with a third party.[93]

Flintkote plans to acquire seven additional properties by the end of the second year after the

effective date.[94]  Although ITCAN characterizes Flintkote's real estate activity as merely

"passive investing," the evidence at trial established that Flintkote's real estate activities are

fairly considered a "business."  Flintkote searches for properties to acquire through its officer,

David Gordon, who has twenty years of experience in the quick-service food industry.[95]  Post-

acquisition, Flintkote engages in other activity, including: (1) evaluating tenant risk;[96] (2)

---

[91] *See* Disclosure Statement, at 3.
[92] Hr'g Tr. 201:22-202:3, Sept. 12, 2011 (Gordon); *see supra* note 24.
[93] *Id*. at 203:11-12.
[94] *See* the Profit and Loss Statement ("P&L"), at Notice of Filing Pursuant to Court's Order Reopening Record on Confirmation and Setting Deadlines Related Thereto, Doc. No. 5622.
[95] *See* Hr'g Tr. 166:11-167:9, Sept. 19, 2011 (Gordon); Hr'g Tr. 209:8-10, Sept. 12, 2011 (Gordon); Hr'g Tr. 204:24-205:18, Sept. 12, 2011 (Gordon).
[96] *See* Hr'g Tr. 167:13-169:6, Sept. 19, 2011 (Gordon).

periodically inspecting the restaurants and monitoring the tenant's financial performance;[97] (3)

collecting and distributing the rents;[98] (4) ongoing market review, to ensure that the brands

operated by Flintkote's tenants are performing profitably in their respective areas;[99] and (5)

building Flintkote's credibility and reputation in the quick service food industry, so that it can

develop relationships with brokers who have access to profitable properties.[100]

Flintkote is also currently under agreement to provide consulting and executive

management services to Plant.  The contract with Plant has been renegotiated and approved by

the bankruptcy court in *In re Plant Insulation Co.* (the "Amended Plant Agreement").[101]  Under

the Amended Plant Agreement, Plant is obligated to pay Flintkote a monthly service fee of

$21,000 plus expenses, and Flintkote is entitled to a success fee of up to $1,000,000 upon Plant's

successful emergence from bankruptcy.[102]  As of October 31, 2011, Flintkote earned $968,000 in

fees from Plant.[103]  Even if Flintkote is unsuccessful at attracting new clients for this portion of

its business, Flintkote's consulting and executive management services business is currently

operational.

Assuming § 524(g)(2)(B)(i)(II) requires a "going concern," the Court finds that

Flintkote's real estate business and its consulting and executive management services business

---

[97] *See* Hr'g Tr. 140:19-141:8, Oct. 25, 2010 (Gordon).
[98] *See* Hr'g Tr. 200:3-5, Sept. 12, 2011 (Gordon).
[99] *Id*. at 170:19-171:22.
[100] *Id*. at 166:18-167:5.
[101] *See In re Plant Insulation Co.*, Case No. 09-31347-TC (Bankr. N.D. Cal. Feb. 11, 2011), Order Granting Debtor's Motion for Order Authorizing the Debtor to Assume Executive Agreement with the Flintkote Company, As Amended, at Case No. 09-31347, Doc. No. 1012.
[102] *See* Amended and Restated Executive Consulting Agreement (the "Amended Plant Agreement"), at § 2(a)-(c), at Notice of Filing Fourth Amendment to Plan Supplement to Amended Joint Plan of Reorganization (As Modified), Doc. No. 5873, Ex. A.
[103] *See* Monthly Operating Report for Period Ending October 30, 2011, Doc. No. 6343, at 2.

satisfy that requirement.  Having met the "ongoing business" or "going concern" requirement of § 524(g) by virtue of its real estate and consulting and executive management services businesses, the Court expresses no opinion on whether two of Flintkote's three other purported business lines, claims processing and trust services, constitute "businesses" sufficient to satisfy an "ongoing business" or "going concern" requirement for purposes of § 524(g).  That said, we note that we do not consider Flintkote's effort in simply pursuing or managing a lawsuit (*i.e.*, the DRL) in pursuit of an asset to be a going concern business.

Furthermore, having found that Flintkote will "engage in business after consummation of the plan" sufficient to be entitled to discharge under § 1141(d), the Court assumes without deciding and need not determine whether Flintkote is liquidating "substantially all of the property of the estate."  *See* § 1141(d)(3)(A).

Although the Court finds that Flintkote will be engaged in business sufficient to satisfy any "ongoing business" requirement of § 524(g) and the requirements for discharge in § 1141(d)(3), the Court must still be assured that Flintkote will be able to meet the express funding requirements of § 524(g)(2)(B)(i)(II).  To that end, the Court reopened the record on January 7, 2011, to allow the Plan Proponents and ITCAN to introduce evidence as to the profitability of Flintkote's real estate business.

### Profitability

Upon ITCAN's oral motion at the confirmation hearing on October 25, 2010, to deny confirmation as a matter of law based on a failure of Flintkote to satisfy its burden of proof as to the profitability[104] of its business lines, this Court agreed that historical results from Flintkote's

---

[104] "Profitability," as used in this Opinion, is a short-hand expression for the ability of the
(continued...)

real estate business were relevant to the evaluation of the likelihood that Flintkote would have an operating business post-confirmation.[105]  The Plan Proponents must convince the Court that confirmation "is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor,"[106] and that Flintkote will have some kind of business in place to be able to make "future payments" to the Trust in accordance with § 524(g)(2)(B)(i)(II).  Flintkote provided the Court with a profit and loss statement ("P&L") to evidence historical results of its real estate business along with revised pro forma projections (the "pro formas").

After a period of discovery, the confirmation hearing continued on September 12, 13, and 19, 2011.  The Court heard extensive testimony from several witnesses regarding the performance and projection of profitability of Flintkote's real estate business.  The Plan Proponents presented as fact witnesses the Debtors' CEO and President, David Gordon, and Donald F. Oliver, the Debtors' Controller.  Flintkote also presented Daniel T. Gary, a Certified Public Accountant ("CPA") with KPMG LLP, to provide expert testimony in support of confirmation.  ITCAN presented expert witnesses Craig P. Casey, a CPA with Grant Thornton LLP, and Boris Onefater, a CPA with Constellation Investment Corporation.  The parties introduced numerous documentary exhibits, affidavits, and various other evidence.

### The Plan Proponents' Evidence

In January 2011, the Debtors submitted the P&L and the pro formas (together, the "Schedules") to demonstrate the profitability of the real estate business.  The substance of the

---

[104](...continued)
Debtors to make "future payments, including dividends," to the Trust as required by § 524(g)(2)(B)(i)(II).
   [105] The inquiry into profitability was limited to the real estate business.
   [106] § 1129(a)(11).

schedules is summarized by the following chart:[107]

|  | Real Property Business Historical Results | | | Real Property Business Post-Effective Date Projected Results | | |
|---|---|---|---|---|---|---|
|  | 2008 | 2009 | 2010 | Year 1 | Year 2 | Year 3 |
| Rental Income | $14,328 | $376,188 | $450,416 | $706,439 | $1,096,439 | $1,332,689 |
| Recurring Costs | $0 | $26,565 | $39,849 | $84,237 | $123,124 | $137,856 |
| Depreciation | $2,962 | $60,256 | $62,186 | $77,570 | $108,338 | $123,722 |
| EBITN | $11,366 | $289,367 | $348,381 | $544,632 | $864,977 | $1,071,111 |
| EBIT | ($164,826) | $165,368 | $85,491 | $88,702 | $398,560 | $1,071,111 |

At the direction of Mr. Gary, Flintkote utilized segment accounting under ASC-280[108] and cost identification and allocation under SAB Topic 1-B[109] to present the Schedules. Mr. Gary testified that the most meaningful way of measuring the profitability of the real estate business is to consider the "normal state of operations," *i.e.* generated revenue reduced only by recurring charges.[110] Thus, Flintkote segregated out the non-recurring expenses to better match

---

[107] *See* Plan Proponents' Post-Trial Brief in Support of Confirmation of the Amended Joint Plan of Reorganization in Respect of the Flintkote Company and Flintkote Mines Limited, Doc. No. 6442, at 15. "EBIT" are earnings before income taxes are deducted. "EBITN" are earnings before both income taxes and non-recurring items are deducted.

[108] Accounting Standards Codification Topic 280 (ASC-280) is a recognized methodology for breaking down larger businesses into segments. Hr'g Tr. 50:18-20, Sept. 13, 2011 (Gary). ASC-280 provides management with discretion in presenting the most meaningful measure of profit of a particular segment by excluding certain expenses such as income taxes, expenses not allocated to the particular segment, and various non-recurring charges. *Id.* at 50:18-25 - 51:1-15.

[109] Staff Accounting Bulletin Topic 1-B (SAB Topic 1-B) is a cost allocation guidance issued by the SEC which acknowledges that cost allocation is "often necessary to present a business on a carve-out basis." Hr'g Tr. 52:3-5, Sept. 13, 2011 (Gary). SAB Topic 1-B specifies that whenever possible, expenses should be specifically identified and tracked to a business. *Id.* at 52:10-13. When it is not possible to specifically identify expenses, a reasonable allocation method should be used. *Id.*, at 53:23-25.

[110] *See* Hr'g Tr. 88:19-20, Sept. 13, 2011 (Gary).

the recurring expenses with the recurring income.[111]  This information is summarized in the

"EBITN" line on the chart.  By the end of Year 2, post-effective date, Flintkote will have

acquired all of its real estate and will have incurred all acquisition-related expenses.[112]  Thus, in

Mr. Gary's opinion, "[t]he most predictive year is year three of the pro formas, because by that

time the properties are acquired . . . [A]t that point, you've held all of your properties and you're

now receiving 12 months of rent for each of them, for the full year."[113]  Mr. Gary testified that

the future projections in the pro formas are tied to the historical results of the P&L, adding

reliability and accuracy to the projections.[114]

    In accordance with ASC-280, Flintkote presented its real estate business earnings before

income taxes, non-recurring costs, and reorganization-related expenses.  Mr. Gary testified that

excluding income taxes from the profitability presentation was reasonable because: (1) including

income taxes is not a common practice in segment accounting, (2) Flintkote had no income taxes

to allocate because it did not pay income tax for any of the years comprising the historical

period, 2008-2010, (3) without historical income taxes any allocation of future income taxes

would be hypothetical and speculative, creating more inaccuracy and uncertainty in the

schedules.[115]

    With respect to non-recurring, start-up costs, Mr. Gary testified that, for accounting

purposes, those expenses must be recognized immediately rather than amortized over time.[116]

---

[111] *See* Hr'g Tr. 65:1-7, Sept. 12, 2011 (Oliver).
[112] *Id.* at 66:7-16, Sept. 12, 2011 (Oliver); Hr'g Tr. 238:2-5 (Gordon); *id.*, at 232:20-233:6.
[113] *See* Hr'g Tr. 92:9-11, Sept. 13, 2011 (Gary).
[114] *Id.* at 61:19-22.
[115] Hr'g Tr. 76:10-77:15, Sept. 13, 2011 (Gary).
[116] *Id.* at 59:13-18.

Non-recurring costs are comprised of expenses incurred prior and leading up to the acquisition of a property which would not be incurred after the property is acquired.[117] These include legal fees associated with closing on properties, due diligence costs, third party costs in evaluating properties, and other time and expenses incurred in acquiring the property.[118] Recognizing large acquisition costs entirely in the years they are incurred leads to historical profitability results that will not be indicative of future performance.[119]

Similarly, we agree with Mr. Gary that reorganization-related costs, such as legal fees incurred in connection with motions to purchase real estate, should not be included in the presentation of future real estate business earnings. Post-confirmation, Flintkote will not be required to incur these expenses, and therefore their exclusion from the presentation of earnings creates a more accurate picture of what the true expenses of the business will be going forward.[120] Flintkote points out that ITCAN's expert, Craig Casey, conceded that a large portion of Flintkote's reorganization expenses are driven by Flintkote's having to respond to ITCAN's objections to confirmation.[121] Therefore, the Plan Proponents argue that ITCAN should be precluded from objecting to Flintkote's exclusion of these expenses from its presentation of real estate earnings. While we do not preclude the objection, we find it to lack merit in the circumstances of this case.

The significant recurring costs for the real estate business are compensation, travel, and

---

[117] Hr'g Tr. 64:11-14, Sept. 12, 2011 (Oliver).
[118] *Id.* at 64:14-17.
[119] Hr'g Tr. 59:4-22, Sept. 13, 2011 (Gary).
[120] Hr'g Tr. 90:23-92:17, Sept. 12, 2011 (Oliver).
[121] Hr'g Tr. 31:6-13, Sept. 19, 2011 (Casey) ("[T]here is a reality that [the estimate of Flintkote's legal fees], in part, could be driven by ITCAN and constantly objecting and driving up that cost in a way that was maybe . . . that would greatly impact that number. So, I didn't want it to be a circular reference in the analysis.").

administrative costs such as rent, directors and officers' insurance ("D&O insurance"), and the

costs of support staff.  As for the compensation and administrative costs, Flintkote allocated

them by dividing the number of workdays Mr. Gordon spent conducting real estate business by

the number of total available workdays.[122]  Mr. Gordon's time is the most appropriate benchmark

for this allocation because Mr. Gordon conducts nearly all of Flintkote's real estate activity

himself with the help of outside professionals, and requires "very little" from Flintkote's other

employees or support staff.[123]  Mr. Gordon's time spent on real estate business was estimated

using a half-day convention, so as to conservatively overestimate the time spent on days where

Mr. Gordon might only attend one, single hour meeting related to real estate.[124]  Flintkote also

estimated that Mr. Gordon spent roughly twelve hours of time in-office per each real estate

transaction.[125]  Mr. Gary testified that a half-day convention was a reasonable way to allocate

Mr. Gordon's time given that Mr. Gordon did not keep track of his work time.[126]  Mr. Gordon

spent fifty-six total work days conducting real estate business.  Divided by the total amount of

available workdays in the three-year historical period, this amounts to 8.3% of Mr. Gordon's

time.[127]  The D&O insurance was allocated to real estate in a share proportionate to Mr.

Gordon's compensation for the amount of insurance premium related to him.[128]  Rent was

allocated by taking a portion of Mr. Gordon's office space, without including any common areas

---

[122] Hr'g Tr. 63:4-6, Sept. 13, 2011 (Gary).
[123] Hr'g Tr. 199:20-200:11, Sept. 12, 2011 (Gordon).
[124] Hr'g Tr. 69:21-70:7, Sept. 12, 2011 (Oliver).
[125] *Id.* at 73:23-74:9.
[126] Hr'g Tr. 80:12-19, Sept. 13, 2011 (Gary).
[127] Hr'g Tr. 75:3-9, Sept. 12, 2011 (Oliver).
[128] *Id.* at 85:14-16.

such as the kitchen, and pro-rating by the rent and by his time spent on real estate.[129]  The costs

of support staff were allocated based on an estimation of the staff's time spent assisting Mr.

Gordon, which was then allocated to Mr. Gordon's time spent conducting real estate business.[130]

       The other significant recurring cost is Mr. Gordon's travel expense.  Local travel

expenses, such as lodging, meals, and rental cars, were specifically identified by reviewing Mr.

Gordon's credit card bills and other receipts, then allocated in proportion to the amount of real

estate business conducted on that particular trip.[131]  Because Mr. Gordon often visited several

cities for various business purposes in the course of one trip, transcontinental airfare was

allocated according to the "primary purpose" of the trip.  This meant that if the primary purpose

of a trans-continental flight was to conduct real estate business, the costs of such flight would be

allocated to the real estate segment of the business.[132]  If, on the other hand, the primary purpose

of a particular trip was to do something other than conduct real estate business, then the

transcontinental airfare would not be allocated to the real estate segment.[133]  If, during the course

of a trip to the east coast, Mr. Gordon made stops in other cities, the cost of those additional

flights would be allocated to real estate to the extent that the purpose of that incremental trip was

to conduct real estate business.[134]  Mr. Gary testified that the manner in which Flintkote allocated

its operating costs to the real estate segment of its business was reasonable in light of SAB Topic

1-B.[135]

---

[129] *Id.* at 85:18-20.
[130] *Id.* at 85: 20-25; 86:6-18.
[131] *Id.* at 78:6-9.
[132] *Id.* at 75:23; 76:4-12.
[133] *Id.* at 78:19-21.
[134] *Id.* at 78:19-79:2
[135] Hr'g Tr. 63:13-16, Sept. 13, 2011 (Gary).

Based on the evidence presented by the Plan Proponents, the bottom line for Flintkote is that, assuming it is able to acquire seven additional properties, Flintkote's real estate business will generate rental income in excess of $1.3 million in the third year, post-effective date. Flintkote will earn $1.071 million in both annual EBIT and annual EBITN in the third year, post-effective date and beyond, as none of Flintkote's triple-net leases expire before 2023.[136]  The properties currently held by Flintkote are all leased to successful quick-service restaurant operators such as McDonald's USA and Carrols Corporation,[137] and all tenants as of the date of trial have timely performed on all lease obligations.[138]  In Mr. Gary's opinion, the pro formas represent a "fair and consistent" presentation of the profitability of Flintkote's real estate business because the earnings components and the underlying accounting and allocation methods are consistent between the P&L and the pro formas.[139]

### ITCAN's Objections Regarding Profitability

ITCAN objects that the Plan is not feasible under § 1129(a)(11), and does not qualify under the going concern requirement of Section 524(g) because Flintkote's businesses, when viewed as a whole, show that Flintkote is not a profitable company.  ITCAN also maintains that even when the real estate business is considered alone, that segment of Flintkote's business is not currently and will never be profitable, and thus the Plan remains infeasible.

Section 1129(a)(11) states that a plan can be confirmed, *inter alia*, when confirmation "is

---

[136] *See* Debtors' Motion for Order Pursuant to 11 U.S.C. § 363 Authorizing Purchase and Leaseback of Real Property Parcels in Raleigh, NC, Akron, OH, and Wooster, OH, Doc. No. 3363, ¶ 20; Hr'g Tr. 133:20, Oct. 25, 2010 (Gordon); *id.*, at 135:20-21; *id.* at 138:14-16.

[137] *See supra* note 23.

[138] *See* Declaration of David J. Gordon in Support of Debtors' Motion for an Order Pursuant to 11 U.S.C. § 363 Authorizing Purchase and Leaseback of Real Property in Jacksonville, FL, Doc. No. 5974-5, ¶ 2.

[139] Hr'g Tr. 68:24-69:12, Sept. 13, 2011 (Gary).

not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ."  § 1129(a)(11).  The debtor must prove the feasibility of its plan by a preponderance of the evidence.  *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012). The bankruptcy court must make a specific finding that the plan is feasible, and, in doing so, it "need not require a guarantee of success, but rather only must find that 'the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success.'" *Id.* (quoting *Corestates Bank, N.A. v. United Chem. Techs. Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996)).  Factors to be considered by the bankruptcy court in making a finding of feasibility include "assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management." *Id.* at 115.  "Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity." *Id.*

ITCAN objects that Flintkote did not provide any evidence of profitability as to any of its business lines other than the real estate business, and that if all of Flintkote's businesses are considered, the company as a whole is not profitable.  ITCAN maintains that "to understand and assess the viability of Flintkote, a reasonably prudent investor would want to understand *all* costs associated with the business – in other words, to understand a slice of the pie, one needs to understand the whole pie."[140]  ITCAN points out that Flintkote's general ledger evidences $16 million in expenses incurred during the years 2008, 2009, and 2010, not including expenses

---

[140] *See* Brief of Imperial Tobacco Canada Limited in Opposition to Confirmation of the Amended Joint Plan of Reorganization (As Modified November 16, 2011) In Respect of the Flintkote Company and Flintkote Mines Limited, Doc. No. 6441, at 20 (emphasis in original).

related to Flintkote's reorganization.[141]  ITCAN argues that Flintkote cannot be a profitable

company if it has spent $16 million while the real estate business earned only $860,000 in

revenue.

Flintkote argues that it is misleading to compare company-wide expenses to revenue

solely from the real estate business, because a large portion of that $16 million in expenses has

produced over $175 million in insurance recoveries during the same three year period.[142]  We

agree.  In making its comparison, ITCAN also fails to account for the approximately $600,000

Flintkote earned from Plant during this three year period for consulting and executive

management services.[143]  Furthermore, ITCAN has cited no cases supporting the application of

the "reasonably prudent investor" standard in the § 1129 context of determining the future

earning capacity of a particular debtor or the businesses it chooses to pursue.  Even if the

standard were appropriate, as Flintkote points out, the "reasonably prudent investors" in this case

are the representatives of the Trust, including the FCR, and they approve of Flintkote's business

activities and support the Plan.

Moreover, in reopening the record, the Court did not require Flintkote to provide

financial information on every aspect of its company.  Rather, the record was reopened on

---

[141] *See* Trial Demonstratives of Craig P. Casey, Sept. 13, 2011, at 10.

[142] *See* Orders approving various insurance settlements at Doc. No. 3000, filed Jan. 25, 2008 (approving $500,000 settlement); Doc. No. 3062, filed Feb. 25, 2008 (approving $7,291,550 settlement); Doc. No. 3156, filed Mar. 18, 2008 (approving $5,371,673 settlement); Doc. No. 3371, filed June 18, 2008 (approving $613,575.08 settlement); Doc. No. 3504, filed July 28, 2008 (approving $429,357.11 settlement); Doc. No. 4052, filed Feb. 23, 2009 (approving settlement with initial payment of $1,880,752.61); Doc. No. 4053, filed Feb. 23, 2009 (approving settlement with initial payment of $3,152,029.95); Doc. No. 4545, filed Sept. 24, 2009 (approving $11 million settlement); Doc. No. 5173, filed July 14, 2010 (approving $150 million settlement); and Doc. No. 5274, filed Aug. 31, 2010 (approving settlement for CAN $3,796,723).

[143] Hr'g Tr. 158:6-13, Oct. 25, 2010 (Gordon).

January 7, 2011, "for the limited purpose of allowing (a) the Plan Proponents to introduce

evidence relating to the profitability or loss of the Debtors' real property management business."

*See* Order Reopening Record on Confirmation and Setting Deadlines Related Thereto, Doc. No.

5602.  We limited the reopening of the record to the real estate business because, at the time, the

Court viewed this as Flintkote's only business line that could satisfy an "ongoing business"

requirement within § 524(g)(2)(B)(i)(II).[144]  The Court did not request additional evidence on the

profitability or loss as to any other aspect of Flintkote's businesses, and thus the Plan Proponents

provided what was required.

ITCAN next argues that the Plan is not feasible because Flintkote relies too heavily on

the Trust for the funding of its businesses.  Under the Trust Services Agreement, the Trust is

obligated to pay "Reorganized Flintkote's expenditures relating to its performance of the

Flintkote Services (including the allocable portion of Flintkote's general overhead attributable to

the Flintkote Services compared to Flintkote's other business activities)" for an initial period of

eighteen months, subject to automatic renewal.[145]  "Flintkote Services" refers to "[t]he Start Up

Claims Processing Services, the Claims Processing Services, and the Administrative Services

---

[144] We opined at the confirmation hearing on October 26, 2010, that the consulting and executive management services business could also potentially satisfy *Combustion Engineering's* purported "ongoing business" requirement, but for the fact that, at the time, Flintkote was no longer being paid by Plant for its services.  *See* Hr'g Tr. 109:10-17, Oct. 26, 2010 (J. Fitzgerald).  As of this writing, Flintkote's contract with Plant to provide consulting and executive management services has been renegotiated and approved by Plant's bankruptcy court. *See In re Plant Insulation Co.*, Case No. 09-31347-TC (Bankr. N.D. Cal. Feb. 11, 2011), Order Granting Debtor's Motion for Order Authorizing the Debtor to Assume Executive Agreement with the Flintkote Company, Doc. No. 1012.  The confirmation order in *Plant* was recently affirmed by the U.S. District Court for the Northern District of California.  *See* Civil Case No. 3:12-cv-01887-RS, Doc. No. 110 (N.D. Cal. Oct. 9, 2012).  Thus, it, too, satisfies the business continuity criterion.

[145] *See* Trust Services Agreement, Doc. No. 5317, Ex. A, at § 4.1, 6.1.

provided by Reorganized Flintkote to the Trust."[146]  The Trust will also fund all DRL-related expenses.[147]

In *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), the court held that the debtor failed to prove its plan was feasible due to insufficient business prospects post-confirmation. *Quigley*, 437 B.R. at 143.  Quigley's only business was providing claims processing services, which Quigley performed for its parent company, Pfizer, under a five year agreement.  *Id.*, at 121-22.  The plan also provided that Quigley would perform claims processing services for the post-confirmation trust.  *Id.*  The court credited testimony at trial indicating that it was unlikely that Quigley would be able to attract any new clients for its claims processing business and thus, once its contract with Pfizer terminated, it would have insufficient business to continue operating.  *Id.*, at 142-43.  ITCAN argues that the instant case is very similar to *Quigley*, because Flintkote's businesses are "merely services to be provided to a post-confirmation trust pursuant to a time-delimited contract."[148]

As the Plan Proponents point out, however, there are crucial differences between Quigley's post-confirmation business and that of Flintkote.  The most obvious difference is that Flintkote has substantially more business operations and opportunities than Quigley, which only performed claims processing services.  *Quigley*, 437 B.R. at 121-22.  Flintkote will perform claims processing and trust services for the Trust.  Flintkote operates its consulting and executive management services business, and currently performs such services for a third party, Plant.  Flintkote also operates its real estate business, which currently consists of owning six

---

[146] *See Id.* at § 2.4.1
[147] *See* Plan § 4.6.
[148] Opposition Brief, at 23.

properties[149] and leasing them to third parties operating quick-service restaurants.  The latter two enterprises, the real estate business and the consulting and executive services business, are producing revenue for Flintkote.

ITCAN contends that if the Trust were to terminate the Trust Services Agreement, and Flintkote were forced to cover its own administrative costs and overhead, Flintkote could never be profitable.  However, the Court finds there is no evidence to suggest that the Trust will terminate the Trust Services Agreement.  The Court credits the testimony of Mr. McMonagle, the FCR, that Flintkote's employees are experienced in processing claims and performing various other administrative functions and as such the employees will provide valuable services to the Trust.[150]  Mr. McMonagle testified that he could see no reason why the Trust would terminate the Trust Services Agreement so long as Flintkote performed adequately.[151]  In any event, the Court credits the testimony that, even if the Trust Services Agreement were terminated and Flintkote could no longer provide trust services and claims processing for the Trust, Flintkote will be able to scale back its operations accordingly in order to keep its real estate business profitable.[152]

**The P&L and Pro Forma Schedules**

As to the real estate business itself, ITCAN disputes Flintkote's presentation of profitability, arguing that the historical P&L is flawed which renders the pro forma projections flawed and inaccurate.

ITCAN contends first that Flintkote's presentation of profitability does not comport with

---

[149] *See supra*, note 24.
[150] Hr'g Tr. 62:2-24; 63:7-20; 64:6-17, Oct. 26, 2010 (McMonagle).
[151] *Id.* at 64:20-25.
[152] Hr'g Tr. 237:5-8, Sept. 12, 2011 (Gordon).

any recognized financial methodology.  ITCAN's expert, Craig P. Casey, testified that in his

opinion, Mr. Gary selectively applied portions of ASC-280 and SAB Topic 1-B in order to show

that the real estate business makes a profit.[153]  First, to the extent that ITCAN contends that

Flintkote's presentation does not technically comply with ASC-280 or SAB Topic 1-B because

Flintkote did not present financial information for all of its business lines, we note again that the

record was reopened to examine the real estate business.  Furthermore, Mr. Gary admitted that

ASC-280 was not applied in its entirety because doing so would have cost considerable time and

expense, would have been outside the scope of the Court's order, and would not "add any light

to the assessment of the real estate performance."[154]  The District Court for the District of

Delaware recently held that "neither the Code nor federal caselaw require [sic] [a debtor] to

submit any specific documents proving the Plan's feasibility."  *In re W.R. Grace*, 475 B.R. 34,

117 (D. Del. 2012).  Thus, despite the fact that Flintkote did not provide complete company-wide

financial statements in full accordance with U.S. GAAP, the Court finds Flintkote's presentation

of the profitability of its real estate business to have substantiated the fact that Flintkote will

have ongoing business operations sufficient to satisfy § 1141(d)(3) and § 524(g).

Next, ITCAN contends that even when only the real estate business is considered,

Flintkote severely understated or omitted real estate-related expenses attributable to that segment

of its business in an effort to show a profit.  Mr. Casey calculated that the minimum quantifiable

amount of these errors and omissions for the historical period is $484,000, which when

compared to Flintkote's reported net profit in that period of roughly $86,000, makes Flintkote

---

[153] Hr'g Tr. 227:10-13, Sept. 13, 2011 (Casey).
[154] Hr'g Tr. 65:6-25; 70:22-71:14, Sept. 13, 2011 (Gary).

unprofitable during the historical period.[155]

The Court notes that nearly 70% of the $484,000 identified by Mr. Casey as the "minimum quantifiable errors" relate to legal fees associated with seeking Court approval for real estate purchases and fees associated with the creation of the Court-ordered business plan.[156] As far as those fees are concerned, the Court finds them immaterial to whether Flintkote's real estate business will be profitable post-confirmation. Upon Flintkote's emergence from bankruptcy, Flintkote will not be required to incur costs of preparing motions to approve the purchase of real estate or of responding to ITCAN's objections. Similarly, the costs related to the creation of the business plan will not be recurring. ITCAN's expert, Mr. Casey, admitted that ITCAN itself was driving most of the legal fees incurred in connection with the real estate business.[157] Thus, the Court finds that both the legal fees and the fees associated with the creation of the business plan are Chapter 11-related expenses. As such, the Court finds it was reasonable for Flintkote to exclude them as they are not indicative of what the normal cost of operations for the real estate business will be going forward.

ITCAN also objects to Flintkote's omission of federal income taxes from its presentation of earnings. Mr. Casey contends that $34,000 in income tax expenses should have been allocated to the real estate business over the historical period.[158] However, the Court credits the testimony of Mr. Gary that under ASC-280, the preferred method is to present earnings before taxes.[159] Moreover, Flintkote did not pay federal income taxes during the historical period

---

[155] *Id.* at 214:9-23.
[156] Hr'g Tr. 26:15-27:3, Sept. 19, 2011 (Casey).
[157] *Id.* at 31:6-13.
[158] Hr'g Tr. 16:20-17:5, Sept. 19, 2011 (Casey).
[159] Hr'g Tr. 132:23-133:5, Sept. 19, 2011 (Gary).

covered by the P&L, 2008 through 2010, and as such there are no income taxes to allocate to the real estate business in that period.[160]  With no historical income taxes to allocate, Mr. Gary testified that to include hypothetical income tax expenses based on assumptions regarding Flintkote's tax structure and surviving tax attributes in the pro formas would increase the risk of inaccurate or misleading pro forma projections.[161]  Without including federal income taxes, Mr. Gary opined that it would be inconsistent and would not be helpful in presenting the profitability of the real estate business to include the state income taxes and the franchise taxes that Flintkote paid during these bankruptcy cases.[162]  Furthermore, presenting the taxes paid during the historical period would not be meaningful because they were based on Flintkote's property acquisitions, which will cease after year 3, post-effective date.  The Court recognizes that going forward, Flintkote may be required to pay taxes of some sort.  However, the Court credits the testimony of Mr. Gary that the extent of Flintkote's future tax liability is highly speculative.  As such we overrule the confirmation objection based on the omission of federal income taxes from Flintkote's presentation of earnings.

Next, ITCAN contends that Flintkote understated Mr. Gordon's time (and thus, his compensation) spent working on real estate matters in order to allocate a smaller portion of his salary to the real estate business. The Plan Proponents concede that Mr. Gordon's time is the primary driver of expenses for the real estate business.  As noted above, Flintkote allocated 8.3%

---

[160] Hr'g Tr. 76:16-19, Sept. 13, 2011 (Gary); Hr'g Tr. 93:4-5, Sept. 12, 2011 (Oliver).

[161] Hr'g Tr. 77:3-15, Sept. 13, 2011 (Gary) ("[T]here are a variety of things you need to determine in order to present a meaningful estimate of taxes: the tax structure, the tax attributes that survive, that carry with the real estate company.  A tax structure could yield a rate . . . anywhere from zero to 40 percent . . . When I'm looking at a spectrum that wide and I don't have a basis for a point that's more likely than not, I'd rather disclose the fact that it's not presented.").

[162] Gary Rebuttal Report, at 12-13.

of Mr. Gordon's compensation to the real estate business based on Mr. Gordon's estimation that he utilized 56 work days for it during the historical period.  ITCAN contends that Mr. Gordon had no basis for making any allocation and in fact spent much more time than he allotted.  As evidence ITCAN points to Mr. Gordon's testimony in 2010, during which he stated that "I don't keep track of time.  I know that I spent a significant amount of time developing the portfolio that exists today."[163]  Mr. Gordon testified further that "[t]he only thing I can say intelligently is that it took a tremendous amount of time.  I do a lot.  I have a lot of responsibilities, and it's all mixed up together.  So I think it would be almost impossible for me to sort of segregate out the time that I spent on real estate as distinguished from other things."[164]  Upon reviewing Flintkote's contemporaneous records, Mr. Casey identified 310 days, in addition to those identified by Mr. Oliver, during the historical period where Mr. Gordon had phone calls or emails relating to real estate.[165]  For reasons that follow, the Court overrules any objection as to the allocation of Mr. Gordon's time or compensation.

The court finds that Flintkote reasonably allocated Mr. Gordon's time.  Because it was impossible, as Mr. Gordon testified, to account for every moment Mr. Gordon spent on real estate matters while traveling, Flintkote established a minimum one-half day increment for allocation purposes.  The one-half day increment was specifically chosen to over-allocate Mr. Gordon's time to real estate business on days in which he might have a single, hour-long meeting related to real estate.[166]  We credit Mr. Gary's testimony that the half-day convention is

---

[163] Gordon Depo. Tr. 107:3-6, Aug. 11, 2010.
[164] *Id.* at 107:19-24.
[165] Hr'g Tr. 35:11-24, Sept. 19, 2011 (Casey).
[166] Hr'g Tr. 69:25-70:7, Sept. 12, 2011 (Oliver).

"more specific than what's typically used" and "very likely to produce a reasonable result."[167]  In terms of in-office time, Mr. Oliver allocated twelve hours for each real estate closing[168] due to the fact that "there was little way to know what fractions of hours were spent at any point in time."[169]  We credit Mr. Gary's testimony that the twelve hour estimate "is in the middle of the fairway.  You know, some of [the real estate closings] may have taken a little longer; some of them may have taken a little less time.  I couldn't think of a more reasonable estimate."[170]  Furthermore, Mr. Gary testified that estimating time spent on real estate based on reviewing email correspondence is "very unlikely to produce an accurate result if you apply a formula to it," because there is no way to estimate with any degree of accuracy how much time Mr. Gordon spent on each email.[171]  Mr. Casey's adjustments to Flintkote's compensation allocation resulted in a $57,000 increase during the historical period and $125,000 increase over the pro forma period.[172]

Even if the allocation of Mr. Gordon's compensation to real estate is understated to some degree, which, assuming arguendo is the case, the Court finds that given that Flintkote's projected earnings from Year 3 of the pro forma period and beyond exceed $1 million, Mr. Casey's adjustments do not substantially alter the picture of profitability for Flintkote.[173]

---

[167] Hr'g Tr. 80:12-19, Sept. 13, 2011 (Gary).
[168] Hr'g Tr. 74:7-9, Sept. 12, 2011 (Oliver).
[169] *Id.* at 73:25-74:1.
[170] Hr'g Tr. 81:12-15, Sept. 13, 2011 (Gary).
[171] *Id.* at 81:22-82:12.
[172] *Id.* at 243:21-24 (Casey).
[173] ITCAN argues that when Mr. Gordon's compensation allocation is adjusted upward, so too must be the allocation of administrative and other overhead expenses, because those allocations are driven by Mr. Gordon's time.  Mr. Casey included an extra $24,000 in Flintkote's allocation of administrative and other overhead expenses to the real estate business.  Again, the Court finds that this adjustment does not affect the Court's determination that the real estate

(continued...)

ITCAN also objects that Mr. Gordon's travel expenses incurred in connection with the real estate business have been materially understated by Flintkote.  ITCAN suggests that Flintkote made over 259 errors related to omitted or under-allocated travel expenses, including omitting altogether four specific trips during which real estate business was conducted.  Mr. Casey opined that the "minimum quantifiable impact" of these errors and omissions total close to $25,000 over the historical period and approximately $43,000 over the pro forma period.[174] The Court finds that the increased expenses relating to Mr. Gordon's travel identified by Mr. Casey are the result of Mr. Casey employing an alternative methodology to the "primary purpose" doctrine used by Mr. Oliver.[175]  The Court credits the testimony of Daniel Gary that "when you present a reasonable methodology . . . you're typically not allowed to say my methodology is better than yours if it's reasonable."[176]  We find the "primary purpose" philosophy used by Mr. Oliver to allocate travel expenses to be reasonable, and Mr. Oliver to be credible, and thus, accept it as opposed to Mr. Casey's alternative methodology, reasonable as it may be.  As far as information regarding Mr. Gordon's trips to conduct Flintkote's real estate business, Mr. Oliver admitted that he did not account for one trip, but testified at trial that he did not miss the remaining three trips and that Mr. Casey reported them "missing" due to his utilizing a different methodology.[177]  Upon reviewing Mr. Casey's report, Mr. Oliver determined that the total amount of errors he made in the allocations net out to approximately $5,000, due to

---

        [174] ITCAN Ex. 279, at 31.
        [175] Hr'g Tr. 87:16-88:4, Sept. 13, 2011 (Gary).
        [176] Id. at 88:6-9.
        [177] Hr'g Tr. 100:19-104:23, Sept. 13, 2011 (Oliver).

over-allocating in some instances and under-allocating or omitting in others.[178]  Additionally,

Mr. Gary testified that he was comfortable that the travel expenses were accurately and

reasonably calculated based on the availability of third party documentation corroborating the

data, such as credit card receipts and travel itineraries.[179]  The parties dispute the total impact of

the errors made in allocating travel expenses.  Based on the credible evidence, the Court finds

that even if we were to credit Mr. Casey's totals of approximately $25,000 over the historical

period and approximately $43,000 over the pro forma period, these adjustments do not establish

that Flintkote has no reasonable likelihood of success post-confirmation.

Based on the evidence presented, the Court finds that the Plan is feasible under §

1129(a)(11).  Flintkote's Plan is far from "visionary or speculative."  *In re Aleris Intern., Inc.*,

2010 Bankr. LEXIS 2997, at *86 (Bankr. D. Del. 2010).  Rather, the Court finds that Flintkote

will be able to meet its primary obligations under the Plan after confirmation.  The § 524(g)

Trust will be able to operate upon the effective date, as the Trust Agreement, the TDPs, and the

Trust Services Agreement are included as exhibits to the Plan and will go into effect upon the

effective date.[180]  Upon confirmation, the Trust will be funded with reorganized Flintkote's stock

and the majority of Flintkote's funds, totaling $300 million.[181]  Flintkote will retain

approximately $37.6 million in cash, $10.7 million in real estate assets, and $300,000 in other

assets,[182] which will be sufficient to satisfy Flintkote's obligations under the Plan.

In the short term, Flintkote is obligated to pay approximately $200,000 in allowed

---

[178] *Id.* at 104:20-106:17.
[179] Hr'g Tr. 72:3-16, Sept. 13, 2011 (Gary).
[180] *See* Doc. No. 2721, Ex. A; Doc. No. 4330; and Doc. No. 5317, Attachment 1.
[181] *See* Plan § 9.2.2; Hr'g Tr. 219:24-220:2, Sept. 12, 2011 (Gordon).
[182] Hr'g Tr. 220:4-7, Sept. 12, 2011 (Gordon).

general unsecured claims.  *See* Confirmation Ex. 74.  Flintkote is also reserving $5.5 million

from the $37.6 million in cash it will retain to pay costs such as professional fees, reorganization

bonuses, environmental settlements, and deferred retention payments.  *Id.*  Another $6 million

will be reserved for any potential environmental liability that may remain unresolved upon the

effective date.  *Id.*  The $37.6 million retained by Flintkote will be more than sufficient to cover

these short-term Plan obligations.

With respect to long term obligations under the Plan, Flintkote must perform under the

Trust Services Agreement and its employment contracts.  We find that it will be able to do so.

There is no evidence that the Trust will terminate the Trust Services Agreement.  We credit the

testimony of the FCR that there is no reason that the Trust would not continue to use Flintkote

for its claims processing as long as it performed well.[183]  Mr. McMonagle testified that Flintkote

not only has the ability to process the claims, which it has been doing for "a long period of

time," but also has crucial information regarding claims history and corporate history, which

allows for a more efficient processing of claims than could be accomplished by a third-party

lacking such knowledge.[184]  Under the Trust Services Agreement, the Trust will be obligated to

pay Flintkote's expenses related to the services Flintkote performs for the Trust, including

covering a portion of Flintkote's overhead allocable to the services Flintkote will perform for the

Trust, for a period of 18 months subject to automatic renewal.[185]

The Trust is also obligated to fund the DRL, for which it will receive 98% of any net

recovery.  Furthermore, Flintkote has established that its real estate business will produce a

---

[183] Hr'g Tr. 62:2-24, 63:7-20; 64:6-17, Oct. 26, 2010 (McMonagle).
[184] *Id*. at 62:2-16.
[185] *See* Trust Services Agreement, Doc. No. 5317, Attachment 1 §§ 4.1, 6.1

steady stream of income post-confirmation.  Thus, the Court finds that Plan confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization" of Flintkote.  § 1129(a)(11).

ITCAN has attempted to show that Flintkote's picture of historical profitability is less than accurate and, as a result, Flintkote's future projections based on the same historical data must necessarily be inaccurate as well.  The Court agrees that errors were made and that Flintkote's historical data, upon which it makes its projections, are not 100% accurate.  However, these inaccuracies are not dispositive of the issue of the probability of Flintkote's future success or likelihood of the need for further reorganization or liquidation.  Flintkote is not required to definitively prove that its newly initiated real estate business has been profitable in the past.  Historical profitability is certainly relevant to whether there can be a "reasonable expectation of success" from a "workable scheme of organization,"[186] but in this case, the historical profits are hampered by massive start-up costs and reorganization-related costs that will not be incurred in the future.  Several courts have discounted results of past performance in similar circumstances.[187]  We agree that Flintkote's start-up costs and reorganization related

---

[186] *In re Duval Manor Assocs.*, 191 B.R. 622, 632 (Bankr. E.D. Pa. 1996).

[187] The Plan Proponents cite, among others, *In re Schoeneberg*, 156 B.R. 963, 974 (Bankr. W.D. Tex. 1993) ("[t]he Court is not bound to blindly look at past performance without taking into consideration the reasons for that past performance."); *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts.* (*In re Sea Garden Motel & Apts.*), 195 B.R. 294, 305 (D.N.J. 1996) (rejecting "past performance as the sole reliable criterion of . . . future performance."); *In re Duval Assocs.*, 191 B.R. at 632 (overruling objections based on past performance where debtor explained reasons for enhanced profitability and objecting creditor had not rebutted debtor's anticipated rent revenue); *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 428-30 (Bankr. W.D. Mo. 2009) (finding plan feasible despite debtor missing its projections in the previous quarter because the debtor had "shown progress"); and *In re Gilbertson Rests. LLC,* 2005 Bankr. LEXIS 554, at *9-11, *18-19 (Bankr. N.D. Iowa 2005) (finding plan funded by debtor's income from operating Burger King restaurants feasible despite the debtor's failure to meet projections

(continued...)

expenses carry little probative value, and find that, going forward, the real estate business has a reasonable probability of success. Flintkote's real estate assets as of the date of trial consisted of six fast-food restaurant properties, all of which are under triple-net leases until at least 2023. All six tenants involved in these properties have major market shares in the fast-food industry and have been current on their rent throughout the life of the leases. As of trial, Flintkote's business plan included spending an additional $10 million on seven more properties as to which it will negotiate similar long-term, triple-net leases on the additional properties. Thus, we find that Flintkote's total real estate holdings will provide a stable source of income. The Court finds that Flintkote will be able to execute this aspect of its plan. Flintkote's CEO David Gordon has extensive experience in the fast-food industry and the Court finds that he will be able to secure appropriate tenants for Flintkote. The Court finds it is reasonable that Flintkote will continue to successfully manage its current properties, to make informed decisions as to which locations to purchase, to execute those purchases, and to successfully manage the properties post-acquisition.

*Conclusion*

All objections not addressed herein having been previously resolved, and the Court finding no merit to those addressed herein, the Court will confirm the Plan, issue the § 524(g) injunction, and recommend that the District Court affirm the confirmation of the Plan and the § 524(g) injunction. Additional uncontested Findings of Fact and Conclusions of Law and an Order Confirming the Amended Joint Plan of Reorganization will be separately issued.

---

[187](...continued)
because debtor's sales were increasing, Burger Kings were generally doing well, and debtor's fixed costs were expected to stabilize).

DATE: <u>December 21, 2012</u>

Judge Judith K. Fitzgerald      **fjg**
United States Bankruptcy Judge